

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

SHAWN C. NORTHRUP,      :

        Plaintiff,    :

                       :

    v.                 :  Case No:
                       :  3:12-cv-01544-JJH
                       :  Judge Helmick

CITY OF TOLEDO, et al.,  :

        Defendants.   :

- - -

Deposition of **OFFICER DAVID BRIGHT**, a Defendant herein, called by the Plaintiff as upon Cross Examination pursuant to the Federal Rules of Civil Procedure, taken before Vicki L. Plant, Court Reporter and Notary Public in and for the State of Ohio, at the offices of Lydy & Moan Ltd., 4930 Holland-Sylvania Road, Sylvania, Ohio, on Friday, September 27, 2013, commencing at 1:00 p.m.

- - -



SeaGate

Reporting Service, Inc.

405 Madison Avenue, Suite 900  ~  Toledo, OH 43604

Phone: 419-241-2070    Toll Free: 888-419-2070    Fax: 419-241-4718    Web: www.seagatereporting.com

2

INDEX

Deposition of **OFFICER DAVID BRIGHT:**

                                                        Page/Line

CROSS EXAMINATION By MR. ELLIS.............    3    15
DIRECT EXAMINATION By MR. MADIGAN..........   54     3
RECROSS EXAMINATION By MR. ELLIS...........   56     9
REDIRECT EXAMINATION By MR. MADIGAN........   57    23
RECROSS EXAMINATION By MR. ELLIS...........   58    20

- - -

EXHIBITS

                                                        Page/Line

PLAINTIFF'S EXHIBIT 2 MARKED...............    6    18
PLAINTIFF'S EXHIBIT 1 MARKED...............   33    20
PLAINTIFF'S EXHIBITS 3, 4, 5 MARKED........   95    12

- - -

OBJECTIONS

    Entered by                                  Page/Line

MR. MADIGAN................................   42    15
MR. ELLIS..................................   58     4

- - -

3

```
1        APPEARANCES:

2
         On behalf of the Plaintiff:
3
         LYDY & MOAN LTD.:
4        Daniel T. Ellis
         4930 Holland-Sylvania Road
5        Sylvania, Ohio  43560   419-517-7741

6        On behalf of the Defendants:

7        CITY OF TOLEDO DEPARTMENT OF LAW:
         John T. Madigan
8        One Government Center, Suite 2250
         Toledo, Ohio  43604   419-245-1020
9
         Also Present:  Shawn Northrup
10                      Sergeant Daniel Ray

11                         -  -  -

12              OFFICER DAVID BRIGHT,

13   being first duly sworn, as hereinafter certified,

14   testified and said as follows:

15                   CROSS EXAMINATION

16   BY MR. ELLIS:

17   Q    Could you please identify yourself.

18   A    I'm Officer David Bright.

19   Q    My name is Dan Ellis, and I'm the attorney for

20        Shawn Northrup.  You understand this deposition is

21        an opportunity to explain the facts given rise to

22        this lawsuit, correct?

23   A    That is correct.

24   Q    Have you ever had your deposition taken before?

25   A    No.
```

4

| | | |
|---|---|---|
| 1 | Q | Do you understand that everything you say in this |
| 2 | | room will be taken down by the court reporter? |
| 3 | A | I do. |
| 4 | Q | If you don't hear a question, would you say so, so |
| 5 | | I can repeat it? |
| 6 | A | Yes, sir. |
| 7 | Q | If you don't understand a question, please say so, |
| 8 | | so I can rephrase it? |
| 9 | A | Correct. |
| 10 | Q | You understand you've been given an oath to tell |
| 11 | | the truth? |
| 12 | A | Correct. |
| 13 | Q | And you should answer the questions fully, |
| 14 | | accurately, and truthfully as best you can as if |
| 15 | | you were sitting in front of a judge in a |
| 16 | | courtroom, okay? |
| 17 | A | Correct. |
| 18 | Q | If you realize at anytime that an earlier answer |
| 19 | | is incorrect, would you let me know so I can give |
| 20 | | you an opportunity to correct it? |
| 21 | A | Sure. |
| 22 | Q | If you don't know or can't remember an answer, |
| 23 | | would you just say so and give us your best |
| 24 | | recollection? |
| 25 | A | Yes. |

5

1  Q   And do you understand the instructions I've given

2      you?

3  A   I do.

4  Q   Do you have any illness that would prevent you

5      from testifying fully, truthfully, and accurately

6      today?

7  A   No, I don't.

8  Q   Are you on any medications or mood altering drugs

9      that would prevent you from testifying fully,

10     truthfully, and accurately today?

11  A  No.

12  Q  After we finish the deposition, your attorney will

13     have an opportunity to talk to you about whether

14     you want to transcribe it, so you can read it and

15     review it.  If you just decide to sign it, your

16     signature means that it's truthful and accurate as

17     best we talk about it today, okay?  Your lawyer can

18     explain that to you.

19  A  Okay.

20  Q  Can you tell me what you did to prepare for your

21     deposition today?

22  A  I've talked to the city attorney, John Madigan.

23  Q  Anything else?

24  A  Reviewed my report.

25  Q  Did you talk to anyone else?

6

| | | |
|---|---|---|
| 1 | A | Well, just Sergeant Ray. |
| 2 | Q | When you talked to Sergeant Ray, when did you talk |
| 3 | | to him? |
| 4 | A | I talked to him yesterday. |
| 5 | Q | What did you say to him? |
| 6 | A | I asked him if he was going to wear his uniform, |
| 7 | | what he was going to wear, and the conversation |
| 8 | | after that went into personal things. |
| 9 | Q | You didn't talk about this case at all? |
| 10 | A | No.  Other than what we were going to wear and |
| 11 | | where we were going. |
| 12 | Q | The documents you reviewed prior to today, was |
| 13 | | there a police report? |
| 14 | A | The one I generated on the date of the incident, |
| 15 | | yes. |
| 16 | Q | Did you bring a copy of that? |
| 17 | A | No, I didn't. |
| 18 | | (Plaintiff's Exhibit 2 marked.) |
| 19 | Q | I'm going to hand you what was previously marked |
| 20 | | at Officer Comes's deposition as Plaintiff's |
| 21 | | Exhibit 2, and ask if you can review that for a |
| 22 | | minute. |
| 23 | | MR. ELLIS:      Do you need copies, |
| 24 | | John? |
| 25 | | MR. MADIGAN:      No, I have lots of |

7

```
 1                     copies.
 2     Q     Officer Bright, I'm not asking you to read it.   I
 3           just want you to look at it and tell me is that
 4           your report.
 5     A     Yes, this is my report.
 6     Q     Is that what you reviewed yesterday?
 7     A     Yes.
 8     Q     Was there anything besides those pages that you
 9           reviewed?
10     A     There's nothing more.
11     Q     So that's the only thing you reviewed prior to
12           today?
13     A     That's the only thing I reviewed for today.
14     Q     Can you tell me your date of birth.
15     A     8-17-1972.
16     Q     And where are you registered to vote?
17     A     Well, there's a snafu.  Apparently, I was
18           originally registered to vote in the City of Toledo
19           in my precinct, which was at Elmhurst Elementary,
20           but due to a snafu at the county registration or
21           whatever, they moved me down to the EMS building.
22           So I'm trying to get that back to my original.
23     Q     Is that in Toledo?
24     A     That is in Toledo, yes.
25     Q     Can you give me your educational background.
```

8

| | | |
|---|---|---|
| 1 | A | I have received my Associates degree, and was |
| 2 | | about eight classes shy of having my Bachelors. |
| 3 | Q | What's your Associates degree in? |
| 4 | A | Law enforcement. |
| 5 | Q | Where did you get that at? |
| 6 | A | Owens Community College. |
| 7 | Q | What year did you get that? |
| 8 | A | 1999. |
| 9 | Q | Where did you continue your secondary education |
| 10 | | after that? |
| 11 | A | Lourdes University.  It was Lourdes College at the |
| 12 | | time. |
| 13 | Q | And what program of study were you in? |
| 14 | A | The criminal justice law enforcement program. |
| 15 | Q | And you said you're about seven classes shy, so |
| 16 | | you went there about a year and a half, two |
| 17 | | years? |
| 18 | A | Roughly about a year and a half. |
| 19 | Q | And did you take any education after you left |
| 20 | | there? |
| 21 | A | Updated training through the Police Department. |
| 22 | Q | Did you ever take a police officer's training |
| 23 | | course? |
| 24 | A | As far as, I'm sorry?  Like the Academy? |
| 25 | Q | Yes.  Did you go to Academy? |

9

1    A    When I was recruited, I went to the Toledo Police

2         Academy.

3    Q    How long was that?

4    A    I started the Academy October 19th of 2001,

5         graduated that April -- I think it was April 12th

6         of 2002 was the graduation date.

7    Q    Over a year?

8    A    Six months.

9    Q    Oh, okay.  When were you hired by the City?

10   A    October 19th of 2001.

11   Q    Prior to being hired October 19th, did you have

12        any other prior jobs?

13   A    I did.

14   Q    What jobs were those?

15   A    Going back from October, I was a police officer

16        with the University of Toledo from approximately

17        May 7th of 2001 to October of 2001.  And prior to

18        that, I worked for the 7-Up Bottling Company for

19        seven years.

20   Q    That would be about 1994 to 2001?

21   A    I left 7-Up in May of 2001, and I started in July

22        approximately of 1994.

23   Q    What year did you graduate from high school?

24   A    1990.

25   Q    Between high school and your job with the bottling

10

1       company, were you employed?

2    A   Yes, I was.

3    Q   What did you do?

4    A   Do you want me to go backwards from 7-Up or

5       forward?

6    Q   You can go backwards.

7    A   From 7-Up I worked at the old Churchill's in

8       Perrysburg, third shift night stock, from July of

9       that year is when I left, I began in about April of

10      '94.  Prior to that I worked for Schneider National

11      Trucking Company for -- I ended in the beginning of

12      March of '94, started there in December of '93.

13      Prior to that I worked -- it's called FedEx now,

14      but at the time it was Roadway Packaging Services,

15      from November of '93 to -- I started there in about

16      June of '93, if I'm keeping my years correct, I'm

17      trying to the best of my ability.  Prior to that I

18      worked at McDonalds in Perrysburg.

19    Q   So you started working for Roadway when you were

20      still in high school?

21    A   No, I was working at McDonalds in high school and

22      I left McDonalds when I turned 21.  And I was

23      working for Roadway Packaging Services unloading

24      trailers.

25    Q   Did you graduate in '94 from high school?

11

| | | |
|---|---|---|
| 1 | A | '90. |
| 2 | Q | What high school did you graduate from? |
| 3 | A | Maumee High School. |
| 4 | Q | Have you ever owned any businesses? |
| 5 | A | No. |
| 6 | Q | Have you ever been in the military? |
| 7 | A | No. |
| 8 | Q | Have you ever been convicted of a crime? |
| 9 | A | No -- well, if you want to call a traffic accident |
| 10 | | ticket.  I plead guilty to that because I was at |
| 11 | | fault. |
| 12 | Q | It wasn't a felony or a misdemeanor? |
| 13 | A | No. |
| 14 | Q | Can you tell me -- do you recall the incident that |
| 15 | | we're here for? |
| 16 | A | I do. |
| 17 | Q | Do you recall what police cruiser you had that |
| 18 | | day, the number? |
| 19 | A | I do believe -- I think 275, I'm not sure.  It's |
| 20 | | in the log history, my unit history log. |
| 21 | Q | Did your cruiser have video? |
| 22 | A | No, it did not.  It had a camera head, but no |
| 23 | | videotaping system. |
| 24 | Q | So it was not functioning whatever it had? |
| 25 | A | Correct. |

                                                                    12

1    Q    Can you tell me generally the manner in which you

2         communicate or get dispatched to incidents?

3    A    Via radio from our communications bureau.

4    Q    Do you normally respond?

5    A    When my unit number is called, yes, I do.

6    Q    Now, do you ever get dispatched -- what do you

7         call your mobile communication device in your

8         cruiser?

9    A    The MDT.  On a rare occasion, if the air is closed

10        for another incident.

11   Q    And they close the air, under what circumstances;

12        do you recall or do you know?

13   A    Weapons calls, people shooting, major crimes, for

14        persons going into a building, searching.  They'll

15        close the air to keep it quiet so we can search the

16        building safely.

17   Q    So when they close the air, it stops the

18        communication?

19   A    Verbal communication over the radio, yes.

20   Q    If somebody talked, would you still be able to

21        hear?

22   A    Yes.

23   Q    Do you recall being dispatched to this?

24   A    I do.

25   Q    Can you tell me how you were dispatched.

13

1   A   They called my unit number, I think the original

2       location may have been Bapst and Stillwater, man

3       carrying a gun in the open, the exact wording I

4       don't remember.  It's in the log history of the

5       call.

6   Q   Is that something you hear or is that something

7       you see?

8   A   A combination of both.  They read it over the air

9       and then you can read it also on the MDT.

10  Q   MDT, what does that stand for?

11  A   Mobile data terminal.

12  Q   That's the computer screen in your car?

13  A   That's correct.

14  Q   Do you have a telephone you use during stops?

15  A   No.

16  Q   Do you use your personal phone during stops?

17  A   No.

18  Q   You've never called anybody during a stop?

19  A   Not during a stop, no.

20  Q   When you have to document an incident, how have

21      you been trained to do so?

22  A   Document as in report writing?

23  Q   Yes, like this.  Like Exhibit 2 I assume is a

24      crime report -- let me back up for a second.

25          Under what circumstances do you create a

14

| | | |
|---|---|---|
| 1 | | report? |
| 2 | A | When a crime has been committed.  If we respond to |
| 3 | | crimes that have been committed, we generate a |
| 4 | | report.  If a person requests a report, we do a |
| 5 | | report.  And basically that's a generality of when |
| 6 | | we generate a police report.  If we take someone |
| 7 | | into custody, we do a report, an arrest report. |
| 8 | Q | You create an arrest report? |
| 9 | A | Correct. |
| 10 | Q | There's times when you stop people and never |
| 11 | | create a report? |
| 12 | A | Right. |
| 13 | Q | In those incidents as I understand it, you just |
| 14 | | give them tickets and that's the report? |
| 15 | A | For a traffic violation, such as a stop sign |
| 16 | | violation, and we would just issue a ticket and |
| 17 | | that's essentially the affidavit that would go to |
| 18 | | the court. |
| 19 | Q | So that is the police report at that point? |
| 20 | A | Correct. |
| 21 | Q | Do you create anything else besides the ticket |
| 22 | | when it goes to court? |
| 23 | A | As far as? |
| 24 | Q | When you issue a traffic ticket, is that the only |
| 25 | | thing you create? |

15

| | | |
|---|---|---|
| 1 | A | If it's just a traffic stop, yes. |
| 2 | Q | Can you tell me what your job is for the |
| 3 | | Toledo Police Department. |
| 4 | A | I work in the field operations division, which is |
| 5 | | street patrol, uniformed street patrol and in a |
| 6 | | marked unit. |
| 7 | Q | You're in a marked police cruiser? |
| 8 | A | That's correct. |
| 9 | Q | And you're dispatched wherever you go and cruise |
| 10 | | around? |
| 11 | A | Correct. |
| 12 | Q | And is that the way it's been since you were |
| 13 | | hired? |
| 14 | A | Yes. |
| 15 | Q | You've never participated in any undercover |
| 16 | | operations? |
| 17 | A | No, not directly.  Maybe assisting our vice and |
| 18 | | narcotics unit, you know, transported people that |
| 19 | | have been put under arrest for something, but |
| 20 | | directly undercover, no. |
| 21 | Q | Have you ever been disciplined during your |
| 22 | | career? |
| 23 | A | Yeah, I have. |
| 24 | Q | What type of discipline is it? |
| 25 | A | Directly for me? |

16

```
1    Q    Yes.
2    A    I was involved in two motor vehicle crashes in a
3         year, calendar year, that were both my fault.  One
4         was a counseling and one was a verbal.  And I
5         received a verbal reprimand one time for not
6         handing out a proper receipt for an ID that was
7         handed to me, and I returned to the owner of the
8         ID.
9    Q    Any other times?
10   A    No.
11   Q    So how do you normally prepare your police
12        reports?
13   A    First, I start out with gathering information that
14        I need for the report.
15   Q    You write that down somewhere?
16   A    On a notepad.  You know, generally what I get
17        is the person's name, date of birth, Social
18        Security number, address, phone number, and then
19        I go and handwrite it or type it up or use our
20        new report wide system, then I go in and generate
21        the report.
22   Q    So you write it on your notebook or piece of
23        paper, and take it to the office?
24   A    In our car.
25   Q    You can do that right in your car?
```

17

1    A    Do it in the car.

2    Q    Do you know whether you created this crime report

3         in the car?

4    A    That one was generated -- if I handwrite a report,

5         it's going to be in the car.  If I use report wide,

6         it's going to be in the car.  A typed up crime

7         report like that would be done either at the

8         Scott Park District Station or the Safety Building

9         because those computers -- either this type of

10        report is a mirror image of the ones we write on,

11        and so to get one like that, you have to log on to

12        a computer in one of the stations.

13   Q    So in this particular case, you went back to the

14        office?

15   A    Correct.

16   Q    So what did you do with the notebook or piece of

17        paper you wrote it on, that you originally wrote

18        the information on?

19   A    In this particular case, it's probably in my box

20        where I put all my other notebooks at the office.

21            MR. ELLIS:          John, can you produce

22            that to me, the written notes?

23            MR. MADIGAN:        Yes.

24   Q    Now, when you prepare a police report, do you try

25        to be accurate in recording the information?

18

```
 1    A    Yes, I do.

 2    Q    I notice on this particular one, there's like a

 3         detail typed up summary it appears.

 4    A    Correct.

 5    Q    Is that your summary?

 6    A    Correct.

 7    Q    You prepared that?

 8    A    I prepared that, yes.

 9    Q    Did you prepare that at or near the time of the

10         incident?

11    A    Right after the incident when I went back to the

12         station, and completed that police report.

13    Q    In this particular instance, you had the stop and

14         then you went directly to the police station and

15         prepared this report?

16    A    Correct.

17    Q    Is that normally how it works?

18    A    Sometimes, it just depends on the situation.

19    Q    So it's not unusual?

20    A    It's not unusual, no.

21    Q    I notice on here there's a lot of information of

22         what occurred there at the stop.  Is that from your

23         memory or is that from the notes you took?

24    A    Memory.

25    Q    So that wouldn't be something you recorded on the
```

19

| | | |
|---|---|---|
| 1 | | notes you took down? |
| 2 | A | No. |
| 3 | Q | So at the time you write this down, would you say |
| 4 | | that's your best recollection of what happened? |
| 5 | A | At the time, yes. |
| 6 | Q | Close proximity to when it happened? |
| 7 | A | Yes. |
| 8 | Q | Now, in preparing this and in preparing the |
| 9 | | detail, you're trying to be as accurate as you can, |
| 10 | | correct? |
| 11 | A | That's correct. |
| 12 | Q | And you try to be truthful? |
| 13 | A | Yes. |
| 14 | Q | So the information here would be truthful? |
| 15 | A | To the best of my recollection, yes. |
| 16 | Q | Did you take any photos that day? |
| 17 | A | No. |
| 18 | Q | Are there any particular procedures that you |
| 19 | | follow when you're dispatched to an incident with a |
| 20 | | man carrying a firearm? |
| 21 | A | Then or now? |
| 22 | Q | Then. |
| 23 | A | There was very little direction at that time. |
| 24 | Q | From the Police Department or your training? |
| 25 | A | From the Police Department, correct. |

20

1   Q    Or your training?

2   A    The training that I had was prior when I was in

3        the Academy where the city had an ordinance that

4        stated you weren't allowed to carry within the City

5        limits in a public place, which has been ruled

6        unenforceable at one time.

7   Q    When were you first aware that people could carry

8        openly -- let me rephrase that.

9             Are you aware that private citizens can

10       carry openly in Ohio?

11  A    Yes.

12  Q    And do you know when you became aware of that

13       fact?

14  A    Approximately right around the time when the laws

15       for the carry concealed weapons permits were

16       issued.  I believe 2003, if I'm not mistaken.

17       There was a time when the department came out with

18       a memo saying there were certain ordinances dealing

19       with weapons violations that were no longer

20       enforceable.

21  Q    Did you also understand at that time that a

22       private citizen could openly carry a firearm?

23  A    At that time, yes.

24  Q    And that would be about 2003?

25  A    That's correct.

21

| | | |
|---|---|---|
| 1 | Q | Now, did you have any personal procedures that you |
| 2 | | followed when you were responding to a person |
| 3 | | carrying a firearm? |
| 4 | A | Within the standard training of keeping myself |
| 5 | | safe, conducted through the training procedure at |
| 6 | | the Academy. |
| 7 | Q | What would that be? |
| 8 | A | Maintaining distance -- I'm sorry, I just lost my |
| 9 | | train of thought here, maintaining distance, |
| 10 | | weapons discipline, not only for us but for others, |
| 11 | | keep an eye on hands. |
| 12 | Q | When you say weapons discipline, what do you |
| 13 | | mean? |
| 14 | A | We're trained to maintain -- our weapons |
| 15 | | discipline and try not to be like -- really, I'm |
| 16 | | not sure what word I'm looking for to be honest |
| 17 | | with you at this time.  Discipline, if you have |
| 18 | | your gun out, where you're pointing it at because |
| 19 | | you have innocent people out there. |
| 20 | Q | And you didn't pull your firearm in this |
| 21 | | instance? |
| 22 | A | No, I didn't. |
| 23 | Q | Would you approach a situation differently if as |
| 24 | | you approached, the individual had a gun out? |
| 25 | A | Yes. |

22

| | | |
|---|---|---|
| 1 | Q | What would be different? |
| 2 | A | If the situation -- if the person was out waving a |
| 3 | | gun, my gun would be out.  I mean, in a threatening |
| 4 | | manner, my gun would be out. |
| 5 | Q | And this incident at no time did Mr. Northrup |
| 6 | | remove his firearm from his holster until directed |
| 7 | | by you to do so; is that correct? |
| 8 | A | He did not, no.  No, he did not remove it. |
| 9 | Q | That's not my question.  My question is:  It was |
| 10 | | in his holster? |
| 11 | A | Yes.  It was in his holster, he did not remove |
| 12 | | it. |
| 13 | Q | You removed it, right? |
| 14 | A | I did, yes. |
| 15 | Q | Now, have you ever received complaints from |
| 16 | | anybody? |
| 17 | A | As far as? |
| 18 | Q | The way you conducted an investigation or |
| 19 | | talked to a civilian.  Did anybody ever file a |
| 20 | | complaint? |
| 21 | A | Not to my recollection, no.  The only one was the |
| 22 | | property receipt incident. |
| 23 | Q | Can you tell me what your understanding is when a |
| 24 | | police officer can approach somebody and |
| 25 | | interrogate them? |

23

1   A   Well, my understanding is we can approach people
2       and talk to people.  And if we're under the guise
3       that somebody has committed a crime, we're allowed
4       to approach and ask certain questions that pertain
5       to that crime.
6   Q   I think my question is a little broader than that.
7       I guess what I'm asking you is:  Do you believe
8       that you can walk up to anybody on the street and
9       investigate them for a crime?
10  A   No, you can't, no.
11  Q   So as a person is walking down the street, you
12      wouldn't be permitted in your understanding to just
13      walk up and say what are you doing in this
14      neighborhood, and what are you doing walking down
15      the street; is that correct?
16  A   Just by me personally observing them, no, I don't.
17  Q   Well, I guess that begs a little bit of a question
18      here:  If you're dispatched to an area where the
19      dispatch was simply man walking down the street in
20      a neighborhood, what would you do about it?
21  A   Respond and see if I can find them, and if so --
22      because we get those kinds of calls all the time.
23      Make contact with the person, and see what they're
24      up to.
25  Q   You believe that's sufficient to stop and

24

```
 1        interrogate somebody then?
 2    A   We're not interrogating them at that time, we're
 3        just asking simple questions.
 4    Q   If he refuses to answer simple questions, what
 5        would you do?
 6    A   If that's all we had, we'd let him go.
 7    Q   Doing what you do -- does your interrogation
 8        change based on the demeanor of the individual?
 9    A   No.
10    Q   How about an individual sitting in a parking lot
11        and he's just sitting in his automobile, do you
12        believe you can approach him and ask him what he's
13        doing?
14    A   We can approach anybody, but that doesn't mean
15        they have a right to talk to us.  They don't have
16        to talk to us at all, especially if we get called
17        on people because again, we get calls all the time
18        on suspicious like people that we have to go and
19        check out.
20    Q   I think my question is a little bit broader than
21        that though.  I'm just saying that if you get a
22        call that a person is sitting over in a parking
23        lot, not doing anything, do you believe you can
24        just walk up and begin to interrogate them for a
25        crime?
```

25

```
1    A     I don't interrogate people for crimes.  I may
2          approach and explain why I'm approaching, and let
3          them know that they had gotten called on.  That's
4          how I generally handle those type of folks.
5    Q     What's your understanding of what probable cause
6          means?
7    A     Probable cause is beyond reasonable suspicion.
8    Q     Well, what does that mean, beyond reasonable
9          suspicion?
10   A     You have reasonable suspicion and probable
11         cause.
12   Q     So when you say reasonable suspicion, do you
13         mean that a crime has been committed?
14   A     Reasonable suspicion that a crime could have been
15         committed or you see activity that could be
16         criminal in nature.
17   Q     So you understand that probable cause involves
18         both a reasonable suspicion that either a crime has
19         been committed or is being committed?
20   A     Correct.
21   Q     Under those circumstances, what and how do you do
22         that?
23   A     To stop and investigate.
24   Q     Without probable cause, how do you believe you
25         have the authority to stop and investigate?
```

26

| | | |
|---|---|---|
| 1 | A | I'm sorry? |
| 2 | Q | Without probable cause, do you have the authority |
| 3 | | to stop and investigate? |
| 4 | A | No, we don't. |
| 5 | Q | Can you explain what a terry stop is. |
| 6 | A | A terry stop is where again, along with reasonable |
| 7 | | suspicion you have a right to pat somebody down for |
| 8 | | weapons. |
| 9 | Q | So you can stop them? |
| 10 | A | If you're investigating them for a -- I don't want |
| 11 | | to say a crime, but if you believe again, going |
| 12 | | along with reasonable suspicion that they committed |
| 13 | | a crime, you can pat them down for your safety and |
| 14 | | make sure they don't have any weapons. |
| 15 | Q | Do you understand that probable cause is the |
| 16 | | individual officer's knowledge? |
| 17 | A | That's correct. |
| 18 | Q | So do you understand that you have to have the |
| 19 | | facts and circumstances observed by you for |
| 20 | | probable cause? |
| 21 | A | Yes. |
| 22 | Q | You also understand that without probable cause, a |
| 23 | | police officer has no right to stop, question, or |
| 24 | | arrest somebody? |
| 25 | A | Yes. |

27

1    Q    What is your understanding when it's all right to

2         ask somebody for their personal information?

3    A    That a crime has been committed or about to be

4         committed or you believe it has been committed.

5         I'm sorry.

6    Q    That's okay, take your time.  I'm not trying to

7         confuse you.

8    A    A crime was committed or has been committed or is

9         about to be committed.

10   Q    Would that also -- are there any other

11        circumstances which you think you can ask for ID

12        from somebody?

13   A    If you're trying to ID them.  If we get a general

14        description of the possible suspect and we see

15        them, we stop them based on reasonable suspicion

16        that they may be involved in a crime, so we ask

17        them for their information.

18   Q    Are you aware -- I understand that situation and

19        I'm asking besides that type of situation where you

20        either think they committed a crime or you suspect

21        they committed a crime, are there any other

22        circumstances to your understanding that you can

23        ask somebody for their ID?

24   A    Are you excluding traffic stops and stuff like

25        that?

28

1    Q    Yes.

2    A    If they're just walking around the street minding

3         their own business, no, we cannot walk up and ask

4         for their ID.

5    Q    I'll come back to that in a second.  What is your

6         understanding of when an individual can carry a

7         concealed firearm?

8    A    Carry a concealed?

9    Q    Yes.

10   A    Legally they have to go through a background check

11        by the Sheriff's Department, and I do believe they

12        have to take some classes, and they have standard

13        protocol that has been outlined by state law.

14        Then the Sheriff's Department would issue a CCW

15        permit.

16   Q    They have to have a permit?

17   A    That's correct.

18   Q    If they have a permit, they can carry concealed in

19        Ohio?

20   A    Yes.

21   Q    That's your understanding?

22   A    That's correct.

23   Q    You don't need a permit to carry openly, do you?

24   A    No, you don't.

25   Q    You understand you don't need a permit to carry

29

1      openly?

2   A   I understand, yes.

3   Q   Do you occasionally contact anyone when you don't

4      quite know what to charge a person with?

5   A   I contact our detective bureau.

6   Q   How would you do that?

7   A   By phone.

8   Q   And how would you do that when you're at an

9      incident?

10  A   How would I do that?  It depends on the situation.

11     If the situation is calm and cool, I would contact

12     them by phone.

13  Q   Whose phone would you use?

14  A   My cell phone.

15  Q   You do carry a cell phone?

16  A   I do.

17  Q   Do you know in this particular incident if you

18     used your cell phone?

19  A   I did not.

20  Q   What personal equipment do you carry when you're

21     on patrol?

22  A   Personal?

23  Q   Yes.

24  A   Carry my the cell phone, things to drink like

25     water or Gatorade.

30

| | | |
|---|---|---|
| 1 | Q | What police equipment do you carry? |
| 2 | A | Police issued equipment I carry all of the stuff |
| 3 | | on my gun belt that's been issued to me, my |
| 4 | | uniform. |
| 5 | Q | What would be issued to you on your gun belt? |
| 6 | A | Everything.  Everything that's on my gun belt has |
| 7 | | been issued to me. |
| 8 | Q | What's everything on your gun belt? |
| 9 | A | The magazine, the magazine pouch, the mace and the |
| 10 | | mace pouch, my gun, it's a standard issue weapon |
| 11 | | and its holder, my handcuffs and handcuff case, my |
| 12 | | protective gloves and its case, my ASP and its |
| 13 | | case, my radio and its holder, and my Taser and its |
| 14 | | holder. |
| 15 | Q | Do you ever carry a knife? |
| 16 | A | Sorry, that is my personal knife.  Yes, I do carry |
| 17 | | a pocketknife.  I forgot about that. |
| 18 | Q | Did you have a shotgun? |
| 19 | A | That is department issued. |
| 20 | Q | Is that in the car most often? |
| 21 | A | That is in the car in the rack. |
| 22 | Q | Were you ever taught how to apply handcuffs? |
| 23 | A | Yes. |
| 24 | Q | What were you taught?  What is your understanding |
| 25 | | of the proper procedures to do that? |

31

1   A   The proper procedure is you -- the person has to

2       put their hands behind their back and you put the

3       cuffs on, and we were told one finger, you've got

4       to be able to put one finger between the wrist and

5       the cuff.

6   Q   Why do you do that?

7   A   To make sure they're not on too tight.

8   Q   Do you know what happens when you put them on too

9       tight?

10  A   They leave marks.

11  Q   If you leave them on too tight, do you know what

12      else occurs?

13  A   Bruising.

14  Q   Have you ever handcuffed somebody too tightly?

15  A   No.

16  Q   How are your daily assignments made?

17  A   Through the lieutenant.

18  Q   Is that in the morning?

19  A   Whenever they make them.  They may change my crew

20      assignment for the day or put me on the desk, my

21      turn on the desk, and they make them assignments up

22      and I don't know when they make those.

23  Q   Do you know before you go on shift, what your

24      assignment is or is it posted somewhere?

25  A   They read it off at rollcall.

32

1   Q   So you have a rollcall?

2   A   That's correct.

3   Q   And they read off what your assignment is?

4   A   That's correct.

5   Q   And do they normally assign a neighborhood?

6   A   Not a neighborhood in and of itself, but what we

7       call a sector.

8   Q   Do you normally have the same sector?

9   A   I do.

10  Q   What normally is your sector?

11  A   What we call 8 Sector.

12  Q   What's the geographical?

13  A   Geographical, northern most boundary would be from

14      Elmer Road, and Elmer doesn't go all the way, but

15      you just kind of draw a straight line over to the

16      expressway, expressway down to where South Avenue

17      is, and it comes back in to Holland-Sylvania, and

18      then Holland-Sylvania you circle all the way down

19      to approximately where the turnpike is, turnpike

20      over to the river, up the river to Glendale, where

21      Glendale, River Road, and Broadway meet, Broadway

22      up South Detroit, South Detroit up and around to

23      where the railroad tracks are, along Airline

24      Avenue, back over to Byrne Road, Byrne Road up to

25      Dorr Street, and then Dorr over around Secor, and

33

```
1            up and around Ottawa Hills.
2      Q     And that's what you would normally patrol?
3      A     That's what I normally patrol.
4      Q     How long have you been doing that particular
5            sector?
6      A     Five years now.
7      Q     Do you recall when you started that particular
8            sector?
9      A     2009.
10     Q     Essentially since 2009, you've been in the same
11           area?
12     A     That's correct.
13     Q     And is that the area in which this incident
14           occurred?
15     A     It is.
16     Q     How were you dispatched to this particular
17           incident?
18     A     Again, they called my unit number over the air and
19           read the text to me.
20                (Plaintiff's Exhibit 1 marked.)
21     Q     I'm going to hand you what was previously marked
22           as Plaintiff's Exhibit 1 in Officer Comes's
23           deposition, and ask you to look at that for a
24           second.
25     A     Okay.
```

34

1    Q    Is that the dispatch report you're talking

2         about?

3    A    Yes, this is the incident report detail.

4    Q    Now, is this something that would normally pop up

5         on your computer screen?

6    A    Not in this form, no, but this information, yes.

7         Except for what we usually get is the street

8         location, who the caller was, and the text which

9         would be about this first entry here on the very

10        top, male caller unanimous.  WM referring to white

11        male walking his dog on Rochelle carrying a handgun

12        out in the open.  That's what we would see

13        generally on our computer.

14   Q    Is that what the dispatcher told you?

15   A    What is here is what she read to me.

16   Q    Okay.  Can you tell me what you did in response to

17        that.

18   A    I proceeded to go to the area of -- you know, the

19        general area where Rochelle is and started driving

20        through.

21   Q    So you got a call from the dispatcher who said

22        what?

23   A    She read the exact text that's written there.

24   Q    Which says?

25   A    The top one.

35

| | | |
|---|---|---|
| 1 | Q | White male walking his dog on Rochelle carrying a |
| 2 | | handgun out in the open? |
| 3 | A | Correct. |
| 4 | Q | That's what you understood? |
| 5 | A | Correct. |
| 6 | Q | That was the information you had when you were |
| 7 | | dispatched to the area? |
| 8 | A | Correct. |
| 9 | Q | And so what did you do in response to that; you |
| 10 | | went to the area? |
| 11 | A | Went to the area, started driving through the |
| 12 | | area, and asked the dispatcher to do a callback |
| 13 | | to give a description of the person walking |
| 14 | | around. |
| 15 | Q | Why did you do that? |
| 16 | A | Standard procedure, I guess.  I mean, if you're |
| 17 | | looking for someone, you're looking for a specific |
| 18 | | person, so you're looking for specific traits or |
| 19 | | characteristics or clothing description as to what |
| 20 | | and who we're looking for. |
| 21 | Q | Did you -- I assume you got a response back from |
| 22 | | that? |
| 23 | A | Correct. |
| 24 | Q | Now, did you get the response back on what the |
| 25 | | description was prior to seeing anybody or was that |

36

| | | |
|---|---|---|
| 1 | | on your way over there or when you were looking |
| 2 | | around? |
| 3 | A | I asked for that I believe right before I got into |
| 4 | | the general area.  And once it was given to me, |
| 5 | | then I started looking for the specific person and |
| 6 | | matched up the description. |
| 7 | Q | Did you find that person? |
| 8 | A | I did. |
| 9 | Q | What did you observe as you approached him? |
| 10 | A | I saw Mr. Northrup walking down the street with a |
| 11 | | dog, and I observed a gun on his hip. |
| 12 | Q | Was he walking alone? |
| 13 | A | No, he was not. |
| 14 | Q | Can you tell me who he was with. |
| 15 | A | There was a female who turned out to be his wife |
| 16 | | and two young children. |
| 17 | Q | Were they walking too? |
| 18 | A | All four of them. |
| 19 | Q | Did you observe anything else? |
| 20 | A | At that point, no, I did not. |
| 21 | Q | So if we capture that moment, you saw Mr. Northrup |
| 22 | | walking down the street with his wife and two kids |
| 23 | | walking their dog. |
| 24 | A | That's correct. |
| 25 | Q | What did you do in response to that? |

37

| | | |
|---|---|---|
| 1 | A | Notified the dispatcher where I was at, and that I |
| 2 | | located the gentleman we got called on. |
| 3 | Q | Then what did you do? |
| 4 | A | As I rolled up, stopped the car, and got out. |
| 5 | Q | At that point are you alone? |
| 6 | A | I'm still alone, yes. |
| 7 | Q | What did you do then? |
| 8 | A | Got out of the car, and I do believe I said, |
| 9 | | excuse me, sir, or something along those lines to |
| 10 | | announce my presence. |
| 11 | Q | Then what happened? |
| 12 | A | Mr. Northrup turned around, and I asked him to |
| 13 | | hand over the dog leash. |
| 14 | Q | To his wife? |
| 15 | A | Yes. |
| 16 | Q | Did he do that? |
| 17 | A | He did. |
| 18 | Q | Then what happened? |
| 19 | A | After a while I remember him pulling out a cell |
| 20 | | phone, reaching back and pulling out a cell phone |
| 21 | | as he was kind of standing bladed toward me, and |
| 22 | | moved his hands back toward his weapon in what I |
| 23 | | believed to be furtive movement. |
| 24 | Q | Then what happened? |
| 25 | A | After that, I ordered him to hand over his cell |

38

| | | |
|---|---|---|
| 1 | | phone several times. |
| 2 | Q | To his wife? |
| 3 | A | To his wife.  And then raised his hands several |
| 4 | | times, which he finally complied -- each time |
| 5 | | finally complied, and then asked him to turn |
| 6 | | around several times, and he kept asking his |
| 7 | | questions. |
| 8 | Q | What did he ask you? |
| 9 | A | I do believe it was along the lines of what the |
| 10 | | stop was all about. |
| 11 | Q | What did you say? |
| 12 | A | After he made the furtive movement towards his |
| 13 | | gun, my concern was for my safety and ultimately |
| 14 | | for his.  So I -- I was trying to proceed to disarm |
| 15 | | him for everybody's safety, to let him know why we |
| 16 | | were there, and he kept asking and I told him I |
| 17 | | would let him know here shortly. |
| 18 | Q | So then he turned around? |
| 19 | A | He finally complied. |
| 20 | Q | Raised his hands? |
| 21 | A | Yes, and I walked up and unsnapped and temporarily |
| 22 | | took possession of his firearm. |
| 23 | Q | And when you say unsnapped, you unsnapped the |
| 24 | | holster? |
| 25 | A | Unsnapped his holster. |

39

| | | |
|---|---|---|
| 1 | Q | He had his firearm buckled in? |
| 2 | A | Correct. |
| 3 | Q | You unsnapped it and took it out? |
| 4 | A | Correct. |
| 5 | Q | Then what did you do? |
| 6 | A | I informed him as to why we were called on him. |
| 7 | Q | What did you inform him? |
| 8 | A | That we got a call on him that he was walking |
| 9 | | around with a gun essentially.  I mean, don't get |
| 10 | | me wrong, I don't remember word for word what was |
| 11 | | said.  So generally that's what happened. |
| 12 | Q | And then what did you do? |
| 13 | A | As Mr. Northrup explained to me that there was a |
| 14 | | verbal exchange. |
| 15 | Q | I'm not asking what he said, I'm asking what you |
| 16 | | did.  You took his firearm? |
| 17 | A | Told him why we were there.  And then he started |
| 18 | | talking and explaining that there was a verbal |
| 19 | | exchange between him and the original caller, with |
| 20 | | the original caller saying all types of words. |
| 21 | Q | Like vulgarities? |
| 22 | A | Vulgarities and stuff like that, and that he had |
| 23 | | just politely walked away.  And what he said was |
| 24 | | that they were arguing over the fact of, you know, |
| 25 | | the right to open carry versus not and all that. |

40

1           And he said he had just walked away.

2      Q    Did you have any evidence to believe that wasn't

3           true?

4      A    At that time I did not know exactly what I had

5           still.  I didn't know if I had a crime that was

6           committed or not.

7      Q    At the time you pulled over and started

8           questioning him, what probable cause did you have

9           to stop him and talk to him?

10     A    The 911 call.

11     Q    You believe the 911 call is probable cause in and

12          of itself?

13     A    Because I felt that he may have induced panic.

14     Q    So the 911 call doesn't say he induced panic

15          though, does it?

16     A    There's a lot of calls that unfortunately don't

17          give us a whole lot of information.

18     Q    So the answer is, no?

19     A    No.

20     Q    It did not?

21     A    No, it did not say anything about panic.

22     Q    It said a man was walking his dog with a gun,

23          right?

24     A    In the open, yes.

25     Q    And when you observed that, you saw him walking

41

1      down the street with his dog and his firearm; is

2      that correct?

3    A   That's correct.

4    Q   What's the probable cause there?  At that moment

5      that's all the facts you have, correct?

6    A   That's all the facts I have, yes.

7    Q   So observing him and your knowledge, what's the

8      probable cause?

9    A   To me it was based on the fact that we got called,

10      and then he, you know --

11   Q   Before you even get out of your car, I'm asking

12      you, what's your observable facts and circumstances

13      that gave rise in your mind that there's probable

14      cause that existed to stop and question this

15      gentleman?

16   A   It was based on the 911 call.

17   Q   You based it on a white man walking his dog on

18      Rochelle carrying a handgun out in the open?

19   A   Yes.

20   Q   You believe any time 911 calls you, you can stop

21      somebody and interrogate them?

22   A   I don't interrogate, I ask questions.

23   Q   Right, but you can stop anybody you want based on

24      a 911 call and ask questions?

25   A   Well, we get 911 calls of people -- again, maybe

42

1          not specific like this, but people taking

2          interest --

3      Q   I'm just asking you:  What's your understanding

4          and knowledge; you believe it's okay?

5      A   I'm there to talk to people and find out what's

6          going on.  When I get called to a scene, you know,

7          if I see a person that we get called on, I make

8          contact with him and try to let them know we got a

9          call on them, and to find out what is going on.

10     Q   I understand, but you do understand don't you that

11         even in spite of the 911 call, you have to observe

12         and have knowledge and information sufficient to

13         form a belief that gets you to probable cause

14         before you start questioning?

15              MR. MADIGAN:      I'm going to object at

16              this point.  I think you're asking him to

17              make a legal opinion.

18              MR. ELLIS:        I'm asking his

19              understanding, John --

20              MR. MADIGAN:      Go ahead and answer if

21              you can.

22     A   I'll be honest, I'm not sure what you're trying to

23         get at.

24     Q   I'm asking you under what circumstances do you

25         believe as a police officer, with your training

43

1    and experience, that you can stop and question
2    people?
3  A  Well, again we get calls on people.  I guess what
4    I'm trying to say is we get calls on people all the
5    time, and it's our job to investigate things, you
6    know, such as, you know, person walking down the
7    street in the middle of -- where this happened the
8    other night, wearing an orange hat and orange
9    shirt, didn't fit the neighborhood.  So we drove
10    through, didn't find the person.
11       As police officers we can make contact with
12    people and talk to people.  There's nothing that
13    says we can't.
14  Q  If you saw Mr. Northrup walking down the street in
15    the same circumstances without a 911 call, would
16    you stop and question him?
17  A  No, I wouldn't.  I would have just kept on driving
18    by.
19  Q  I think that's really where my question is.  So
20    the only thing that you felt gave you the right to
21    stop, was a 911 call?
22  A  I hadn't talked to the original caller yet because
23    I located Mr. Northrup first, so I was
24    investigating why the call took place.
25  Q  That isn't my question.  My question is:  Given

44

1      your statement that if he was walking down the

2      street without the 911 call, you wouldn't have

3      stopped him; can we agree on that?

4    A   If there was no 911 call, there would have been no

5      stop.  Correct.

6    Q   So my question then is:  Because of the 911 call,

7      you believe you could stop and question him?

8    A   Yes.

9    Q   And that's the only reason that you believe that

10      you could stop and question him was because of the

11      911 call?

12    A   Because we had a 911 call complaint on him, yes.

13    Q   Do you have any idea what the 911 call said?

14    A   Right there, white male carrying a gun out in the

15      open.

16    Q   Do you understand that that white male that

17      complained said that I don't want to send out a

18      crew; were you told that?

19    A   The original caller?

20    Q   Yes.

21    A   No.

22    Q   And did you ever go back and listen to the 911

23      call?

24    A   No, I did not.

25    Q   You understand that he told the operator or the

45

1      dispatcher there's no reason to send an officer if

2      you can carry openly in Ohio?

3    A    We did not get that information.

4    Q    But you were dispatched?

5    A    We were dispatched, yes.

6    Q    We left off where you had just removed

7      Mr. Northrup's firearm for the safety of both you

8      and people in the area.  What did you do next?

9    A    I informed him as to why we stopped him.

10   Q    Which was?

11   A    We had a call on him by the caller.

12   Q    Then what did you do?

13   A    Let him speak and say what he told me, and then

14     after that I asked him for his ID.

15   Q    So what did he say to you specifically?

16   A    I don't recall word for word.  I know he explained

17     to me in general there was a verbal exchange, I'm

18     not saying that he was the one arguing, but there

19     was an exchange between him and the caller, and

20     that he indicated that he had walked away.

21   Q    Prior to that, did he say to you to explain why

22     you stopped him?

23   A    He asked that, and I told him, you know, after I

24     secured his firearm for everyone's safety, I

25     explained to him why he got stopped -- why he was

46

1        being stopped to talk to.

2   Q   Then you asked for his ID; is that correct?

3   A   After he said what he had said, you know,

4        explained to me what he --

5   Q   So you didn't stop him -- I just want to make sure

6        you and I are on the same page.  You didn't stop

7        him and say, put your hands up, turn around while I

8        remove your firearm?

9   A   I don't recall exactly how it was worded.  I don't

10       recall exactly what I said, but generally when he

11       got done, after he made that furtive movement with

12       his hands --

13   Q   Did you have your hand on your firearm?

14   A   Yes, I did.

15   Q   Did you disengage the safety on it?

16   A   No, I did not.

17   Q   He turned around, you removed his firearm.  Did

18       you ask him for his ID at that point?

19   A   Not that specific moment.

20   Q   Did you ever ask him if he had a CCW permit?

21   A   After I asked him for his ID.

22   Q   I'm talking about before he even talks to you, did

23       you ask him for his ID or his CCW permit?

24   A   No.  I asked him all that after he explained to me

25       what his version of what happened.

47

1    Q    I just want to make sure what the facts are, as

2          you understand them.  So then he explained them to

3          you.  What crime do you think he committed at that

4          point to justify to ask for his ID?

5    A    Inducing panic.

6    Q    So you believe he induced panic?

7    A    That's correct.

8    Q    And you got that from what statements and facts?

9    A    Not statements and facts from him, but from the

10         fact that we had been sent out there on a 911

11         call.

12   Q    So you believe he induced panic because there's a

13         white male walking his dog on Rochelle carrying a

14         handgun out in the open?

15   A    That's what I believed, yes.

16   Q    So that induced panic?

17   A    In my opinion, at that specific moment, yes, but

18         when we investigated further, we didn't have

19         that.

20   Q    I understand that, but you believe that this

21         statement is sufficient to say that this induced

22         panic?

23   A    That's what I believed at the time, yes.

24   Q    At any time prior to making contact with

25         Mr. Northrup, were you told that he removed the

48

```
1           firearm?

2      A    No.

3      Q    Were you told that he touched his firearm?

4      A    No.

5      Q    Were you told that he threatened anybody?

6      A    No.

7      Q    So the only thing we have is this statement?

8      A    That's correct.

9                 (Recess taken.)

10     Q    Now, so you've now removed Mr. Northrup's firearm,

11          and you state that he talked to you on what

12          happened.

13     A    That's correct.

14     Q    You're not being confused that it was his wife

15          that explained to you?

16     A    She talked to me a little bit later.

17     Q    I'm talking about at that point.

18     A    At that point, no.

19     Q    So it's your testimony that it was Mr. Northrup

20          that told you what happened?

21     A    I do believe it was Mr. Northrup, yes.

22     Q    At that point you asked him for his ID?

23     A    Yes.

24     Q    Then what happened?

25     A    After three requests he finally asked if he could
```

49

```
1              reach back and get it out, and he finally got it
2              out.
3       Q      During the time of those requests, did he ask you
4              what was the purpose of the stop?
5       A      I don't recall.
6       Q      You did not answer; do you recall that?
7       A      I don't recall what transpired between all three
8              requests.
9       Q      Now, he gave you his ID, correct?
10      A      Eventually, yes.
11      Q      You asked for his driver's license?
12      A      Driver's license, yes.
13      Q      You didn't ask for his CCW?
14      A      I asked for the CCW permit after I asked for and
15             received his driver's license.
16      Q      Why?
17      A      Two-fold.  One, to find out -- for one, it let's
18             me know that he is legally able to carry a gun and
19             is not convicted of another felony and disallowed
20             under the Weapons with Disability Act because he's
21             already gone through the background check by the
22             Sheriff's Department; and two, my intention was
23             to let him know that not everybody understands
24             the open carry in Ohio.  And that if he's legally
25             able to carry concealed, just, you know, it's up
```

50

1       to him, but just cover it up, you know, with a

2       shirt.

3   Q  But you understand that he doesn't need a permit

4       to carry openly?

5   A  That is correct.

6   Q  So he had no obligation to show you his conceal

7       carry permit?

8   A  Correct.

9   Q  What happened then?

10  A  Based on the fact that I had inducing panic at the

11      time, I ordered him to put his hands behind his

12      back, and I proceeded to handcuff him.

13  Q  Then what did you do?

14  A  I escorted him to the police car and put him in

15      the back of the patrol car.

16  Q  And what did you do after that?

17  A  After he complained that his cuffs were too tight,

18      I readjusted the cuffs again for him.  And after he

19      requested a sergeant, I informed him that a

20      sergeant was already on the way.

21  Q  Those things happened before you put him in the

22      back, right?

23  A  No, they were at that time.

24  Q  I mean, he wasn't in the back when you adjusted

25      his handcuffs, was he?

51

| | | |
|---|---|---|
| 1 | A | Yes.  He was already seated in the back of the |
| 2 | | patrol car when he made both of those requests. |
| 3 | Q | And it's your testimony you loosened them? |
| 4 | A | I know I loosened them. |
| 5 | Q | Did you know whether he had ligature marks after |
| 6 | | you removed them? |
| 7 | A | I did not notice any ligature marks after they |
| 8 | | were removed. |
| 9 | Q | So you didn't notice them? |
| 10 | A | No. |
| 11 | Q | Did you hear him complain they were still too |
| 12 | | tight? |
| 13 | A | No. |
| 14 | Q | So it's your testimony that he never told you |
| 15 | | that? |
| 16 | A | It's my testimony I never heard him complain a |
| 17 | | second time. |
| 18 | Q | After you put him in the back of the car, what did |
| 19 | | you do? |
| 20 | A | After I closed the door, I walked over to the |
| 21 | | woman who turned out to be his wife to ask her why |
| 22 | | he was being so difficult. |
| 23 | Q | Did you call him a jerk? |
| 24 | A | I don't recall ever using the word jerk. |
| 25 | Q | Were you still alone at that point? |

52

| | | |
|---|---|---|
| 1 | A | Yes.  I believe I was still alone at that point, |
| 2 | | yes. |
| 3 | Q | What did she tell you? |
| 4 | A | She basically said I had his ID and kind of walked |
| 5 | | away. |
| 6 | Q | Did you ask her if he had a CCW? |
| 7 | A | I don't recall. |
| 8 | Q | Did you tell her she was being uncooperative? |
| 9 | A | I don't recall if I ever said that to her. |
| 10 | Q | Go ahead. |
| 11 | A | At that point Sergeant Ray pulls up, and I walk |
| 12 | | over to him and started talking about the |
| 13 | | incident. |
| 14 | Q | Did you run his license yet? |
| 15 | A | At that moment, no, but eventually it was. |
| 16 | Q | What did you learn by that? |
| 17 | A | He had a CCW permit and had no warrants or |
| 18 | | anything like that because when we run somebody on |
| 19 | | the mobile data computer, it automatically runs |
| 20 | | through the other databases and does warrant checks |
| 21 | | and everything, so it's automatic. |
| 22 | Q | And that pops up he's a CCW too? |
| 23 | A | It pops up CCW. |
| 24 | Q | So then what did you do for the next 40 minutes? |
| 25 | A | There was no 40-minute timeframe. |

53

1    Q    How long do you think the stop took?

2    A    I think the whole stop was approximately

3         30 minutes.

4    Q    How long did it take you to get him in the car?

5    A    I don't recall exactly how long, it wasn't that

6         long.  From the time I put him in handcuffs to the

7         time I put him in, less than a minute.

8              MR. ELLIS:        John, if you want to ask

9              the questions, we can have that guy come

10             in and take the pictures, and then he can

11             leave, and then I'll continue.

12             MR. MADIGAN:     All right.

13             (Recess taken.)

14             MR. MADIGAN:      The purpose of this is

15             we're going to do a demonstration of

16             Officer Bright depicting what happened

17             when Mr. Northrup supposedly made a

18             furtive movement.  And we're having a

19             videographer take a picture of

20             Officer Bright at that very moment

21             showing what it looked like to him what

22             Mr. Northrup was doing.

23             MR. ELLIS:        You're going to provide

24             me copies of the pictures?

25             MR. MADIGAN:      Absolutely, everybody

54

1          gets a copy.

2                        - - -

3                DIRECT EXAMINATION

4     BY MR. MADIGAN:

5     Q    Officer Bright, you testified that there was a

6          furtive movement made by Mr. Northrup; is that

7          correct?

8     A    That is correct.

9     Q    This was at what point, at what point in the stop

10         did he do that?

11    A    Close to the beginning.  After I stopped him and

12         asked him to hand over the dog leash.

13    Q    And Mr. Northrup had his gun on which side of his

14         body?

15    A    His right side.

16    Q    Put your hands down to your side, Officer, and

17         show exactly how far -- well, first of all, what

18         did Mr. Northrup do when this happened, what

19         movement did he make with his hand?

20    A    Well, after -- he's bladed to me sort of something

21         similar to this, and then he pulled out a cell

22         phone, and he had a cell phone in his hand.

23    Q    Which hand?

24    A    He probably had it in both hands, both hands was

25         holding on to the cell phone, and he was doing

55

1      something with his hands.  So he had his hands

2      about right here, and then he draws them back

3      towards like this, towards his back, towards his

4      gun.

5   Q  You're sure both hands were drawn back towards the

6      back?

7   A  Both hands were back towards his gun.

8   Q  What did you do at that point?

9   A  At that point I ordered him to hand over the cell

10     phone to his wife, and he finally complied, and

11     then I ordered his handgun several times.

12  Q  Where you're stopped right now, is that how close

13     he got to his gun?

14  A  Approximately, yes.

15  Q  What did you do at that point?

16  A  Then I ordered him several times to hand the cell

17     phone over to his wife, and approximately the third

18     time he complied.  Ordered him to raise his hands

19     away from his weapon approximately three times, and

20     approximately the third time he raised his hands.

21     And I ordered him to turn around, which he took

22     several attempts -- or commands to turn around, and

23     he finally turned around.  And then at that point I

24     walked up from behind and unsnapped his gun and

25     took his gun out of his holster.

56

1    Q    When you unsnapped it and took out his gun, where

2         were his hands?

3    A    They were still raised up in the air.

4              MR. MADIGAN:        I have no further

5              questions of Officer Bright.

6              MR. ELLIS:         Let me just ask you a

7              couple questions.

8                        -  -  -

9                   RECROSS EXAMINATION

10   BY MR. ELLIS:

11   Q    Was he still bladed towards you at the time he was

12        doing all this because you haven't turned?

13   A    You know, from my recollection he was still bladed

14        during most of the time, and for the sake of

15        pictures, I didn't turn, but when I ordered him to

16        turn around after the third attempt, he finally

17        turned around, his hands were in the air, and he

18        did something like this.

19   Q    So he did do that?

20   A    He did.

21   Q    And he doesn't have his cell phone at that time,

22        right?

23   A    No, because he did hand that over to his wife.

24   Q    What pocket did he take the cell phone from?

25   A    I did not notice what pocket, I just noticed he

57

```
1         had reached back and pulled out a cell phone from

2         somewhere.

3    Q    He didn't have a shirt on with pockets; is that

4         correct?

5    A    I do believe it was just a T-shirt so, no.

6    Q    When you removed his firearm, he had his back to

7         you; is that correct?

8    A    That's correct.

9    Q    And all the time you were giving him these

10        directions, you had your hand on your firearm; is

11        that correct?

12   A    I do believe, yes.

13   Q    He did give the leash to his wife and cell phone

14        to his wife, correct?

15   A    Correct.

16   Q    And he raised his hands?

17   A    Correct, after several times.

18   Q    Then you disarmed him; is that correct?

19   A    That's correct.

20                MR. MADIGAN:     I have one question, and

21             I think this needs a picture.

22                        -  -  -

23                REDIRECT EXAMINATION

24   BY MR. MADIGAN:

25   Q    Officer Bright, face me.  Now, I know he wasn't
```

58

1      facing you when he reached toward his gun, was

2      he?

3   A  No.

4          MR. ELLIS:        Objection to the form of

5          the question.  John, you know better than

6          that.

7          MR. MADIGAN:       I'm trying to make it

8          clear which way he was facing, so we don't

9          get misled here.

10  Q  Now, and this is just for purposes of a photograph

11     so the photographer can see your whole body.  Show

12     us again with your hands how close he got to the

13     weapon that he was carrying.

14  A  As I'm facing you?

15  Q  Yes.

16  A  About right here.

17         MR. MADIGAN:       All right.  That's all I

18         have.

19                       -  -  -

20                 RECROSS EXAMINATION

21  BY MR. ELLIS:

22  Q  Which side did he have his firearm on?

23  A  I do believe it was his right side.

24  Q  I want to ask you a couple questions.  I left off

25     where you had talked to his wife and walked away

59

| | | |
|---|---|---|
| 1 | | and talked to Officer Ray, I believe. |
| 2 | A | Sergeant Ray. |
| 3 | Q | Yes.  I want to take you back to the initial stop |
| 4 | | now, and I want to ask you a series of questions. |
| 5 | | If you'd answer them, I'd appreciate it.  When you |
| 6 | | stop and get out of your car and introduce |
| 7 | | yourself, did you ask my client to give the leash |
| 8 | | to his wife, correct? |
| 9 | A | I did, yes. |
| 10 | Q | He reached for his cell phone and you told him to |
| 11 | | give that to his wife; is that correct? |
| 12 | A | That's correct. |
| 13 | Q | And you told him to raise his hands; is that |
| 14 | | correct? |
| 15 | A | Eventually, yes, he did. |
| 16 | Q | And you turned him around; is that correct? |
| 17 | A | That's correct. |
| 18 | Q | You disarmed him; is that correct? |
| 19 | A | That's correct. |
| 20 | Q | Upon disarming him, all of this occurred before |
| 21 | | you questioned him; isn't that correct? |
| 22 | A | That's correct. |
| 23 | Q | Now, after you disarmed him and he put his hands |
| 24 | | down, you asked him if he had a CCW, didn't you? |
| 25 | A | I don't recall when exactly.  I do remember I |

60

| | | |
|---|---|---|
| 1 | | asked him about the CCW permit after I asked him |
| 2 | | for his ID, but not before. |
| 3 | Q | So you first asked him for his ID then? |
| 4 | A | I explained to him why he was being stopped, he |
| 5 | | explained to me his version of what happened. |
| 6 | Q | I'm not asking you that. |
| 7 | A | I'm answering your question, give me a second. |
| 8 | | So after he gave me his version, I asked for his |
| 9 | | ID. |
| 10 | Q | So that happened after you disarmed him? |
| 11 | A | All that happened after I disarmed him, yes. |
| 12 | Q | You disarm him and then you tell him why you |
| 13 | | stopped him? |
| 14 | A | Correct. |
| 15 | Q | And you told him you stopped him for what |
| 16 | | reason? |
| 17 | A | We had a call on him. |
| 18 | Q | Did you tell him he was inducing panic? |
| 19 | A | At that point, no. |
| 20 | Q | Did you tell him at any time during the stop that |
| 21 | | if he didn't tell you if he had a CCW, you would |
| 22 | | charge him with inducing panic and arrest him? |
| 23 | A | I don't recall making those statements. |
| 24 | Q | Do you recall saying that if he didn't answer your |
| 25 | | questions, you would arrest him for inducing panic |

61

1   and take him downtown and have him sit overnight in

2   the police station?

3   A   I don't recall saying that.

4   Q   Do you recall him refusing to answer any more of

5   your questions?

6   A   He did say he wasn't going to answer any more of

7   my questions.

8   Q   At that point, in fact, is when you handcuffed

9   him, isn't it?

10  A   I did.

11  Q   And that's when you took him in the car and said

12  I'm taking you downtown for inducing panic?

13  A   I don't recall saying that to him.

14  Q   Isn't that the basis in which you put him in the

15  back of the police car is because you were

16  arresting him for inducing panic?

17  A   I believe that's what I had was inducing panic at

18  the time, yes.

19  Q   And that's why you arrested him; isn't that

20  correct?

21  A   That's correct.

22  Q   Now, it wasn't for him failing to give you his ID,

23  correct?

24  A   Originally, no.

25  Q   So you've now got him in the back of the car under

62

1      the guise of inducing panic and you arrest him;

2      isn't that correct?

3  A   That's correct.

4  Q   Now, you understand a person has a right to not

5      answer your questions; isn't that right?

6  A   That is correct.

7  Q   And when he refused to answer any further

8      questions, that's when he was handcuffed,

9      correct?

10 A   That is correct.  He stopped answering questions,

11     so I went ahead and arrested him on what I believe

12     I had.

13 Q   Didn't he ask you if he was free to leave?

14 A   I don't recall if he asked.

15 Q   Didn't he ask you on a number of occasions if he

16     was being arrested?

17 A   He asked me what he was being arrested for, I do

18     remember him asking that.  And that's when I

19     informed him he was being arrested for inducing

20     panic.

21 Q   Now, do you ever recall saying to him that I am

22     giving you a ticket because you failed to give me

23     your CCW permit?

24 A   I don't recall saying that.

25 Q   Could you have said that?

63

```
 1    A    I don't know.
 2    Q    Now, you have him in the back of the car, and you
 3         go talk to Sergeant Ray.  What do you say to
 4         Sergeant Ray at that point?
 5    A    I go up as we're talking, I tell him what had
 6         transpired, saw Mr. Northrup walking down the
 7         street, stopped him, explained, you know -- I'm
 8         sorry, I lost the word I'm looking for.  The
 9         sequence of events I explained to him, I had gone
10         over, and at that point after we talked, you know,
11         he made a phone call to our detective bureau.  And
12         he came back and said that all we have is failure
13         to disclose personal information, and that's why I
14         went with the --
15    Q    Who called the detective bureau?
16    A    Sergeant Ray did.
17    Q    He came back with you could only charge him with
18         failure to give personal information?
19    A    Correct.
20    Q    Why did you feel it was necessary to charge him
21         with anything?
22    A    Because I had had a crime.
23    Q    What's the crime?
24    A    I thought I had inducing panic.
25    Q    But that's not what you charged him with though,
```

64

1        correct?

2    A   That's correct.  I had a right to change my mind

3        as to what -- because I tell someone I'm going to

4        charge them with one thing doesn't mean I have to

5        charge him with that.

6    Q   Are you familiar with the statute on which you

7        charged him under?

8    A   The failure to disclose personal information.  Can

9        I recite it verbatim, no.

10   Q   What's your understanding of it?

11   A   That -- if a person, you know, upon request is

12       supposed to provide information, you know, based on

13       a police officer believing a crime was committed,

14       has been committed, or is about to be committed.

15   Q   What crime was being committed?

16   A   I believed it was inducing panic at the time.

17   Q   What's your understanding of inducing panic?

18   A   Someone going out and causing a disorder to incite

19       panic.  People like in a threatening manner,

20       similar to a person going into a movie theatre and

21       yelling fire.

22   Q   Did you ever charge somebody for inducing panic

23       prior to the conceal carry law if you carried

24       openly?

25   A   No, I have not.

65

1   Q   Do you know that any officers or yourself ever

2       charged anybody with inducing panic for carrying a

3       firearm openly?

4   A   Not based on firearms, no.

5   Q   Are you aware of the State of Ohio versus Cline

6       case?

7   A   I have not heard of that case.

8   Q   Prior to 2003, were you ever instructed that

9       people were not supposed to carry firearms around

10      the City of Toledo?

11  A   In Lucas County, that's correct.

12  Q   And what was your understanding?

13  A   That people were not allowed to carry firearms in

14      the open in any public place.

15  Q   How did you derive that understanding?

16  A   We were instructed by the chief prosecutor,

17      Dave Toska.

18  Q   Were you ever told that open carry was permitted

19      in the State of Ohio before that?

20  A   I don't recall.

21  Q   Did you have an understanding that open carry was

22      always permitted in the State of Ohio?

23  A   I don't recall.  Me personally, no.

24  Q   So prior to 2003 when the concealed carry law was

25      enacted, it was your understanding that people

66

1           couldn't carry firearms; is that correct?

2    A      Within the City of Toledo in the open, yes.

3    Q      They couldn't carry concealed either, right?

4    A      Correct.

5    Q      Do you know the law that existed prior to the

6           concealed carry law, what it was, whether you could

7           carry concealed?

8    A      I don't recall.

9    Q      Prior to 2003, did you ever arrest somebody for

10          carrying a concealed firearm?

11   A      You know, I don't remember, it's been so long.   If

12          I had, I don't remember.

13   Q      Now, when you handed Mr. Northrup his ticket, did

14          you explain to him why you were giving him a

15          ticket?

16   A      Yes.

17   Q      What did you tell him?

18   A      I explained to him what the charge was, the court

19          date, and that his signature on the all purpose

20          citation was not admitting any guilt, just being

21          notified of his court date.

22   Q      Did you tell him that I'm giving you this ticket

23          because you failed to give me your CCW?

24   A      I don't recall ever saying that.

25   Q      Did you say I'm giving you this ticket because

1         you failed to give me your personal

2         identification?

3    A    I don't recall the exact wording back then when I

4         issued the ticket -- the all purpose citation.  I

5         don't remember what I said to him verbatim.

6    Q    If you hadn't given him that ticket, what would

7         have been the basis to arrest him?  What was your

8         understanding of what would have happened?

9    A    As far as?

10   Q    Your basis for arresting him.  You arrest him for

11        inducing panic, correct?

12   A    Correct.

13   Q    You don't have inducing panic.  At some point you

14        made that decision; is that correct?

15   A    That's correct.

16   Q    How did you make that decision?

17   A    Officer Comes went and spoke to the original

18        caller, and came back and informed us as to what he

19        said.

20   Q    What did Officer Comes inform you?

21   A    That there were words exchanged between him and

22        Mr. Northrup, and that there's vulgarity, vulgar

23        words, the F bombs and stuff were thrown by both

24        parties is what was told to us -- or told to me

25        through Officer Comes what the original caller

68

```
 1        said.
 2    Q   Did he tell you that personally?
 3    A   He did.
 4    Q   He didn't call you on the phone and tell you
 5        that?
 6    A   No, he came back to the original scene.
 7    Q   Did he go personally and interview him?
 8    A   Yes, I do recall he went.
 9    Q   Are you aware that's not his testimony?
10    A   I'm not sure what he said.  From my recollection,
11        he left the scene, spoke to the caller, and he came
12        back.
13    Q   Are you aware that he's testified that he never
14        spoke to you at the scene?
15    A   Well, that may be his testimony.  My recollection
16        is that we spoke at the scene.
17    Q   I just want to make sure your testimony is he came
18        back and said there were vulgarities thrown, and
19        people walked away?
20    A   Yes.
21    Q   And you concluded from that that was not inducing
22        panic?
23    A   Correct.
24    Q   You never said to Mr. Northrup, as I understand
25        your testimony, that because you're carrying a
```

69

| | | |
|---|---|---|
| 1 | | firearm, you're inducing panic to anybody that |
| 2 | | sees you? |
| 3 | A | I don't recall saying that, no. |
| 4 | Q | But that wasn't your understanding at the time |
| 5 | | that you were charging him, was it? |
| 6 | A | I'm sorry? |
| 7 | Q | That wasn't your understanding of the original |
| 8 | | charge, was it? |
| 9 | A | Can you rephrase your question. |
| 10 | Q | Sure.  Anybody carrying a firearm walking down the |
| 11 | | street, you didn't accuse them of inducing panic of |
| 12 | | just doing that, right? |
| 13 | A | No, not because he was just walking down the |
| 14 | | street, no.  But because of the fact that someone |
| 15 | | had called on him.  Specifically, yes, that was my |
| 16 | | reasoning. |
| 17 | Q | Did you observe him prior to stopping him? |
| 18 | A | Mr. Northrup? |
| 19 | Q | Yes. |
| 20 | A | As I was rolling up behind him. |
| 21 | Q | You watched him? |
| 22 | A | Yes. |
| 23 | Q | Was he doing anything unusual? |
| 24 | A | Walking down the street. |
| 25 | Q | When you stopped him, did he run? |

70

1   A   No.

2   Q   You didn't charge him with failing to give his ID

3       because you arrested him, did you?

4   A   I arrested him originally on what I believe I had,

5       which was inducing panic.  And based on the course

6       of the investigation, I asked for his ID three

7       times.  And based on that and realizing we didn't

8       have inducing panic, that's why we went with

9       failure to disclose personal information.

10  Q   Did you break his driver's license before you gave

11      it back to him?

12  A   No, I did not.

13  Q   If an officer comes to a scene and leaves a scene,

14      would it be recorded anywhere?

15  A   If he notifies the dispatcher.

16  Q   At some point you closed down the communication,

17      right?

18  A   Me personally, no.

19  Q   The dispatch did?

20  A   They advised if I wanted the air, and I don't

21      believe I took the air.

22  Q   That does this mean?

23  A   Close the air.  Take the air means I'm going to

24      close the air.

25  Q   Do you know whether they did?

71

1    A    If they did, I had them immediately open it

2         back up.  But I don't recall them ever closing

3         the air.

4    Q    Let me hand you this incident report detail, which

5         my understanding is is the communications between

6         the dispatch and the other officers including you;

7         is that correct?

8    A    Correct.

9    Q    You see at the first entry where it says -- I

10        don't know, male call unanimous, white male walking

11        his dog, Rochelle, carrying a handgun; do you see

12        that one?

13   A    The first entry, yes.

14   Q    That's where your --

15   A    The original call, yes.

16   Q    You're being notified there, 821C is you?

17   A    821C is me.

18   Q    And then that's Officer Comes being dispatched and

19        Sergeant Ray is dispatched, correct?

20   A    Correct.

21   Q    Now, you get a call back it looks like probably

22        pursuant to your request on the callback?

23   A    Where?

24   Q    It says --

25   A    6-foot 4, long ponytail.  Yeah, that's the

72

1          description I had asked for that was given.

2      Q   Why isn't there a recording of you calling back?

3          They don't normally record those things?

4      A   It would be verbally recorded on the tape, but I

5          don't know what had been recorded physically or

6          not, but audibly it would have my voice.

7      Q   So you did call back?

8      A   I did ask for that, yes.

9      Q   It says 17:19:20, it says 821C on scene.

10     A   Means I was on scene in the area.

11     Q   So you got the description prior to arriving on

12         scene, correct?

13     A   Correct.

14     Q   Then it says 600 Hayes.  Are you talking that's

15         where you're at?

16     A   That would be the location.  I believe I gave

17         700 Hayes, but I know on the report I put 702 or

18         whatever Hayes, but that could be a typo on their

19         part.

20     Q   But that's the information you gave them?

21     A   That's the information I gave them.

22     Q   It says 823C there.  Is that Officer Comes giving

23         that information?

24     A   Once I notified dispatch where I was at and where

25         I had seen Mr. Northrup.

73

```
 1    Q    They're sending him there?

 2    A    They automatically changed the location for the

 3         backup officers.

 4    Q    I got it now.  So that's what that is.  They're

 5         sending Officer Comes and Sergeant Ray to

 6         600 Hayes?

 7    A    Right.

 8    Q    That's what that means.  They're dispatching them

 9         there?

10    A    Correct.

11    Q    Then it says 821C open the air; what does that

12         mean?

13    A    That means dispatch -- right after I went on

14         scene, they closed the air and I didn't realize it.

15         I didn't think it was almost two minutes or

16         three minutes, but I told them open the air back

17         up to normal air traffic, so people could use the

18         air.

19    Q    Now, you can see that you get there at 17:22:05 --

20         or you get there at 17:19:20 I guess?

21    A    I was in the area at 17:19:20 hours, saw

22         Mr. Northrup at 17:22:05 hours.

23    Q    So that's when you first see him?

24    A    That's when I first observed him, yes.

25    Q    When they closed the air, is that when you got out
```

74

1      of the car?

2  A   They closed the air probably when I announced

3      where I was located.

4  Q   And you saw him?

5  A   And I saw him, correct.

6  Q   That happened at 17:22:09, that's when you told

7      them you saw him, and you were getting out of your

8      car or something?

9  A   At 17:22:05 is when I had notified dispatch that I

10     had located Mr. Northrup, and 17:22:09 is when

11     dispatch closed the air.  I didn't request it, they

12     just did it.

13 Q   Then it shows that 17:22:09 the air is closed,

14     then 17:22:28 it shows Officer Comes arriving; is

15     that correct?

16 A   No.  It's changing his location from the general

17     area to being more specific for Officer Comes and

18     Sergeant Ray.

19 Q   When you open the air, is Mr. Northrup in the

20     car?

21 A   I don't recall exactly when I had opened the air

22     versus when he was in the car.

23 Q   Was it at the point that you handcuffed him; do

24     you know?

25 A   Again, I don't recall exactly the time.

75

1   Q   At some point do you make a call that he's under

2       custody and he's in the back of my car?

3   A   I don't think so.  I don't think I made that over

4       the air, no.

5   Q   So you just announce open the air then?

6   A   Right.

7   Q   So then it looks like at 17:26:08  Sergeant Ray

8       gets to the scene?

9   A   Correct.

10  Q   So you are basically alone until Sergeant Ray got

11      to the scene?

12  A   Correct.

13  Q   Then it says -- do you know CHGLOC means?

14  A   Change location.

15  Q   So that's when you went to the desk?

16  A   At 17:58, yes.

17  Q   So at that point you left to go to the desk?

18  A   Correct, to go to Scott Park.  Yes.

19  Q   It says at 17:58 there's a message from

20      Officer Comes saying I'll take an IDA from this.

21  A   IDA is a disposition code that he's not --

22      apparently he didn't, you know, officially was on

23      scene.

24  Q   He's basically saying I'm not going to do

25      anything, it's up to you?

76

```
1    A    Correct.

2    Q    He says 17:58:51 he's cleared, whatever that

3         means.  What does that mean?

4    A    D/I stands for disposition code, and I would be

5         the IDA code.

6    Q    So he's left and gone?

7    A    Correct.

8    Q    Now, it says 821C, that's you, you're still on

9         scene; what does that mean?

10   A    At 18:10?

11   Q    Yes.  It's a different call?

12   A    No.  If you go back up 17:58:38 where it says

13        change location 821C, that means I put myself in

14        route to Scott Park, and at 18:10 is when I arrived

15        at Scott Park to do my paperwork.

16   Q    So it took you about 15 minutes to get to the desk

17        at Scott Park?

18   A    Right.

19   Q    I assume that the ones after that are not

20        applicable to here; is that right?

21   A    Everything after that, no.  Those are just people

22        going to different scenes or changing locations and

23        coming in with their disposition codes.

24   Q    At the 21:03:33 it says change location to clerks;

25        what does that mean?
```

1   A   Anytime we write an all purpose citation or an

2       affidavit, we have to clerk it with the clerks.  So

3       at that point I left Scott Park after I completed

4       all my paperwork to go down to the clerk's office

5       to officially turn the all purpose citation in with

6       the clerk.

7   Q   Which is what you gave a copy of to Mr. Northrup,

8       correct?

9   A   Correct.

10  Q   Did you give him a copy of the police report you

11      prepared?

12  A   No.  If he wanted a police report, it's public

13      record though.

14  Q   Then it says 21:07:18 at 806 D/E; what does that

15      mean?

16  A   Disposition code of Edward.

17  Q   What does that mean?

18  A   Finish assisting.

19  Q   SP, what does that mean?

20  A   Scott Park.

21  Q   So Sergeant Ray went with you to Scott Park?

22  A   Correct.

23  Q   Did he help you complete the report?

24  A   I don't recall exactly what he did at the Park

25      when I was there.

1   Q   Then it says at 21:18 you're on scene?

2   A   I'm sorry, where?

3   Q   21:18:06.

4   A   Yeah, that's on scene at the clerks.

5   Q   What is 06/16.10 DC mean, the next one, it says

6       close?

7   A   They're closing the incident out because the

8       incident is done with this particular call.

9       06/16/10 is the date of the incident, and then the

10      disposition C is Charles, which means I issued an

11      all purpose citation.

12  Q   And then the next one says you're clear, D/C?

13  A   Correct.  I mean, I don't know exactly the

14      different code types and stuff up there, what they

15      do, but that just means the scene is completely

16      clear.

17  Q   And you're going back out on the road?

18  A   Right.  Going back out on the road and answering

19      the next call.

20  Q   So this is what happened as best as the dispatcher

21      recorded?

22  A   Yes.

23  Q   Now, you said there's a recording from you to the

24      dispatcher.  Did you ever listen to that?

25  A   No, I didn't.

79

| | | |
|---|---|---|
| 1 | Q | I'd like you to look at your police report now if |
| 2 | | you wouldn't mind.  This is the report that you |
| 3 | | went back to Scott Park to prepare? |
| 4 | A | Correct. |
| 5 | Q | As you can see under the details, and it says 911 |
| 6 | | called you, walking his dog through the |
| 7 | | neighborhood with a gun on his hip, and open and |
| 8 | | wanted to check it out, okay? |
| 9 | A | Yes. |
| 10 | Q | That's what you did, right? |
| 11 | A | Yes. |
| 12 | Q | Spotted that and checked it out, right? |
| 13 | A | Yes. |
| 14 | Q | Now, as I understand it -- what is PRO, P-R-O? |
| 15 | A | PRO is the person reporting, which technically |
| 16 | | would be this Mr. Allen Rose, but then, of course, |
| 17 | | up on the face page it has me as the PRO, so that |
| 18 | | unfortunately is a typo. |
| 19 | Q | So who gave the description white male wearing a |
| 20 | | white T-shirt, tan shorts, with a brown ponytail. |
| 21 | | Is that what's in this one here is that six-foot |
| 22 | | long ponytail, tan pants, white shirt walking along |
| 23 | | and walking -- |
| 24 | A | That's towards Holland-Sylvania. |
| 25 | Q | That's basically what you wrote there, right? |

80

1    A    Correct.

2    Q    It says you spotted a white male walking down

3         Hayes that matched the description given; is that

4         correct?

5    A    Correct.

6    Q    And then you observed his firearm?

7    A    That is correct.

8    Q    And his holster?

9    A    Correct.

10   Q    You say here that you stopped him to conduct an

11        investigation as to whether the suspect was legally

12        carrying a firearm; is that correct?

13   A    That's what's written, yes.

14   Q    Is that why you did it; I'm asking you?

15   A    When I originally stopped him and was inducing

16        panic.  Why I wrote that, I don't remember why.

17   Q    So that's wrong?

18   A    Right.  Maybe my wording is poorly written, I

19        guess on my part, but during the investigation --

20   Q    Just try to answer my questions if you can.  We're

21        going to go through this whole thing and if you

22        want to add anything, you can.

23   A    Okay.

24   Q    That statement is wrong though?

25   A    Apparently.

81

| | | |
|---|---|---|
| 1 | Q | It's inaccurate? |
| 2 | A | It's inaccurate, yes. |
| 3 | Q | Then you have or -- you have or there, violating |
| 4 | | the Weapons Under Disability Act, right? |
| 5 | A | Correct. |
| 6 | Q | What's the Weapons Under Disability Act? |
| 7 | A | Someone who is not allowed to own or possess a |
| 8 | | firearm legally such as a convicted felon, a person |
| 9 | | who commits domestic violence. |
| 10 | Q | Is that a state or Federal law? |
| 11 | A | I do believe that that is a state law. |
| 12 | Q | Do you know what the statute number is? |
| 13 | A | I couldn't tell you.  I'd have to look that one |
| 14 | | up. |
| 15 | Q | So you basically stopped him to see if he was a |
| 16 | | convicted felon or committed domestic violence? |
| 17 | A | According to the report, yeah, but -- |
| 18 | Q | Your report was the most accurate information you |
| 19 | | had at the time you made it, isn't it? |
| 20 | A | At the time, yes. |
| 21 | Q | Now, it says, during the stop you first walked up |
| 22 | | to him to hand over the dog leash to his wife, |
| 23 | | which he did immediately, correct? |
| 24 | A | That's correct. |
| 25 | Q | Then you said the suspect was told to raise his |

82

| | | |
|---|---|---|
| 1 | | hands away from his weapon due to officer not |
| 2 | | knowing the suspect along with what his intentions |
| 3 | | were with the weapon. |
| 4 | A | That's when he made the furtive movement. |
| 5 | Q | But you're saying he refused to do that.  Did he |
| 6 | | say anything or just didn't do it? |
| 7 | A | I don't recall if he said anything, but he didn't |
| 8 | | move his -- |
| 9 | Q | Then you said the suspect refused to raise his |
| 10 | | hands and instead grabbed his cell phone, right? |
| 11 | | That's what you're saying when he made the furtive |
| 12 | | movement, right? |
| 13 | A | Correct. |
| 14 | Q | Started to fumble around with it near his weapon, |
| 15 | | right? |
| 16 | A | Correct. |
| 17 | Q | Now, you repeated your command to hand the cell |
| 18 | | phone over to his wife and raise his hands several |
| 19 | | more times; is that right? |
| 20 | A | Correct. |
| 21 | Q | Then he did, he complied, correct? |
| 22 | A | Yes. |
| 23 | Q | And he was asked to turn around away from this |
| 24 | | officer, correct? |
| 25 | A | Correct. |

                                                                    83

1    Q    He did that, right?

2    A    Not at first, no.

3    Q    You don't say there that he didn't do it at first.

4         You just say, once the suspect raised his hands, he

5         was told to turn around away from the officer,

6         right?

7    A    Yes.

8    Q    And then you say, he first refused to turn around

9         and asked what was this all about, right?

10   A    That's what is written, yes.

11   Q    So he asked you, what's this all about, and that's

12        when you told him, as I understand from your prior

13        testimony, we'll get to that in a minute?

14   A    Correct.

15   Q    That's what you say next, the suspect was told he

16        would be informed of the nature of the stop once

17        the officer secured his weapon for the safety of

18        him and the others, right?

19   A    Correct.

20   Q    Then he turned around and the weapon was secured

21        by the officer, right?

22   A    Correct.

23   Q    How did you secure the weapon?

24   A    I took it into my possession and had it in my

25        hand.

84

| 1 | Q | Did you drop the magazine out? |
|---|---|---|

1  Q    Did you drop the magazine out?

2  A    Eventually, yes.

3  Q    But not at that moment?

4  A    Not at that specific moment, no.

5  Q    What did you do with the firearm?

6  A    I kept it in my hand.  Originally, I kept ahold of

7       it, and then proceeded to inform Mr. Northrup why

8       we were there.  And then he made his statement and

9       again going back through.

10 Q    When you say going back through, what do you

11      mean?

12 A    When he told me his version is what I'm trying to

13      say.

14 Q    Before I go on, I just want to ask you a question:

15      If Mr. Northrup is prepared to testify that he

16      asked you the purpose of your stop after you had

17      him disarmed, and you refused to answer that, would

18      that be inaccurate?

19 A    I wasn't refusing.  I told him, you know, I would

20      tell him -- which I believe I said or I would tell

21      him after I secured the weapon because --

22 Q    I'm asking you after that point because after that

23      point you got the weapon, you have the weapon in

24      your hand, you've secured the weapon.

25 A    Okay.

85

```
 1    Q    Did Mr. Northrup ask you why did you stop him and

 2         why are you taking his firearm?

 3    A    I don't recall exactly if he asked me that or

 4         not.

 5    Q    Did you tell him that he was being stopped for

 6         inducing panic at that point?

 7    A    I don't recall if I said those exact words.

 8    Q    Well, I'm asking you if that's the point in which

 9         you --

10    A    I know, I do know that when I had the gun in my

11         hand after all that, I told him that we had gotten

12         a call on him.  And I don't believe -- I don't

13         recall if I said you're inducing panic to him.

14    Q    But it says after being told the nature of the

15         stop.  What did you tell him was the nature of the

16         stop?

17    A    That we got called on him.

18    Q    So you got a call on him, okay.

19    A    We got a 911 call on him.

20    Q    He says, at least in your report, that he was

21         legally carrying his weapon, and then you asked for

22         his identification; is that correct?

23    A    Correct.

24    Q    So he told you he was legally carrying, and you

25         said let me see your ID, right?
```

86

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | And then you write here, he refused to hand it |
| 3 | | over several times, but then he finally handed it |
| 4 | | other; is that right? |
| 5 | A | Correct. |
| 6 | Q | And you have his ID at that point; is that |
| 7 | | correct? |
| 8 | A | That's correct. |
| 9 | Q | And you have his firearm at that point, correct? |
| 10 | A | That's correct. |
| 11 | Q | And he tells you, I refuse to answer any more |
| 12 | | questions; is that right? |
| 13 | A | At that point is when I asked if he had a CCW |
| 14 | | permit, and then that's when he refused to answer |
| 15 | | any more questions. |
| 16 | Q | And at that point did you say to him, if you don't |
| 17 | | answer my question, I'm going to arrest you for |
| 18 | | inducing panic? |
| 19 | A | I don't recall. |
| 20 | Q | Do you recall saying to his wife, tell him to |
| 21 | | answer or I'm going to arrest him for inducing |
| 22 | | panic? |
| 23 | A | I don't recall. |
| 24 | Q | What aggressive behavior did he continue to show? |
| 25 | A | To be honest with you, I don't recall anymore. |

1       The incident happened so long ago, that I don't

2       remember.

3  Q   How was he confrontational towards you; do you

4       recall?

5  A   I don't recall anymore.

6  Q   He was wearing a T-shirt that said this is the

7       shirt that I wear when I don't give a shit; is that

8       right?

9  A   That's what's written in there.  You know, if I

10      remember right, that's what it said.

11  Q   Could it have said this is the shirt I wear when I

12      don't care?

13  A   It could have.  I don't recall anymore.

14  Q   What do you mean by within arm's reach of this

15      officer; what is that supposed to mean?

16  A   I don't remember why I wrote that.

17  Q   And it says due to past experiences.  What

18      experiences are you referencing there?

19  A   My work experiences dealing with people that are

20      being confrontational or aggressive.

21  Q   But you don't have any recollection of what those

22      were?

23  A   With him, no.

24  Q   So you don't know what all these actions and

25      manner of dress caused you to be concerned for your

1    personal safety; is that right?

2  A  Well, when he made the furtive movement towards

3    his handgun.

4  Q  You've already got his handgun, you've already

5    disarmed him.  You've already got him with his

6    hands up, you're already asking him questions, and

7    you're interrogating him.  At that point I'm asking

8    you:  Your concern for your personal safety in what

9    manner?

10  A  This is a summary statement.

11  Q  You're still holding the firearm, right?

12  A  No.  At this point in my narrative here is a

13    summary of -- a general summary of the incident at

14    the end.  He was already -- at this point, this is

15    an overall statement.  Mr. Northrup already had his

16    gun returned to him.

17  Q  That can't be true because it says the suspect was

18    put in cuffs and placed in the back of the patrol

19    vehicle, that's your next statement.  So that had

20    to be before this stuff happened.

21  A  Right.  This is a summary statement due to my past

22    experiences and all the actions that transpired.

23    The fact that I had to repeat commands several

24    times, and the fact that I was still alone, and

25    then he made the furtive movement, yeah.  So that

1    statement is a summary statement of the whole

2    entire.

3  Q  You don't recall saying to him, if you don't

4    answer my questions, I'm going to put you under

5    arrest and take you downtown?

6  A  I don't recall saying that.

7  Q  You don't recall saying to him that if you do not

8    answer my questions about your CCW permit, I am

9    going to charge you with inducing panic and put you

10    in jail overnight?

11  A  I don't recall that, no.

12  Q  Now, when you say you don't recall that, it

13    doesn't mean you didn't say it, does it?

14  A  It doesn't mean I didn't say it, it just means I

15    don't recall saying it.

16  Q  That's fair enough, that's all I want to know.

17    Now, it says that it was determined that the

18    suspect was legally able to carry a weapon.  What

19    investigation led you to conclude that?

20  A  Running him on the MDT and seeing that the CCW

21    permit was there.

22  Q  What would you have done if he didn't have it?

23    Would a felony have shown up or something?

24  A  No.

25  Q  Would a domestic violence have shown up?

90

| | | |
|---|---|---|
| 1 | A | If we did a criminal history run, yes. |
| 2 | Q | Did you do one? |
| 3 | A | Didn't have to go farther beyond that. |
| 4 | Q | Because the CCW popped up? |
| 5 | A | Because of the CCW permit. |
| 6 | Q | And that basically says that the guy hasn't |
| 7 | | committed a felony and is lawfully carrying a |
| 8 | | firearm, correct? |
| 9 | A | Correct. |
| 10 | Q | It says the suspect was issued an APC. |
| 11 | A | That APC stands for all purpose citation. |
| 12 | Q | And you said the failing to hand over his ID? |
| 13 | A | Correct. |
| 14 | Q | That would be his driver's license? |
| 15 | A | That would be his driver's license. |
| 16 | Q | Now, you've already got his driver's license, |
| 17 | | right? |
| 18 | A | I got it after the third request, yes. |
| 19 | Q | But you've got his driver's license, right? |
| 20 | A | Eventually, yes. |
| 21 | Q | So when you say here, you gave it to him for |
| 22 | | failing to hand over his ID when it was requested. |
| 23 | | That's what you're saying, he delayed in giving it |
| 24 | | to you, so that's why you gave him the ticket? |
| 25 | A | Correct. |

91

| | | |
|---|---|---|
| 1 | Q | You didn't give him a ticket to cover up the |
| 2 | | arrest; is that correct? |
| 3 | A | No. |
| 4 | Q | Then you released him from the scene with his |
| 5 | | weapon; is that right? |
| 6 | A | That's correct. |
| 7 | Q | The next page is the supplemental crime report. |
| 8 | | Who would have prepared that part? |
| 9 | A | I did that myself with the information that I |
| 10 | | believe was gotten and obtained from Officer Comes. |
| 11 | Q | 2000 hours, is about 6:00? |
| 12 | A | 2000 hours is 8:00. |
| 13 | Q | So at 8:00 at night you supplemented your |
| 14 | | report? |
| 15 | A | Right.  I was still working on -- I finished up |
| 16 | | the original report.  And this here is a copy of |
| 17 | | the records section copy and a copy of the all |
| 18 | | purpose citation. |
| 19 | Q | Do you know what the disposition of this case was |
| 20 | | afterwards? |
| 21 | A | It went to court and Prosecutor Pillrose, as we |
| 22 | | spoke, he decided to drop the case. |
| 23 | Q | He dismissed it, right? |
| 24 | A | That's correct. |
| 25 | Q | He told you at the time that he dismissed it |

92

```
 1          that there is no timeframe in the statute,
 2          correct?
 3    A     I don't recall the exact words, but he said that
 4          you got to give someone a reasonable amount of time
 5          or something like that.
 6    Q     Do you recall him saying that with Mr. Northrup
 7          present?
 8    A     I do recall that.
 9    Q     Have you been told by your counsel that
10          Mr. Northrup made a recording of your stop?
11    A     No.
12    Q     Have you ever listened to the recording of the
13          stop?
14    A     No.
15    Q     Are you aware that the recording says at the
16          conclusion of you taking him out of the back of the
17          car that I'm giving you this ticket for failing to
18          give me your CCW permit?
19    A     If it's there, it's there.  I don't recall making
20          that statement.
21    Q     If it's there, would you agree that's what you
22          told him?  Would you like me to play it for you?
23    A     Sure.
24    Q     I'd be more than happy to play it for you.  I
25          don't want any confusion here with the CCW permit.
```

93

1      I'll play it for you later.  You have no

2      recollection of that; is that correct?

3   A  That's correct, I don't recall.

4   Q  You have no recollection of you being belligerent

5      and intimidating towards my client; is that

6      correct?

7   A  That's correct.

8   Q  And you don't recall ever threatening him; is that

9      correct?

10  A  That's correct.

11  Q  Have you been taught to threaten people in public

12     if they don't answer your questions?

13  A  No.

14  Q  In any part of your training, have you been taught

15     to act intimidating towards somebody that didn't

16     answer your questions?

17  A  No.

18  Q  Have you been taught to handcuff people if they

19     exercise their constitutional right to remain

20     silent?

21  A  No.

22  Q  Now, did you speak with his wife at the scene?

23  A  I did, yes.

24  Q  What did you ask her?

25  A  I believed I asked her why he was being so

94

1        difficult.

2    Q   What did she say?

3    A   That she wasn't going to answer any of my

4        questions.

5    Q   She didn't tell you that he didn't do anything, he

6        was just walking down the street?

7    A   I don't recall exactly what she said.

8    Q   She didn't tell you that the guy was being

9        belligerent toward them and they walked away?

10   A   She may have, I don't recall.

11   Q   Well, wouldn't all of those things have gone into

12       your analysis and determination whether to charge

13       Mr. Northrup with anything?

14   A   They would.

15   Q   On whether it's inducing panic?

16   A   They would, yes.

17   Q   You didn't think to record those?

18   A   At the time, no.

19   Q   Did you tell Mrs. Northrup that her husband was

20       being a jerk?

21   A   I don't recall using the word jerk.

22   Q   Do you recall telling Mrs. Northrup that he was

23       being uncooperative?

24   A   I don't recall.

25   Q   Have you ever been told or provided any notices

1       and bulletins about carrying openly in Ohio?

2   A   Yes.

3   Q   Do you remember when you first saw those?

4   A   I don't remember the very first one.  I know we

5       just got another one within the last month, last

6       couple weeks.

7   Q   What did that one say?

8   A   Generally, that people have the right to carry in

9       the open, and as long as they're not committing any

10      criminal act, there's nothing we can do, but

11      generally.

12          (Plaintiff's Exhibits 3, 4, 5 marked.)

13   Q   Now, when there's a notice and bulletin, how do

14      you normally see those?

15   A   Not only are they sent to us via department

16      e-mail, but they're also read off at the rollcall.

17   Q   I'm handing you what's been marked as Plaintiff's

18      Exhibit 3, and have you take a look at that.

19          MR. ELLIS:     John, while he's doing

20          that, I would like to have the recording

21          between the stop and the dispatcher that

22          you should have.

23          MR. MADIGAN:    I think you asked me for

24          that once before, and I told you that we

25          don't have it.

96

1           MR. ELLIS:       No, I think you told me

2           that you didn't have the one between the

3           callback for the ID.

4           MR. MADIGAN:    Which one do you want

5           now?

6           MR. ELLIS:       Apparently, there's one

7           between the police officers and the

8           dispatcher when they're talking.

9           MR. MADIGAN:    Okay. I don't think

10          there is, but I'll check again.

11          MR. ELLIS:       I think what you told me

12          before, John, just so you and I aren't

13          confused, is that somehow they got the

14          description and it sounds like he told her

15          to go get it, and she called him back and

16          got it and put it back out.  That's the

17          one you can't find as far as I can tell,

18          and that's the one I don't have, but

19          apparently there's an audio too of the

20          police officers.

21          And I guess there's two things I'd

22          like you to find for me is did it or does

23          it exist, and if it did, what happened to

24          it.

25          MR. MADIGAN:    I'll check.

97

| 1  | Q | Have you had an opportunity to look at that? |
|----|---|---|
| 2  | A | I did. |
| 3  | Q | Is that similar to what your understanding is |
| 4  |   | that do you know when you first had seen one of |
| 5  |   | these? |
| 6  | A | This actually -- being the fact that there's no |
| 7  |   | date of issue on it, this refers to our incident |
| 8  |   | specifically, and this came out after our incident. |
| 9  | Q | So you believe that relates directly to your |
| 10 |   | incident? |
| 11 | A | Yes. |
| 12 | Q | Exhibit Number 3 is something that came -- |
| 13 | A | Came out as a result of this, yes. |
| 14 | Q | Why is there no date on it then or number? |
| 15 | A | I have no idea.  I don't do notices and bulletins |
| 16 |   | in the department.  That's above my pay grade. |
| 17 | Q | I was going to ask you if it was a result of your |
| 18 |   | incident. |
| 19 |   | I'm handing you what's been marked as |
| 20 |   | Plaintiff's Exhibit 4; do you see the date on |
| 21 |   | that? |
| 22 | A | July 19, 2010. |
| 23 | Q | This came out after the incident? |
| 24 | A | After the incident, just over a month after the |
| 25 |   | incident. |

98

1   Q   Are you sure this isn't the one you're talking

2       about that came out as a direct result of your

3       incident?

4   A   This one definitely is, yes.

5   Q   The one that is dated July 19th?

6   A   July 19th.  But this one, Number 3, it says

7       recently in an Ohio city.  I haven't heard of any

8       other incidents similar to this in Ohio, so I

9       believe, you know, it sounds a lot like our

10      incident.

11  Q   So you think they issued two or are they

12      different?

13  A   They're slightly different.  Again, I don't know

14      when the clarification one came out because there

15      is no date, but any and all notices and bulletins

16      after this incident, they started coming out and

17      clarifying more and more of what we can and cannot

18      do.

19  Q   Were you ever notified between 2003 and this

20      incident?

21  A   No.

22  Q   But you knew people could carry openly?

23  A   Yes.

24  Q   You knew that wouldn't be sufficient to create

25      probable cause to stop him and talk to him?

99

| | | |
|---|---|---|
| 1 | A | No.  Just walking down the street on their own, |
| 2 | | no. |
| 3 | Q | Prior to this incident, are you aware that these |
| 4 | | were also sent out? |
| 5 | A | No. |
| 6 | Q | Are you aware that the Attorney General had |
| 7 | | rendered an opinion as early of 2004 in Ohio that |
| 8 | | said that open carry was permissible in Ohio? |
| 9 | A | No, I'm not familiar with that. |
| 10 | Q | Do you know when the Cline case came out? |
| 11 | A | No, I don't. |
| 12 | Q | I think you said you hadn't even heard of that |
| 13 | | case before? |
| 14 | A | No. |
| 15 | Q | I'm handing you what's been marked as Plaintiff's |
| 16 | | Exhibit 5, will you take a look at that.  Have you |
| 17 | | had an opportunity to look at that? |
| 18 | A | Yes. |
| 19 | Q | You see where it says failure to disclose personal |
| 20 | | information. |
| 21 | A | I do. |
| 22 | Q | That's what you charged him with, correct? |
| 23 | A | That's correct. |
| 24 | Q | What part of that did you charge him with? |
| 25 | A | 2921.29(A-1). |

100

1    Q    So you're saying the person is committing, has

2         committed, or is about to commit a criminal

3         offense?

4    A    Correct.

5    Q    At the time you gave Mr. Northrup this ticket,

6         what crime had he committed?

7    A    I believe he had committed inducing panic at the

8         time.  When I requested, you know, his personal

9         information, his ID, I believe he had committed

10        inducing panic.

11   Q    Well, that isn't true because when you charged

12        him, you already knew he had not committed any

13        crime; is that right?

14   A    When I asked for his ID to -- as part of the

15        investigation, I believed he had committed inducing

16        panic because of the 911 call.

17   Q    Maybe I can clarify this for myself a little bit.

18        If I tell you that my client is prepared to testify

19        that he gave you his ID immediately, you would say

20        that's incorrect; is that right?

21   A    That is incorrect.

22   Q    If his wife says that's what he did, that would be

23        incorrect?

24   A    From my recollection, yes.

25   Q    And it's when he refused to tell you what it is,

101

1        whether he had a CCW permit, is when you arrested

2        him, and said you didn't give me your ID?

3   A   I did arrest him after that when he said he wasn't

4        going to answer any more questions, but that's

5        because at that moment I believed he was inducing

6        panic.

7   Q   I understand, but I'm asking you would that be

8        incorrect?

9   A   What part of that would be incorrect?

10  Q   That you told my client if you don't tell me

11       whether you have a CCW, I am going to arrest you

12       for inducing panic and take you downtown

13       overnight?

14  A   Again, I don't recall.

15  Q   Again, I'm just going to confirm that when you

16       handed him the ticket, the recording says I'm

17       giving you this ticket for failing to give me your

18       CCW permit, okay.  Can you explain the difference

19       there.

20  A   If you have a recording and I said it, then -- I'm

21       not saying I said it, I don't recall saying it is

22       what I'm saying, but hang on --

23  Q   I don't want you to think I'm making it up.

24  A   I'm not saying you're making it up, sir.  All I'm

25       saying is if I said CCW permit, then I must have

1    been mistaken.

2  Q    So now it's a mistake?

3  A    I make mistakes just like a lot of other people

4     make mistakes.  We're not perfect.

5  Q    Isn't it a fact that you wrote him the ticket

6     because he wouldn't cooperate with you?

7  A    I gave him the ticket because I believed he

8     induced panic, but when we realized he didn't, he

9     had failed to hand me his ID three times.  Not

10    until the third request, so that's why we went with

11    the failure to disclose personal information.

12  Q    Did you tell Mr. Northrup that if he touches or

13    goes for his gun, you'd shoot him?

14  A    I don't recall.  I may have, I don't know.  I

15    don't recall.

16  Q    Did you understand that his children were riding

17    their bicycles behind him?

18  A    I remember seeing two little kids.

19  Q    You don't remember the bicycles?

20  A    They could have been on bicycles, they could have

21    been on foot.  I remember seeing two little kids.

22  Q    Did you ask Shawn who he was and he told you his

23    name?

24  A    I never asked him what his name was or I recall

25    not ever asking.

103

```
 1    Q    Before getting his driver's license out for you,
 2         did Mr. Northrup ask you if it would be all right
 3         to reach behind himself to pick it up?
 4    A    He did.  I do recall him asking that.
 5    Q    And you gave him permission?
 6    A    I said, yeah.  I mean, to answer his question.  He
 7         said do you mind if I -- or whatever his exact
 8         words he used, and I said, yes.
 9    Q    So you gave him permission to reach around and get
10         his driver's license out for you?
11    A    Yes.
12    Q    Which he did, correct?
13    A    Correct.
14    Q    Now, do you recall while he was getting his
15         driver's license out, Mrs. Northrup asking what's
16         going on, and telling you that they didn't do
17         anything?
18    A    I don't recall her saying that.
19    Q    Is she the one that explained to you what
20         happened?
21    A    I don't recall her explaining anything to me.
22    Q    Do you recall Mr. Northrup asking you why you
23         wanted his CCW permit?
24    A    I don't recall him asking that question.
25    Q    Do you recall Mr. Northrup telling you that you
```

1        have his driver's license and his firearm, and

2        you're allowed to open carry; do you remember him

3        telling you that?

4  A   Him saying that to me?

5  Q   Yes.

6  A   I don't recall him saying that, no.

7  Q   Do you remember him saying you're allowed to carry

8        openly?

9  A   Yes, that part, yes.

10  Q   Do you recall him asking at that point why he was

11       being detained?

12  A   I don't recall him asking that question, but if he

13       did, I'm trying to investigate whether he induced

14       panic.

15  Q   Do you recall him asking whether he was under

16       arrest?

17  A   When I was putting him in handcuffs, yes.

18  Q   You don't recall him asking that while you were

19       asking him for his CCW permit?

20  A   I don't recall him asking that while I was asking

21       for his CCW permit.

22  Q   Do you recall telling Mr. Northrup that do you

23       want to go to jail?

24  A   I don't recall that, no.

25  Q   Do you recall in response to that question, I'm

1        not answering any more questions?

2   A   I remember him saying that he's not going to

3        answer any more questions.

4   Q   Did you respond to him by saying that you could

5        arrest him right now for inducing panic if he

6        didn't give you his CCW permit?

7   A   I don't recall saying that.

8   Q   Do you recall Mrs. Northrup then asking you,

9        what's the problem, he didn't do anything wrong?

10   A   Again, I don't recall.

11   Q   Do you recall responding to her by saying that you

12        had a call and if he didn't give you his CCW

13        permit, that you'd arrest him for inducing panic?

14   A   I don't recall that.

15   Q   Do you recall that is the point in which you told

16        him to turn around, put up his hands, and put him

17        under arrest; do you recall that?

18   A   I wouldn't have him put his hands up in the air.

19   Q   I meant behind his back, I'm sorry.

20   A   No.  Again, when I say shortly, it was shortly

21        right after he refused to answer any more questions

22        is when I told him to turn around, put his hands

23        behind his back, and go ahead and place him under

24        arrest.

25   Q   At that point what did Mr. Northrup do with his

106

1    wallet he had in his hand?

2  A  I don't recall.  He may have put it back in his

3     pants or his wife putting it in his pocket.  I

4     don't recall.

5  Q  So you don't recall him handing his cell phone and

6     his wallet to his wife at that point?

7  A  I don't recall.

8  Q  You do recall him telling you the cuffs were too

9     tight?

10 A  Yes.

11 Q  Did you get a copy of the complaint?

12 A  From you, yes.

13 Q  Did you remember the photographs in them; did you

14    review those?

15 A  Yes.

16 Q  Did you see the ligature marks?

17 A  There were red marks on his wrists, yes.

18 Q  What would you call those?

19 A  Ligature marks.

20 Q  Now, are they consistent with putting handcuffs on

21    too tight?

22 A  No, I don't believe so.  If they were on too

23    tight, he would have red -- you know, marks all the

24    way around his wrist.

25 Q  You didn't look at all of photographs because he

107

1      did.

2    A    I looked at the ones I had, the ones I was given.

3    Q    So if he had ligature marks all the way around, it

4         would be consistent with handcuffs being too tight,

5         right?

6    A    Being too tight, yes, if they were all the way

7         around.

8    Q    At any time were his children crying?

9    A    I don't recall.

10   Q    Do you recall telling his wife that all

11        Mr. Northrup needed to do was show him his CCW, and

12        the whole thing could have been avoided?

13   A    I do believe I said that, yes.

14   Q    Okay.  Do you recall then you said, but instead he

15        was a jerk and refused to answer, and now he'd have

16        to spend the night in jail for inducing panic?

17   A    I don't recall saying that, no.

18   Q    Do you recall her telling you that they were being

19        harassed by the guy that made the phone call?

20   A    She may have, I don't recall.

21   Q    At any time did you understand that a man was on a

22        motorcycle when they drove by, the Northrups?

23   A    No, I did not.

24   Q    Did you at any time -- were you informed that he

25        went around the corner and came back, and parked

108

```
1          his motorcycle?
2      A   I was not informed of any of that.
3      Q   Were you informed that he got off his motorcycle
4          and approached them?
5      A   I was not informed.
6      Q   Were you informed that he then yelled at them, and
7          told him you can't carry a firearm that way?
8      A   That part I was informed by Mr. Northrup.  That's
9          part of when I say the verbal exchange that he said
10         took place.
11     Q   Did they tell you other things that I just said to
12         you?
13     A   I don't recall them ever saying the other stuff
14         about the motorcycle and getting off and
15         approaching.
16     Q   Did they tell you the guy was yelling obscenities
17         at them?
18     A   Yes, that was --
19     Q   Did they tell you that they tried to explain to
20         him that open carry was all right in Ohio?
21     A   Yes.
22     Q   When you talked to Officer Comes, did he tell you
23         that he told that gentleman that it was all right
24         to carry openly in Ohio?
25     A   You know, I don't recall if Officer Comes informed
```

109

1      me that that's what he told the guy.

2   Q  Did Officer Comes tell you that he told him he was

3      wrong when he told him that?

4   A  I don't recall Officer Comes ever telling me that.

5   Q  Did you ever run Mr. Rose for his criminal record?

6   A  No, I didn't.

7   Q  Do you know that he had a concealed carry that was

8      revoked?

9   A  I did not know that.

10  Q  So you didn't run his criminal record; is that

11     correct?

12  A  Are you talking about Mr. Rose?

13  Q  Yes.

14  A  No.

15  Q  Were you ever told that -- strike that.

16         Did you tell Mrs. Northrup that you understood

17     Mr. Northrup was probably carrying a firearm to

18     express his second amendment rights?

19  A  Me saying that?  I don't recall ever saying that.

20  Q  You know what second amendment rights are?

21  A  The right to bear and keep arms.

22  Q  Were you ever told that they were carrying that

23     for protection?

24  A  Mr. Northrup did say that, yes.

25  Q  Did they also inform you that there was a pit bull

110

```
 1        that had charged them a couple times?
 2   A    Yes.
 3   Q    You were aware of that?
 4   A    I was aware of that, yes.
 5   Q    Did you have a three-ring binder in your car?
 6   A    I do.  I have several three-ring binders, and I do
 7        believe the one you're referring to would be my old
 8        one that I had, the TMC criminal and traffic
 9        sections in it.
10   Q    It's a Toledo criminal code?
11   A    It was the Toledo criminal code and traffic
12        code --
13   Q    Municipal code?
14   A    The municipal code that I put into plastic
15        protective sleeves, and put in a three-ring binder.
16   Q    Was that Exhibit 5?
17   A    Yes, it is.  And was this in there, no, it was
18        not.
19   Q    At the time you handed back Mr. Northrup's
20        driver's license, did he tell you you broke his
21        driver's license?
22   A    I don't recall him ever mentioning that, no.
23   Q    Do you recall telling Mr. Northrup that carrying a
24        gun was inducing panic?
25   A    I don't recall saying that.
```

111

```
1    Q    Do you recall him asking you at least three times
2         if he was free to go or was he being detained or
3         under arrest?
4    A    I don't know if he asked me three times.  I know
5         he asked at least once.
6    Q    He did ask for a superior officer?
7    A    He did ask, and I notified him that one was
8         already on the way.
9    Q    Do you know where you placed his firearm when you
10        took it from him?
11   A    Originally, it was in my hands, but when I went to
12        go arrest him, I dropped the magazine and slid the
13        slide back, and put it in a safe condition.  And
14        unfortunately it was just me, and I only had two
15        hands and hard to work handcuffs with two hands and
16        hold on to an extra gun.  So I ended up putting it
17        on the ground for a split second for the time I
18        could put him in handcuffs.  Once he was in
19        handcuffs, then I went and I picked it up.
20   Q    Do you recall how long it was that he was in the
21        back of car?
22   A    It was within the timeframe of me saying --
23        according to the transcript here, 600 block, but
24        when I notified where I had him and when I changed
25        my location to the desk, which approximately it
```

112

```
1          was -- the whole stop was approximately a half

2          hour give or take a few minutes, but the actual

3          time that he was in handcuffs was less than that.

4          You know, the exact amount of time, I couldn't tell

5          you.

6     Q    But somewhere between zero and 30 minutes he was

7          handcuffed and in the back of the car?

8     A    Correct.

9               MR. ELLIS:       I don't have any further

10              questions.

11              MR. MADIGAN:     I have nothing for him.

12              MR. ELLIS:       Thank you, Officer.

13              MR. MADIGAN:     We'll waive signature.

14              (Deposition concluded at 3:33 p.m.)

15              (Signature waived.)

16                          - - -

17

18

19

20

21

22

23

24

25
```

1                        C E R T I F I C A T E

2      STATE OF OHIO        )
                            ) SS.
3      COUNTY OF LUCAS      )

4              I, Vicki L. Plant, Court Reporter and

5      Notary Public for the State of Ohio, do hereby certify

6      that **OFFICER DAVID BRIGHT** was by me first duly sworn;

7      that the testimony given was reduced to stenotype; that

8      the foregoing is a true and correct transcript of the

9      testimony so given; that this deposition was taken at

10     the time and place in the foregoing caption specified.

11             I do further certify that I am not a

12     relative, employee, or attorney of any of the parties

13     or counsel employed by the parties hereto or

14     financially interested in this action, **nor am I or the**

15     **court reporting firm with which I am affiliated under a**

16     **contract as defined in Civil Rule 28(D).**

17             IN WITNESS WHEREOF, I have hereunto set my

18     hand and affixed my notarial seal of office at Toledo,

19     Ohio, this 11th day of October, 2013.

20

21

22

23                        _____
                                  VICKI L. PLANT
24                          Notary Public in and for the
                                  State of Ohio

25     My Commission expires August 17, 2016.



Incident History for: TOP10130812

| | | | | | |
|---|---|---|---|---|---|
| Received: | 17:10.21 | | | | |
| Entered: | 6/16/2010 17:11:40 | By: | TPC6 / 8360 | Entry Time: | 0.00:1.00:19.00 |
| Dispatched: | 6/16/2010 17:13:32 | By: | TPD3 / 8429 | Wait Time: | 00:01:52 |
| Enroute: | 6/16/2010 17:13:32 | | | Dispatched Time: | 00:00:00 |
| Onscene: | 6/16/2010 17:19:20 | | | Enroute Time: | 00:05:48 |
| Closed: | 6/16/2010 21:21:48 | | | Onscene Time: | 04:02:28 |

Type: WEAPONS (WEAPON VIO./MAN W/GUN/KNIFE) Premise: NN
Severity: 2 Priority: 2 DPR: DSPO: C Alarm Level: Tract: 8600
Group: TOP8 Beat: B820 Police Area: 636 Fire Area: 1414 EMS Area: N-5
LOC: 21 ROCHELLE RD ,TO
Name: WISE DEBORAH Addr: 21 ROCHELLE RD ,TO Phone: 7427934

| | | | | | |
|---|---|---|---|---|---|
| 6/16/2010 | 17:11:40 | 8360 | ENTRY | | M/C ANON .. W/M WALKING HIS DOG ON ROCHELLE CARRYING A HAND GUN OUT IN THE OPEN |
| 6/16/2010 | 17:13:22 | 8429 | HOLD | | |
| 6/16/2010 | 17:13:32 | 8429 | DISPER | 821C | #Q2346 BRIGHT,DAVID R. |
| 6/16/2010 | 17:13:32 | 8429 | ASSTER | 823C | #Q2360 COMES,DONALD |
| 6/16/2010 | 17:14:07 | 8429 | ASSTER | 806 | #Q1814 RAY,DANIEL A. |
| 6/16/2010 | 17:16:01 | 8429 | MISC | 821C | , 6'4 LONG PONYTAIL TAN PANTS WHT SHIRT WALKING ON BAPST TWDS HOLLAND SYLVANIA |
| 6/16/2010 | 17:19:20 | 8429 | ONSCNE | 821C | |
| 6/16/2010 | 17:22:05 | 8429 | ATLOC | 821C | [600 HAYES ] |
| 6/16/2010 | 17:22:09 | 8429 | MISC | 821C | , AIR CLOSED |
| 6/16/2010 | 17:22:28 | 8429 | CHGLOC | 823C | [600 HAYES] |
| 6/16/2010 | 17:22:35 | 8429 | CHGLOC | 806 | [600 HAYES] |
| 6/16/2010 | 17:24:47 | 8429 | MISC | 821C | , OPEN THE AIR |
| 6/16/2010 | 17:26:08 | 8429 | ONSCNE | 806 | |
| 6/16/2010 | 17:58:38 | 8517 | CHGLOC | 821C | [DESK] |
| 6/16/2010 | 17:58:48 | 8517 | MISC | 823C | , 06/16/10 17:58:35 MESSAGE FROM: 823C I'LL TAKE AN IDA FROM THIS |
| 6/16/2010 | 17:58:51 | 8517 | CLEAR | 823C | D/I |
| 6/16/2010 | 18:10:21 | 8517 | ONSCNE | 821C | |
| 6/16/2010 | 18:14:30 | 8517 | ASSTOS | 201 | [600 HAYES] #Q2098 TROENDLE,MICHAEL |
| 6/16/2010 | 18:14:34 | 8517 | CHGLOC | 201 | [SCOTT PARK] |
| 6/16/2010 | 18:21:29 | 8517 | ONSCNE | .201 | |
| 6/16/2010 | 18:26:20 | 8517 | CHGLOC | 806 | [SP] |
| 6/16/2010 | 18:29:57 | 8517 | ONSCNE | 806 | |
| 6/16/2010 | 18:50:44 | 8517 | CLEAR | 201 | D/E |
| 6/16/2010 | 21:03:33 | 8429 | CHGLOC | 821C | [CLERKS] |
| 6/16/2010 | 21:07:18 | 8429 | CLEAR | 806 | D/E |
| 6/16/2010 | 21:18:06 | 8517 | ONSCNE | 821C | |
| 6/16/2010 | 21:21:48 | 8517 | CLOSE | 821C | 06/16/10 D/C |
| 6/16/2010 | 21:21:48 | 8517 | CLEAR | 821C | D/C |

PLAINTIFF'S EXHIBIT 1 9/27/13 JVP PENGAD 800-631-6989

Jul. 7, 2010 2:46PM CITY TOLEDO PROSECUTOR4192451083 No. 6264 P. 15/50

## CRIME REPORT

| POLICE DEPARTMENT | UCR Code | 1. VICTIM Last, First, Middle (Firm Name if Business) State Of Ohio | 2. Report No. 034128-10 |
|---|---|---|---|

TOLEDO, OHIO Form 38.1(a) Rev. 3/97

| 3. Crime (List Additional in Narrative) FAILURE TO DISCLOSE PERSONAL INFORMATION | 4. Location of Occurrence 702 Hayes | 5. R.A. |
|---|---|---|

| 6. HATE/BIAS ☐ | If Hate/Bias Give Type | 7. Type of Premises or Business Where Offense Was Committed Street |
|---|---|---|

| JUVENILE ☐ | 8. Victim Injured | 9. Date and Time Occurred 6-16-10 1730 | 10. Date and Time Reported 6-16-10 1730 |

| GANG RELATED ☐ | Treatment | 
| BAR ☐ | 11. Reporting Person's Name (Last, First, Middle) Listed Officer | 12. Victim's Race | Sex | Age | D.O.B. | Social Security Number |

| OFFICER ASSAULTED ☐ | 13. Reporting Person's Residence Address | 14. Res. Phone | 15. Victim's Residence Address | City | Zip | 16. Res. Phone |

| CRIME ANALYSIS ☐ | 17. Reporting Person's Business Address | 18. Bus. Phone | 19. Victim's Business Address | City | Zip | 20. Bus. Phone |

| 21. WITNESS | WITNESS NO. 1 NAME (Last, First, Middle) | Age | Residence Address | Zip Code | Res. Phone | Bus. Phone |
|---|---|---|---|---|---|---|
| | WITNESS NO. 2 NAME (Last, First, Middle) | Age | Residence Address | Zip Code | Res. Phone | Bus. Phone |

| 22. VEHICLE | Color | Year | Make | Model | Style | License No. (State, Year) | | V.I.N. |
| | Registered Owner's Name | | | Registered Owner's Address | | | HOLDER | TOWED BY: |

| 23. SUSPECT | SUSPECT NO. 1 - NAME (Last, First, Middle) Northrup, Shawn C. | 24. Race W | 25. Sex M | 26. Age 41 | 27. D.O.B. 8-21-68 | 28. Hgt. 6-2 | 29. Weight 240 | 30. Hair BRO | 31. Eyes BRO |
| | 32. Address (Apt. No.) 111 Dutton Toledo | Zip Code 43615 | Phone | 33. Date and Time of Arrest 6-16-10 1730 | 34. F.C.O./Summons Crt. Date 6-25-10 1300 |
| | 35. Relation to Victim | 37. Arrest warrant/ on view attachment T.P.O. 40. Weapon(s) | 38. Arrest Number APC 40266 |
| | 39. Clothing and Other Identifiers (Scars, Marks, Tattoo) | | |

| 2. Records Use Only 034128-10 | SUSPECT NO. 2 - NAME (Last, First, Middle) | 24 Race | 25 Sex | 26. Age | 27. D.O.B. | 28 Hgt. | 29.Wgt | 30.Hair | 31.Eyes |
| | 32. Address (Apt.) | Zip Code | Phone | 33. Date and Time of Arrest | 34. F.C.O./Summons Crt.Date |
| 35. Relation to Victim 9:0 27 NRR 0100 | 36. Social Security # | 37. Arrest warrant/ on view attachment T.P.O. 40. Weapon(s) | 38. Arrest Number |
| 39. Clothing and Other Identifiers (Scars, Marks, Tattoo) | | |

| 41. PREMISES TYPE | | 42. POINT OF ENTRY | 43. LOCATION | 44. METHOD USED |
|---|---|---|---|---|
| 1. ☐ Single Family | 8. ☐ Hospital/Medical | 15. ☐ Parking Lot/Garage | 1. ☐ Door | 1. ☐ Front | 1. ☐ Open/Unlocked |
| 2. ☐ Apt/Duplex | 9. ☐ Office Bldg | 16. ☐ Park/Playground | 2. ☐ Window | 2. ☐ Rear | 2. ☐ Body/Force |
| 3. ☐ Hotel/Motel | 10. ☐ Manufacturer | 17. ☒ Highway/Street | 3. ☐ Garage Door | 3. ☐ Side | 3. ☐ Pry/Cutting |
| 4. ☐ School | 11. ☐ Shopping Mall | 18. ☐ Field/Woods | 4. ☐ Adjacent Premise | 4. ☐ Roof | 4. ☐ Break Glass |
| 5. ☐ Church | 12. ☐ Chain Store | 19. ☐ Other | 5. ☐ Wall | 5. ☐ Other | 5. ☐ Other Method |
| 6. ☐ Bar/Restaurant | 13. ☐ Small Business | | 6. ☐ Upper Floor | | 6. ☐ Unknown |
| 7. ☐ Bank | 14. ☐ Gas/Convenience Store | | 7. ☐ Other | | |

| 45. PROPERTY |
|---|

| QTY. | S R D | PROPERTY DESCRIPTION | MODEL | SERIAL OR OAN# | VALUE |
|---|---|---|---|---|---|
| | S☐R☐D☐ | | | | |
| | S☐R☐D☐ | | | | |
| | S☐R☐D☐ | | | | |
| | S☐R☐D☐ | | | | |

| 46. WHO NOTIFIED/AT SCENE: 805, 201, 212, 281 | | | | TOTAL | $0.00 |
|---|---|---|---|---|---|

| 47. Report Made By: Bright, D. #2346 | Officer(s) Names(s) I.D. # Unit No./Section 821C/2-5 | 48. Officer Assigned to Case | 49. Supervisory Approval |
|---|---|---|---|

50. DISPOSITION: A☐Death of Offender B☐Prosecution Declined C☐Extradition Denied D☐Victim Refuses to Cooperate E☐Juvenile/No Custody F☐Cleared by Arrest - Adult G☐Cleared by Arrest - Juvenile H☐Warrant Issued I☐Investigation Pending J☐Inactive K☐Unfounded L☐Adjudicated U☐Unknown

PLAINTIFF'S EXHIBIT
9/24/13 JP
PENGAD 800-631-6989

Jul. 7. 2010 2:46PM    CITY TOLEDO PROSECUTOR4192451083    No. 6264    P. 11

| 3. Crime<br>FAILURE TO DISCLOSE<br>PERSONAL INFORMATION | 1. Victim (Last, First, Middle)<br>State Of Ohio | 4. Location of Occurrence<br>702 Hayes | 2. Report No.<br>034128-10 |
|---|---|---|---|

51. EVIDENCE: (Where Found, By Whom, Disposition)

| 52.<br>N<br>A<br>R<br>R<br>A<br>T<br>I<br>V<br>E<br><br>I<br>T<br>E<br>M | DETAILS: (Address the categories listed below, where applicable, in the order they appear)<br>(1) List additional victims/crimes          (2) List additional witnesses          (3) List additional suspects, descriptions, charges.<br>(4) If juvenile involved as victim or suspect, list parent's (last, first, middle), phone number, school attended, and whether notified.<br>(5) Indicate time and location where victims and witnesses may be contacted for later follow-up.<br>(6) Itemize additional property taken: give name, brand, model, serial no., caliber of guns, identifying marks and value of each item.<br>(7) List additional physical evidence, where found, by whom, disposition and identifying marks. .<br>(8) Provide additional description on vehicle (unusual paint, body, marks or damage). Describe additional vehicles.<br>(9) If vehicle stolen, give Title number and value. Car unlocked, keys in ignition? List name of insurance and/or finance company.<br>(10) If offense was hate/bias oriented, explain circumstances.<br>(11) Reconstruct the incident - include all necessary elements of the crime. |

| 11 | On the date and time listed, the pro called 911 for a white male walking his dog through the neighborhood with a gun on his hip in the open and wanted it checked out.  The pro gave the description of a white male wearing a white t-shirt, tan shorts, with a brown pony tail.  Upon arrival this officer spotted a male walking down Hayes that matched the description given.  As this officer drove up, closer to the suspect, this officer did observe the listed suspect wearing a black semi-automatic handgun on his hip in the open, holstered.  This officer proceeded to stop the suspect to conduct an investigation as to weather the suspect was leagally carrying the weapon or violating the Weapons Under Disability Act.  During the stop, this officer first asked the suspect to hand over the dog leash to his wife, which he did immediately.  The suspect was then told to raise his hands away from his weapon, due to this officer not knowing the suspect along with not knowing what his intentions were with the weapon.  The suspect refused to raise his hands away from the weapon, instead he grabbed his cell phone and started to fumble around with it near the weapon.  This officer had to repeat his command to the suspect to hand over the cell phone to his wife and raise his hands several more times.  Once the suspect raised his hands, the suspect was told to turn around away from this officer.  Once again the suspect first refused to turn around and asked what this was all this about.  The suspect was told he would be informed as to the nature of the stop once this officer had secured the suspect's weapon off his hip for the safety of the suspect and this officer's safety.  The suspect finally turned around and the weapon was secured by this officer.  After being told the nature of the stop, the suspect stated he was legally carrying his weapon and then was asked for his identification.  The suspect refused to hand over his I.D. after being asked to see it several times.  The suspect finally handed over his I.D.  and refused to answer anymore questions.  The suspect continued to show aggressive behavior and was still very confrontational toward this |

To insert additional pages, select "Insert" on Menu Bar, then "File". Click on 'G0 36_1 Page 2'.

Jul. 7. 2010  2:46PM  CITY TOLEDO PROSECUTOR4192451083  No. 6264  P. 12

| 3. Crime FAILURE TO DISCLOSE PERSONAL INFORMATION | 1. Victim (Last, First, Middle) State Of Ohio | 4. Location of Occurrence 702 Hayes | 2. Report No. 034128-10 |
|---|---|---|---|

**51. EVIDENCE: (Where Found, By Whom, Disposition)**

| 52. N A R R A T I V E I T E M | **DETAILS:** (Address the categories listed below, where applicable, in the order they appear)<br>(1) List additional victims/crimes    (2) List additional witnesses .    (3) List additional suspects, descriptions, charges.<br>(4) If juvenile involved as victim or suspect, list parent's (last, first, middle), phone number, school attended, and whether notified.<br>(5) Indicate time and location where victims and witnesses may be contacted for later follow-up.<br>(6) Itemize additional property taken: give name, brand, model, serial no., caliber of guns, identifying marks and value of each item.<br>(7) List additional physical evidence, where found, by whom, disposition and identifying marks.<br>(8) Provide additional description on vehicle (unusual paint, body, marks or damage). Describe additional vehicles.<br>(9) If vehicle stolen, give Title number and value. Car unlocked, keys in ignition? List name of insurance and/or finance company.<br>(10) If offense was hate/bias oriented, explain circumstances.<br>(11) Reconstruct the incident - include all necessary elements of the crime. |
|---|---|

| 11 | officer; and was wearing a T-shirt stating "This is the shirt I wear when I don't give a shit" and within arms reach of this officer. Due to past experiences, all these actions and manner of dress caused this officer to be concerned for his personal safety, who was still alone because back-up crews had not arrived on scene. So the suspect was put in cuffs and place into the patrol vehicle for the officer's safety to be able to continue the investigation. It was determined that the suspect was legally able to carry a weapon. The suspect was issued an A.P.C. for failing to hand over his I.D. when it was requested. The suspect was released from the scene with his weapon. |
|---|---|

To insert additional pages, select "Insert" on Menu Bar, then "File". Click on 'G0 38_1 Page 2'.

Jul. 7. 2010 2:46PM CITY TOLEDO PROSECUTOR4192451083 No. 6264 P. 13

| 3 APPROVED DISPOSITION | | TOLEDO POLICE DEPARTMENT SUPPLEMENTAL CRIME REPORT | |
|---|---|---|---|
| ☐ Unfounded | ☐ Cleared - No Arrest | | |
| ☐ Cleared by Arrest | ☐ Adjusted | TPD 38.3 | Rev. 4/95(a) |
| ☐ Investigation Continues | ☐ Inactive Case | 1 VICTIM Person Reporting Offense | 2 Records Section No. |
| 4 Location of Occurrence | | State Of Ohio | 034128-10 |
| 702 Hayes | | | |
| 5 Type of Premises or Name of Business Where Offense Was Committed | | 6 Victim's Race,Sex,Age,D.O.B. | 7 Date & Time of this Report |
| street | | | 6-16-10 2000 |
| 8 Date & Time Occurred | 9 Date & Time Reported | 10 Address of Victim/Person Reporting | 11 Phone |
| 6-16-10 1730 | 6-16-10 1730 | | |

| 12 Form Used As: | CONTINUATION SHEET | SUPPLEMENTAL | FOLLOW-UP | R.R.E. | 13 Further Police Action Req'd. |
|---|---|---|---|---|---|
| | ☐ FOR CURRENT REPORT | ☒ INFORMATION | ☐ INVESTIGATION | ☐ DISPOSITION | ☐ YES  ☐ NO |
| 14 Type of Report Continued: | | 15 Offense Reported as: | | 16 Change to: | |
| ☒ CRIME  ☐ JUVENILE  ☐ FOLLOW-UP | | ☐ TMC  ☐ ORC | | ☐ TMC  ☐ ORC | |

| 17 (To Be Completed By Officer Preparing Felony Package) | | | | |
|---|---|---|---|---|
| IDENTIFICATION | STATEMENT | SEARCH | Arrest Date: | Prelim. Date: |
| ☐ On View | ☐ None | ☐ Incident to Arrest | Criminal History: ☐ YES ☐ NO | |
| ☐ One on One | ☐ Oral | ☐ Waiver of Search | Pintout Enclosed: ☐ YES ☐ NO | |
| ☐ Line Up | ☐ Taped  ☐ Written | ☐ Search Warrant | Investigator(s): | |
| ☐ Photo | ☐ Waiver of Rights  P.R.Number | | Duty Hrs | Phone: |

18

The original caller for this incident is Allen Rose 21 Rochelle Toledo Oh 43625 567-742-7934

| 19 Officer Reporting - I.D. No. | 20 Typed by: Date/Time | 21 Supervisor's Approval | Date | Time |
|---|---|---|---|---|
| david richard bright | drb    6-16-10 2000 | | | |

Jul. 7. 2010  2:46PM   CITY TOLEDO PROSECUTOR 4192451083          No. 6264    P. 14

CASE NO. _____

RID NO. _____          REC. NO. 034128-10

☒ STATE OF OHIO  ☒ CITY OF TOLEDO

Name _____

Street _____

City, State, Zip: _____ OH _____

| SEX | HEIGHT | WEIGHT | HAIR | EYES | RACE | OTHER |
|-----|--------|--------|------|------|------|-------|
| M | 6-1 | 240 | BLK | BRO | W | |

D.O.B. _____      S.S.N. _____

5-6-62                    XXX-XX-____

ALIAS _____                  PHONE _____

PLACE OF EMPLOYMENT _____

| DATE | MONTH | YEAR | TIME |
|------|-------|------|------|
| 16 | JUNE | 2010 | 130 |

DESCRIPTION
OF OFFENSE  FAILURE TO DISCLOSE
PERSONAL INFORMATION

LOCATION OF VIOLATION

In Violation Of.  ☒ ORC  ☐ TMC #
CIRCLE ONE → MISD   1   2   3  (4)  M

**IT IS IMPORTANT THAT THE VIOLATOR READ THE IN-STRUCTIONS ON THE REVERSE SIDE OF THIS FORM.**

☒ ■ Summons in lieu of arrest without warrant and complaint on such summons. Rule 4(A)3 READ NOTICE #1

☐ ● Summons after arrest without warrant and complaint on such summons. Rule 4(F) Read Notice #1

☐ ★ Minor misdemeanor citation. Rule 4.1  READ NOTICE #2

IF YOU FAIL TO APPEAR AT THE TIME AND PLACE STATED BELOW A WARRANT MAY BE ISSUED FOR YOUR ARREST

**SUMMONS**

You are ordered to appear at 1:20 P.M. on the 25 day
of July 20 22 in the
Toledo Municipal Court, 555 N. Erie St., Toledo, Ohio.

x _____
          SIGNATURE OF DEFENDANT

This complaint with summons was served personally on the defendant on
____ June 16 ____ 20 10

_____
          SIGNATURE OF ISSUING OFFICER

Officer's Name (print)          I.D. No.

_____ D. St_____               2346

RECORDS SECTION COPY
40266

FORM 23.4

11/02

| Originated by: | Toledo Police Department | |
|---|---|---|
| Planning and Research Section | **NOTICES & BULLETINS** | |
| Staff Review By: | CHIEF OF POLICE: *Michael J. Navarre* | |
| Administrative Services Division | | |
| Processed By: | Subject: | Reference: |
| Planning and Research Section | Open Carry of Firearms Clarifications | |
| To: | Distribution: | Number: | Date of Issue: | Effective Date and Time: |
| Divisions, Bureaus, Sections and Units | 3 | | | Upon Receipt |

Recently in an Ohio city, officers noticed an adult male walking down the street with a pistol strapped in a holster in plain view. The citizen said nothing and did nothing threatening. The officers were concerned, but not alarmed and were unclear on what action they should take.

When Concealed Carry was made legal in Ohio some changes came about that affected local laws. Most recently, state law enacted "preemption" with purpose to make any laws pertaining to firearms a statewide matter with uniform regulation and enforcement. Simply put, state law trumps any pre-existing local ordinances and prohibits creation of new ordinances in conflict with state law.

Under state law, **there is no prohibition against carrying a firearm openly**. A permit is not requires to carry this way. Carrying a pistol openly on the hip is not breaking the law. This action in and of itself alone is not a basis for a stop.

Neither is carrying a gun openly disorderly conduct or inducing panic. If an officer engages in a conversation with a person who is carrying a gun openly, but otherwise is not committing a crime, the person cannot be required to produce identification. The law DOES specify that a person may NOT carry a loaded firearm in a motor vehicle except under the provisions set forth for a person who possesses a concealed handgun license.

### READ AT ALL ROLL CALLS FOR THREE CONSECUTIVE DAYS AND POST ON ALL BULLETIN BOARDS



FORM 23.4

11/02

| Originated by:<br>Planning and Research Section | Toledo Police Department<br>**NOTICES & BULLETINS**<br>CHIEF OF POLICE: *Michael J. Navarre* |  |
|---|---|---|

| Staff Review By:<br>Support and Administrative Services Division | | |
|---|---|---|

| Processed By:<br>Planning and Research Section | Subject:<br>Carrying Firearms in Plain View in Public | Reference: |
|---|---|---|

| To:<br>Divisions, Bureaus, Sections & Units | Distribution:<br>3 | Number:<br>10-145 | Date of Issue:<br>July 19, 2010 | Effective Date and Time:<br>Upon Receipt |
|---|---|---|---|---|

Recently, a question arose to whether or not Toledo Police officers have the authority to stop a citizen who is seen in public carrying a firearm.

The City of Toledo's Department of Law has rendered a legal opinion stating that officers are justified in making investigatory stops **only** when there is evidence or articulable reasonable suspicion. The established standards set forth in, *Terry v Ohio* apply in these circumstances.

Specifically, only when there is evidence or articulable reasonable suspicion (*beyond* the fact that the citizen is openly carrying a firearm) to believe that the citizen is in the process of, or has broken any laws of the City of Toledo or the State of Ohio, do officers have the right to conduct an investigatory stop and verify that the citizen has not been convicted of a felony, or is in any way prohibited from possessing a firearm.

In other words, the fact that a citizen is carrying a weapon in plain view does not in itself give sufficient probable cause to investigate in order to determine if the person is lawfully allowed to carry the firearm.

**READ AT ALL ROLL CALLS FOR**
**THREE CONSECUTIVE DAYS AND**
**POST ON ALL BULLETIN BOARDS**



PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989
1
9/27/13 VP

# 2921.29 Failure to disclose personal information.

(A) No person who is in a public place shall refuse to disclose the person's name, address, or date of birth, when requested by a law enforcement officer who reasonably suspects either of the following:

(1) The person is committing, has committed, or is about to commit a criminal offense.

(2) The person witnessed any of the following:

(a) An offense of violence that would constitute a felony under the laws of this state;

(b) A felony offense that causes or results in, or creates a substantial risk of, serious physical harm to another person or to property;

(c) Any attempt or conspiracy to commit, or complicity in committing, any offense identified in division (A)(2)(a) or (b) of this section;

(d) Any conduct reasonably indicating that any offense identified in division (A)(2)(a) or (b) of this section or any attempt, conspiracy, or complicity described in division (A)(2)(c) of this section has been, is being, or is about to be committed.

(B) Whoever violates this section is guilty of failure to disclose one's personal information, a misdemeanor of the fourth degree.

(C) Nothing in this section requires a person to answer any questions beyond that person's name, address, or date of birth. Nothing in this section authorizes a law enforcement officer to arrest a person for not providing any information beyond that person's name, address, or date of birth or for refusing to describe the offense observed.

(D) It is not a violation of this section to refuse to answer a question that would reveal a person's age or date of birth if age is an element of the crime that the person is suspected of committing.

Effective Date: 04-14-2006

