ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

Shawn C. Northrup,          :   NO.  3:12 CV 01544

    Plaintiff,          :   JUDGE

      vs.                :

City of Toledo, et al,  :

    Defendants.         :

* * * * * * * * * *

DEPOSITION of        DONALD T. COMES

DATE OF DEPOSITION:  Wednesday, August 21, 2013

TIME:                1:30 p.m.

PLACE OF DEPOSITION:
City of Toledo Law Department
One Government Center - Suite 2250
Toledo, Ohio  43604

REPORTER: ELLEN L. LANGEL   DIRECT DIAL:  419.297.8082

* * * * * * * * *

SUPERIOR COURT REPORTING
606 Adams Street
Toledo, Ohio  43604
(419)  241-7417
ellen-langel@peoplepc.com

SUPERIOR COURT REPORTING   (419) 241-7417

```
1                        I-N-D-E-X

2    EXAMINATION:

3        Cross-Examination by Mr. Ellis              4
         Direct Examination by Mr. Madigan          63
4        Recross-Examination by Mr. Ellis           64

5

6    OBJECTIONS:

7

8    EXHIBITS:

9        Plaintiff's Deposition Exhibit One         14
         Plaintiff's Deposition Exhibit Two         55

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

            SUPERIOR COURT REPORTING   (419) 241-7417
```

```
 1    APPEARANCES:

 2        ON BEHALF OF THE PLAINTIFF:

 3            Daniel T. Ellis
              dellis@lydymoan.com
 4            Lydy & Moan
              4930 Holland-Sylvania Road - Suite 1
 5            Sylvania, Ohio  43560
              419.882.7100    Fax:  419.882.7201
 6
          ON BEHALF OF THE DEFENDANTS:
 7
              John T. Madigan
 8            john.madigan@toledo.oh.gov
              City of Toledo Law Department
 9            One Government Center - Suite 2250
              Toledo, Ohio  43604
10            419.245.1020   Fax:  419.245.1090

11        ALSO PRESENT:  Shawn Northrup

12                    * * * * * * * * * *

13                 S-T-I-P-U-L-A-T-I-O-N-S

14            It is stipulated by and between counsel

15    for the respective parties that the deposition of

16    DONALD T. COMES, a witness herein, called by the

17    plaintiff as upon cross-examination, under the Ohio

18    Rules of Civil Procedure, may be taken at this time

19    and reduced to writing in stenotype by the Notary,

20    whose notes may be thereafter transcribed out of the

21    presence of the witness; and that proof of the

22    official character and qualification of the Notary

23    is waived; that the examination, reading and

24    signature of the said DONALD T. COMES to the

25    transcript of his deposition are expressly waived by
```

```
1    counsel and the witness; said deposition to have the

2    same force and effect as though signed by the said

3    DONALD T. COMES.

4              * * * * * * * * * * *

5                    DONALD T. COMES

6              being of lawful age, was by me first duly

7              sworn or affirmed to tell the truth, the

8              whole truth, and nothing but the truth, as

9              hereinafter certified, was examined and

10             said as follows:

11                       Wednesday  Afternoon Session

12                       August 21, 2013

13                       1:30 p.m.

14                  CROSS-EXAMINATION

15       BY MR. ELLIS:

16       Q    Mr. Comes, I'm Dan Ellis.  I don't know if

17   we've met before.

18       A    Hi.

19       Q    This is Shawn Northrup, I don't know if you

20   remember him.  You may or may not.  Have you ever had

21   your deposition taken before?

22       A    I have not.

23       Q    I assume you've testified a number of times

24   in court?

25       A    I have.
```

SUPERIOR COURT REPORTING   (419) 241-7417

1   Q Do you understand everything you say is

2 going to be recorded by her?

3   A I do.

4   Q And if you don't understand a question,

5 will you let me know so I can we repeat it?

6   A Certainly.

7   Q If you don't hear questions, let me know

8 and I'll repeat it as well.

9   A Okay.

10   Q If you don't understand a question, let me

11 know and I will rephrase it.

12   A Okay.

13   Q You understand you've given an oath to tell

14 the truth and you should answer your questions fully,

15 accurately and as completely as you can?

16   A Yes.

17   Q If you realize at any point during the time

18 we're talking that an earlier answer is incorrect,

19 will you let me know so we can go back and go over it

20 and fix it?

21   A I will.

22   Q If you don't know or remember information

23 necessary to answer it, just say so.

24   A Okay.

25   Q And if you answer a question I'm going to

SUPERIOR COURT REPORTING   (419) 241-7417

1    assume that you heard it, understood it, and gave me

2    your best recollection.

3         A    Okay.

4         Q    Do you understand these instructions?

5         A    I do.

6         Q    Are you on any mood altering drugs or

7    medications that would prevent you from testifying

8    truthfully and accurately today?

9         A    I am not.

10        Q    Do you have any illness that would prevent

11   you from testifying fully, accurately and truthfully

12   today?

13        A    I do not.

14        Q    After we finish the deposition your

15   attorney will have an opportunity to look at it after

16   she transcribes it.

17        A    Um-hum.

18        Q    You will either sign it or you can waive

19   your signature and you and your lawyer can talk about

20   that at the end of the deposition, okay?

21        A    Okay.

22        Q    Can you tell me what you did to prepare for

23   the deposition today?

24        A    Nothing.

25        Q    Nothing, okay.  Did you review any

SUPERIOR COURT REPORTING   (419) 241-7417

1    documents prior to today?

2        A    Prior to today when I was originally served

3    I think with the lawsuit I looked through that

4    lawsuit itself.

5        Q    Okay.  You've not looked at any of the

6    police records or anything?

7        A    I have not.  I tried to obtain some in-car

8    video I think at Mr. Madigan's request and was

9    unsuccessful in doing so.

10       Q    Do you know why?

11       A    To the best -- well, the only thing I can

12   tell you is that the vehicle I was in that day, which

13   was 275, there's a way we can search for video for

14   our cars and in 275 nothing pops up.  Now the issue

15   there is I don't know if 275 had a video system in it

16   on the day in question.  Nowadays most cars that we

17   have, patrol cars have those video systems.  At the

18   time it was kind of a haphazard.

19       Q    Transition?

20       A    Some cars did, some cars did not, some cars

21   had working systems, some cars did not.

22       Q    And your full name is Donald T. Comes?

23       A    Yes, sir.

24       Q    And can you give me your date of birth?

25       A    May 9th, 1969.

                 SUPERIOR COURT REPORTING   (419) 241-7417

1      Q     And where's your place of birth?

2      A     Toledo.

3      Q     And are you registered to vote in Toledo?

4      A     I actually, I live in Walbridge now.

5      Q     And can you tell me what your educational

6   background is?

7      A     I received my bachelor's from the

8   University of Toledo, an associate's degree from

9   Owens Community College, and I graduated from Toledo

10  Central Catholic.

11     Q     And that's high school, when did you

12  graduate from high school?

13     A     1987.

14     Q     And when did you get your associate's

15  degree?

16     A     I think I got my associate's degree in

17  1997.

18     Q     Okay.  And when did you get your

19  bachelor's?

20     A     Around 2002, I believe.

21     Q     And can you tell me what you got your

22  bachelor's in?

23     A     Criminal justice.

24     Q     And what did you get your associate's in?

25     A     Criminal justice as well.

SUPERIOR COURT REPORTING   (419) 241-7417

1       Q    Have you ever been convicted of a felony or

2  misdemeanor?

3       A    I have not.

4       Q    Have you ever pled guilty of a charge?

5       A    I have not.

6       Q    Can you give me your employment history?

7       A    I worked for Church's Supermarkets from

8  1987 until, I believe, 1990.  And then from 1990 to

9  1996 or '07 I worked at United Parcel Service.  From

10  '97 until 2000 I worked for Ham & Knoll Cartozian

11  which is a carpet company in Tacoma, Washington, and

12  from 2000 to 2002 I worked for Dupont, and then I

13  believe the end of 2002 I started -- I'm sorry.  The

14  end of 2003 -- I'm sorry, so Dupont should be until

15  2003.  2003 I started my employment with the City of

16  Toledo.

17       Q    And you've continued till today?

18       A    Yes.

19       Q    And what did you start doing for the City

20  of Toledo?

21       A    Police officer.

22       Q    Did you ever go to a police academy?

23       A    Yes.

24       Q    When did you go to the police academy?

25       A    Well, it's Toledo, City of Toledo's Police

```
1    Academy.
2         Q    When did you do that?
3         A    That was December of 201,3 I believe, until
4    about May of -- I'm sorry, not 2013.  2003, December
5    of 2003 until May of 2004, I believe.
6         Q    And where did you do that?
7         A    Their academy is out at Owens now and at
8    the time was at Owens Community College.
9         Q    And can you tell me your course of study
10   when you took that?
11        A    I believe it's, I guess the generic term is
12   OPOTA, Ohio Peace Officer Training Academy
13   certification and then Toledo throws on some courses
14   that are more germane to their jurisdiction and
15   location.
16        Q    And after completing that you joined the
17   police force?
18        A    Yes.
19        Q    And since joining the police force, have
20   you done continuing education?
21        A    Yes.
22        Q    Can you tell me what you did in continuing
23   education?
24        A    Well, I guess in addition to in-service
25   trainings throughout the year, we have various
```

1  opportunities to pick up stuff, whether specialized

2  in nature, I guess I was assigned vice narcotics for

3  a while, I took quite a few drug courses.  I moved to

4  crimes against persons and took some courses related

5  to crimes against persons, and now I'm assigned to

6  our special victims unit, I've taken some classes

7  that pertain to in particular child and child sex

8  crimes.

9       Q     When you originally started as a police

10  officer were you a patrolman?

11       A     Yes.

12       Q     Are you still a patrolman?

13       A     Technically.  I guess it depends on who you

14  ask, but my title is Detective but it's -- you're a

15  detective but you're essentially on the same playing

16  field as a patrolman.

17       Q     Okay.  Is it like a pay grade change?

18       A     It is not, nope.

19       Q     Have you ever been in the military?

20       A     No.

21       Q     Do you recall the cruiser number of the

22  automobile you were driving that day, June 16th?

23       A     275.

24       Q     When you are assigned a cruiser, do you use

25  the same one over and over again or do you change

SUPERIOR COURT REPORTING   (419) 241-7417

1    every day?

2          A      In theory you're -- no, you don't use the

3    same one every day.  You might have long stretches

4    where you use the same car every single day, but I

5    guess, and again the time period that we're going to

6    refer to eventually, my car would change from day to

7    day because my crew, my assignment, I normally worked

8    with a partner.  When I work with a partner we're in

9    for the most part a car that I was assigned to every

10   day, but at that point I was in what commonly was

11   referred to as spare parts so they jamb you in

12   whatever car's available.

13         Q      So spare parts is whatever car's available?

14         A      Pretty much, or maybe even more it's

15   whatever district they need you in.

16         Q      When you get in a cruiser, what equipment

17   is in the cruiser?

18         A      Mostly your trunk box which consists of

19   some cones, some flares, some blankets, a pry bar, a

20   broom.  It's been a while since I've been in a car.

21   And then to the car you generally take a digital

22   camera if one's available, a shotgun and if you're

23   trained you can take a rifle as well but so that's

24   what maybe is in the car or you take to the car.

25               Some cars have videos systems, some cars do

SUPERIOR COURT REPORTING   (419) 241-7417

1    not.  Every car -- I shouldn't say every car.  Almost

2    every car has a mobile radio in it as well.  The cars

3    that I worked in at the time had light bars and

4    sirens, markings on the sides.

5         Q    What computer connection's in the car?

6         A    It's commonly referred to as an M.D.T.

7    which is a Mobile Data Terminal.  For my usage it's

8    essentially a screen with a power button on it, a

9    keyboard.

10        Q    What shows up on that?

11        A    It depends on what screen you're in but

12   for, I guess for this conversation it shows -- before

13   you get a call it will show what every car is doing,

14   depending on what you enter into the system it will

15   show the cars in your area and what they're doing,

16   ands then once you receive a call from dispatch your

17   call itself will pop up so you get a new screen and

18   it shows you where you're going, basic synopsis of

19   the incident.

20        Q    Would that be like the incident report, is

21   that what it would show like?  Like the call came in

22   and where you're supposed to go?

23        A    Yes, yeah.  So like if there was a fight

24   here at the government center it would show

25   everybody's in service or doing whatever they're

SUPERIOR COURT REPORTING   (419) 241-7417

1    doing and then I get a call --

2        Q    Who's responding?

3        A    Right.  I get a call to the Government

4    Center, and it will pop up saying One Government

5    Center, an attorney and his client are fighting on

6    the 22nd floor.

7                    (WHEREUPON Plaintiff's Deposition

8                    Exhibit One-Comes marked for

9                    identification.)

10    BY MR. ELLIS:

11        Q    I'm going to show you what I've just marked

12    as Plaintiff's Exhibit One and ask you if that's kind

13    of what you would see on that screen?

14        A    No.

15        Q    No?

16        A    No, it's nothing like what we would see.  I

17    mean there's certain things on here.  There's unit

18    numbers, so like Dave Bright was 821 C. stands for

19    Charles, he was 821 Charles, I was 823 Charles, 806

20    generally unit numbers with a zero in them, so I'm

21    right about in the upper middle of the page about a

22    third of way down is 806 Q. 1814 Ray Daniel, I don't

23    know if you guys are familiar with where I'm at.

24                    MR. MADIGAN:        Um-hum.

25                    OFFICER COMES:      Okay.  806 is

SUPERIOR COURT REPORTING  (419) 241-7417

```
 1                    a sergeant designator.  Q. 1814 is his

 2                    I.D. number and obviously that's Danny

 3                    Ray.

 4          BY MR. ELLIS:

 5              Q     Are those like your badge numbers or just

 6     I.D. numbers?

 7              A     I.D. numbers.  Badge numbers and I.D.s are

 8     different.  I.D. numbers are essentially I think a

 9     city function and badge numbers are a police

10     function, but for simplicity we always go by our I.D.

11     number.

12              Q     And you're employed by the City of Toledo?

13              A     Yes, sir.

14              Q     And they pay you?

15              A     Yes, sir.

16              Q     Okay.  Now when you run somebody's license

17     let's say --

18              A     Um-hum.

19              Q     -- does that appear on your screen, the

20     results?

21              A     The results appear on the screen, yes.

22              Q     All right.  Now what would you normally see

23     on the screen when the you put somebody's license

24     number?

25              A     If I put in a license number, I think
```

SUPERIOR COURT REPORTING   (419) 241-7417

1    you're going to get back a couple of different pages

2    that you can scroll through.  You're going to get

3    back the persons that the car is registered to.

4        Q    Now you're talking, when you say license

5    number, you're talking about the plate number, tag

6    number?

7        A    Yes.  So if I put in like my tag number,

8    the first thing that's going for pop up generally is

9    my information, my date of birth, my sosh, my license

10   information, my license number issue expiration, all

11   that stuff, status which is what we -- especially in

12   a marked car you're going use frequently and then

13   below that you'll get a listing and that listing is

14   kind of a hodgepodge of your, a rough, I guess,

15   traffic history for you.

16        Below that on another page you'll get

17   information that pertains specifically to the car,

18   what kind of car it is, the make, the color, if

19   there's a co-owner.

20       Q    Make sure the plates aren't stolen?

21       A    That the plates come back to that vehicle,

22   that type of stuff.

23       Q    And if I'm a concealed carrier, where does

24   that show?

25       A    That will show up on its own page as well.

```
1     And right about -- at the time I don't know if the

2     concealed carry information popped up, but I think it

3     was a -- it might have been but --

4          Q     But if you run a tag it will show up if the

5     guy has a concealed carry permit, right?

6          A     If you run it now, yes.  At the time that

7     Dave had this issue, I don't think he did because the

8     first -- I can remember the first time we saw it I

9     was working with another officer named John Winger

10    which would have been the following year, actually it

11    would have been that year, so I don't think it -- I

12    was surprised that it popped up.  I said, "Oh, this

13    guy's got a C.C.W. in front of us. "

14         Q     Right.

15         A     So it does pop up and actually the screen

16    itself I think illuminates, it will change color.

17         Q     And that's today or sometime after 2010?

18         A     Yes.

19         Q     That was back in --

20         A     It wasn't before 2010.  I mean I remember

21    the first time it happened so I know I guess the guy

22    that I was working with and that was in 2010.

23         Q     Yeah.  Do you know when they enacted the

24    conceal carry law?

25         A     Offhand I do not know the specific date,
```

SUPERIOR COURT REPORTING   (419) 241-7417

1    but I want to say 2009, but I'm spit balling.   I

2    remember there was some issues --

3        Q    It was 2004, I think.

4        A    Okay.  There was an issue with --

5        Q    I'm trying to figure out how often I had to

6    renew mine.  I've already renewed it three times.

7        A    There's some issues, I guess, pertaining to

8    us with some guys trying to assert their rights at

9    parks and things like that and there was quite a

10   media furor over that so whenever that was.

11       Q    I remember that guy.

12       A    Okay.

13       Q    I can't remember his name either but he had

14   a birthday party.

15               MR. MADIGAN:      That was my

16           case.

17               MR. ELLIS:      What was the

18           guy's name?

19               MR. MADIGAN:      I knew you

20           were going to ask that.

21               MR. ELLIS:      He moved to

22           Texas eventually.

23               OFFICER COMES:   Okay.

24               (WHEREUPON a discussion was had

25           off the record.)

SUPERIOR COURT REPORTING   (419) 241-7417

1          BY MR. ELLIS:

2          Q    So you would get the guy's like driving

3    record, his --

4          A    Um-hum.

5          Q    Now if you just ran his license and you

6    didn't have a tag, what would you get?

7          A    Just ran his license I don't think you'd

8    get his driving status.  I think you'd get -- you get

9    wants and warrants when you run his driver's tag,

10   when you run the license plate as well you'll get

11   warrant information as well, if they have an active

12   warrant you'll get a screen that pops up as well that

13   lists his warrants.  When you run them just by sosh,

14   which is generally how -- I guess it's the easiest

15   and most convenient way for us to get a complete

16   record.

17         Q    Picture of somebody?

18         A    Yes.  So when we run somebody by sosh I

19   don't think you get driving status but you do get

20   descriptors, it's been so long since I looked at the

21   screen, you get descriptors and warrant information I

22   think would be the two basic things.  I don't think

23   you get car, I don't think you get vehicle

24   information unless you specifically query for that.

25         Q    Right.  Now when you're out on patrol, how

SUPERIOR COURT REPORTING   (419) 241-7417

1    do you get dispatched to places?

2        A    In theory you work, you work a specific

3    beat and a specific sector.  When a call comes in

4    your beat or sector they, and if you're available

5    meaning not out on a call, if you're available

6    dispatch will see that you're available, they say

7    that's his beat, his sector and call up.

8            And like on this day I was 823, they'll say

9    823 Charles, take a burglary in progress 2634

10   Brookford, neighbor states that a man broke in the

11   back window, doesn't think the homeowners are home,

12   there's somebody in the backyard as a lookout.

13       Q    Then you respond?

14       A    Then I would say 823 okay from whatever

15   location I happened to be at.

16       Q    Okay.  So dispatch calls, you say okay,

17   you've got this issue --

18       A    Um-hum.

19       Q    -- and then you would respond okay, I'll

20   respond --

21       A    Yep.

22       Q    -- if you're available?

23       A    Yes.

24       Q    If you're not you would say I'm not

25   available or --

```
1        A     Generally they're not even going to try

2   because you'll be showing up on their screen as being

3   out of service so if you're out of service they

4   won't.

5        Q     So when you're at a stop you do something

6   so they know you're out of service?

7        A     Yes.

8        Q     What do you do?

9        A     You put yourself out.  So if I stop

10  somebody, I say 823, I'm going to stop and talk to

11  one here, 823 I have traffic, which means you have a

12  traffic stop.

13       Q     Or if you say I'm on the scene of where

14  they sent you --

15       A     Yes.

16       Q     -- they would put you out?

17       A     Yes.

18       Q     Put you out means you're just not available

19  for other calls?

20       A     Yeah.  It means you're aware they have you

21  and then consequently you're not available for other

22  calls.

23       Q     And so if you were just checking somebody's

24  license what would you do?

25       A     License plate or driver's license?
```

SUPERIOR COURT REPORTING   (419) 241-7417

1      Q    Driver's license.

2      A    Meaning I had stopped you to talk to you?

3      Q    I'm walking down the street, you say let me

4  see your I.D., and I give you my driver's license.

5      A    What you're supposed to do is I'm supposed

6  to advise dispatch before I stop and talk to you.

7      Q    Right.

8      A    So if I see you walking down the street and

9  for some reason I feel that there's a need to talk to

10  you I'm going to say I'm going to talk to one on

11  Jackson and Erie.

12      Q    Okay.  And then what do you do when the guy

13  gives you his license?

14      A    Depending on the circumstances most

15  likely -- I guess with just that example I'll try to

16  make sure that I'm a safe distance from you.  If I'm

17  by myself I'll let dispatch know that I'm going to go

18  to another channel, go to that records channel and

19  I'll run your information over to records.

20      Q    And what's that mean when you say you're

21  running it over to records?

22      A    I provide them with your personal

23  identifiers, your name, your date of birth, your sosh

24  or your license number if I have your driver's

25  license.

1      Q     Right.

2      A     They run you through Norris and LEADS and

3  then find out if you have wants, if you have

4  warrants, your descriptors, you know, that kind of

5  stuff.

6      Q     Would it tell me -- at that point would you

7  know I'm a concealed carry holder?

8      A     I don't know if I would.  I don't know if

9  they would tell me that.

10     Q     Okay.  Does that appear on your computer

11  screen?

12     A     When I run you?  Yes.  The disconnect with

13  our records department is some people tell you that

14  information, some people don't.  I think at the time

15  I don't think they would have provided me with that

16  information.

17     Q     But you could have asked?

18     A     I could have asked and just like with the

19  vehicles where at one point it wasn't available, I

20  don't know if they would have --

21     Q     You could have asked?

22     A     I could have asked.  I don't know if they

23  would have had access to it.

24     Q     Yeah.  But if you were sent out on a call

25  where the guy with a firearm would you ask?

1        A     Would I ask?

2        Q     You see a guy walking with a firearm --

3        A     Um-hum.

4        Q     -- would you ask does he have a conceal

5   carry permit if he gave you his driver's license?

6        A     You'd have to do a better job of, I guess,

7   breaking it --

8        Q     You stop the person who has a firearm on

9   his hip openly carrying it.

10       A     Right.

11       Q     Okay.  You were directed by dispatch to go

12  talk to him, okay?

13       A     Right.

14       Q     And the descriptive was man walking down

15  the street with a firearm on his hip.

16       A     Right.

17       Q     And you ask for his driver's license and he

18  give it to you.

19       A     Um-hum.

20       Q     When you go back and run him would you ask

21  if he has a conceal carry permit?

22       A     Would I ask -- what's the manner of carry?

23  It's concealed or it's --

24       Q     Not concealed.

25       A     If it's not concealed I don't think, I

SUPERIOR COURT REPORTING   (419) 241-7417

1   don't think I would ask.

2        Q    Is that true today as it was true in 2010?

3        A    There was a -- I don't know if it was

4   formalized training or if somebody left a memo, I

5   think it was what we called an N.A.B., a notice and

6   bulletin, some people were attempting to, just like

7   the park issue, that concealed carry or that open

8   carry was going to start to become more prevalent and

9   we should be on guard, I guess for lack of a better

10  term, that somebody might try to put themselves into

11  a situation where they would, I don't know if trick

12  is the right word, but create an issue with an open

13  carry situation so they said -- I think it was more

14  of a reminder, just a reminder open carry is allowed

15  in the State of Ohio.

16       Q    When did you become aware that open carry

17  was allowed in the State of Ohio?

18       A    I think I understood at least from a

19  practical perspective my first year on the department

20  we went by a bar called H. Town Bar and there was --

21       Q    Is that 2003?

22       A    I think it was '03, right.  I was in

23  training, still in field training, we went past the

24  bar and there was a guy working security at the bar

25  with a pistol, a six shooter in a leather holster on

SUPERIOR COURT REPORTING   (419) 241-7417

1  his hip and I said, "Are you allowed to do that?"

2  The guy said, "Yeah, it's open carry."  If it was

3  tucked in his pants it would be a different story.

4      Q    So going back to 2003 you understood open

5  carry was in Ohio?

6          From 2003 until today, did you have any

7  incidents where you had to stop somebody that was open

8  carrying and talk to them?

9      A    Never.

10     Q    Okay.  Now --

11     A    I qualify that to say that somebody that I

12  not -- I'm trying to think of a good way to say it.

13  Somebody that's running from me with a pistol in

14  their hand, is that open carry?  No.

15     Q    That would be a little bit different.

16     A    I mean there were times where people had a

17  pistol out in front of me, I guess in terms of these

18  circumstances --

19     Q    I'm talking about with it holstered or just

20  walking around with it, not --

21     A    No.  I mean other than police officers, the

22  only open carry I ever saw would be private security,

23  that type of stuff, guys in armored --

24     Q    Is that true today, too?

25     A    For the most part.  I mean you really have

SUPERIOR COURT REPORTING   (419) 241-7417

1    to, you've really got to look for somebody that

2    carries openly.  And for what it's worth, this is

3    kind of germane to this whole thing, open carry I

4    think spooks some people so people see somebody

5    walking down the street with a gun, I dropped my

6    stepson off at school today wearing just what I'm

7    wearing and it makes people nervous.

8         Q    But they could see your badge?

9         A    My badge is on my belt --

10        Q    Yeah, I see that.

11        A    -- there's some debate as the best place to

12   have it and a lot of guys say it's up here because

13   it's visible.

14        Q    Now so dispatch sends you to the place, you

15   get there put out, tell them I'm there --

16        A    Um-hum.

17        Q    -- and then you go do whatever you do?

18        A    Right.

19        Q    And then do you use your personal phone

20   when you're at the place?

21        A    I do use my personal phone, yeah.

22        Q    Now --

23        A    I try to avoid it for a whole bunch of

24   reasons but, you know, sometimes conveniences.

25        Q    So you carry a personal phone?

SUPERIOR COURT REPORTING   (419) 241-7417

1     A    For the most -- I either carry it or it's

2     in the vehicle with me.  I don't actually usually

3     carry it.  I usually keep it up on the visor because

4     I don't want to break it.

5          Q    And you wouldn't want to break it at an

6     inopportune time?

7          A    Yes.

8          Q    So you basically have your personal phone,

9     you use it, sometimes you don't?

10         A    Right.

11         Q    Do you know whether you used it on this

12    day?

13         A    I did use it on this day.

14         Q    And what did you use it for?

15         A    I used it to call the original caller, the

16    person who placed the call.

17         Q    All right.  And how did you get his number?

18         A    On the -- when the call pops up on our

19    screen, depending on the source of the call,

20    sometimes the phone number of the original caller

21    will pop up as well.

22         Q    So you talked to the guy, Allen?

23         A    I called the number that was provided and

24    said, "Hey, did you call 911?"

25         Q    And what did he say?

SUPERIOR COURT REPORTING   (419) 241-7417

```
 1          A     He said, "Yes, I did."

 2          Q     And what did he say after that?

 3          A     I said, "What happened?  What's going on?

 4   What happened?"  And he said, "A guy's walking down

 5   the street with a gun.  I told him he's not allowed

 6   to do that.  He and I started to argue and he,' and

 7   I'm going to paraphrase, he said, "we started

 8   motherfucking each other and I came in and called the

 9   police."

10          Q     Anything else?

11          A     I told him that, I said, "Can you explain,

12   you know, how it all started?"  And he said, "He was

13   walking down the street with a gun on his hip."  I

14   said, "You realize" -- I said, "How was the gun

15   carried?  He said, "It was carried in a holster."

16   And I said, "Where was it?  Was it tucked in his

17   pants?"  And he said, "No, I could see the gun and

18   that's what made me worried."  And I said, "You

19   realize he's allowed to do that."

20          Q     What did he say?

21          A     He said, "No, he's not."  And I said, "Yes,

22   he is."

23          Q     And did he tell you where he was when he

24   first saw -- I assume you're talking about Shawn?

25          A     I assume so, too.  My understanding was --
```

1    I can't really give you definite answer.  I think he

2    was in his front yard and maybe Mr. Northrup was in

3    the street.

4          Q     He did till he was riding his motorcycle?

5          A     He did not.

6          Q     Did he tell you he circled back?

7          A     He did not.

8          Q     Okay.  Did he tell you that he --

9          A     I don't recall if he said either of those.

10         Q     Okay.  So do you know whether he's riding

11   his motorcycle?

12         A     I do not.

13         Q     You don't know whether he turned in the

14   store at the end of the street?

15         A     I don't.

16         Q     And he basically said Shawn was walking

17   down the street with his firearm?

18         A     Yes.

19         Q     And he engaged him?

20         A     Yes.  He said to him, "You can't do that."

21         Q     And I think you said, and if I didn't just

22   correct me, that he was informed either by Shawn or

23   his wife he could do that?

24         A     Yes.  That was my understanding.

25         Q     Do you know whether his wife talked to the

31

1   guy?

2       A    I do not know that.

3       Q    Do you know whether it was really his wife

4   and him doing the mother effing?

5       A    No.  My understanding from the caller was

6   that it was Mr. Northrup and he that were engaged in

7   the --

8       Q    Did he also tell you that Mr. Northrup just

9   walked away?

10      A    He did not tell me that.

11      Q    And did he tell you at any time Mr.

12  Northrup threatened him?

13      A    He did not.

14      Q    And did he say at any time he touched his

15  firearm or handled it in any manner?

16      A    He did not.

17      Q    And did he say at any time Mr. Northrup or

18  Mrs. Northrup threatened him?

19      A    He did not.

20      Q    Now did he say anything else to you?

21      A    Not to my recollection.

22      Q    And besides telling you he can't do it, and

23  you told him he could, right?

24      A    Right.  I think there was maybe some

25  disbelief on his part that he couldn't do it but --

SUPERIOR COURT REPORTING   (419) 241-7417

1      Q    Do you know whether dispatch already told

2  him that?

3      A    Not my knowledge.

4      Q    Okay.  Do you know that he told dispatch if

5  the guy can do it he's not sending the crew out?

6      A    Not to my knowledge.

7      Q    So he didn't -- dispatch didn't explain to

8  you what they were told?

9      A    No.

10      Q    And he didn't tell you what he told

11  dispatch?

12      A    No.

13      Q    And you have never listened to the 911

14  call?

15      A    No.

16      Q    Okay.  When you go to an incident such as

17  this, how do you document the incident?

18      A    Like how did I document it that day?

19      Q    Yeah.

20      A    I don't essentially do anything.  I guess

21  the document for me exists and the dispatch shows me.

22      Q    Being there?

23      A    I say hey, I'm on scene, they show me being

24  on scene.  If I'm Officer Bright, my documentation

25  involves, you know, a crime report, affidavit, that

1   kind of stuff.

2       Q    That's what I'm trying to figure out.  So

3   would you say Officer Bright was like the primary

4   officer responding?

5       A    Yes, yes.

6       Q    And then you're there for backup?

7       A    Yes.

8       Q    And you predominantly are in the background

9   to watch things, make sure and you let him do his

10  job?

11      A    Yes.

12      Q    And to make sure he stays safe?

13      A    Yes.

14      Q    That's your job?

15      A    Right.

16      Q    Did you get out of your car to do that?

17      A    I did not.

18      Q    So you basically stayed in your car --

19      A    Yes.

20      Q    -- and watched the situation?

21      A    I got to the scene, I remember Mr. Northrup

22  was in handcuffs at the time, I believe Sergeant Ray

23  was already there, in fact, if Dave's car was first,

24  and I don't know that it was, but there were two

25  cars, I roll up third, Mr. Northrup's already in

SUPERIOR COURT REPORTING   (419) 241-7417

34

 1    custody.

 2        Q    Was he in the back seat yet?

 3        A    I don't believe that he was.  Sergeant Ray

 4    and Dave, Officer Bright are outside talking and I

 5    thought, well, I'll see if I can find this caller.

 6    So I put the car in reserve, turned around, looked on

 7    my CAD for the phone number and tried to contact that

 8    homeowner, basically did contact the homeowner.

 9        Q    So by the time you're already at the scene

10    and Mr. Northrup's in handcuffs?

11        A    Um-hum.

12        Q    Then you call the guy that called 911?

13        A    That's what I recall, yes.

14        Q    So basically you're looking for the

15    information and facts after he's already been placed

16    in handcuffs --

17        A    Right.

18        Q    -- just to see what happened?

19        A    I guess what I'm looking for is if I can

20    provide Dave any detail to flush out whatever

21    prior --

22        Q    Generated the call?

23        A    Um-hum.

24        Q    The 911?

25        A    Um-hum.

SUPERIOR COURT REPORTING   (419) 241-7417

```
 1        Q    And if you would have thought, did you give

 2   those facts to Mr. Bright at any point?

 3        A    No, actually I didn't.  Dave came back in

 4   service, said he had one, they were transporting one

 5   so I assumed that whatever his understanding of the

 6   facts and circumstances was, that he was comfortable

 7   enough to not need my assistance.

 8        A    Okay.  So you basically took the

 9   information from the caller but you never relayed it

10   to Officer Bright; is that correct?

11        A    Correct.

12        Q    Okay.  Now at any time after this incident

13   did you relate it to him?

14        A    I think we talked about it afterward, yes.

15        Q    After I sued him?

16        A    I think it was prior to that.

17        Q    After I challenged him in court?

18        A    It might have been about that time

19   actually.

20        Q    All right.  So did he tell you it was

21   dismissed in court?

22        A    I wasn't aware of the circumstances --

23        Q    Okay.

24        A    -- or the disposition.

25        Q    Do you know what he was charged with?
```

SUPERIOR COURT REPORTING   (419) 241-7417

1          A     I think it was failure to disclose personal

2     information.

3          Q     All right.  And how do you know that?

4          A     I think we talked about it from the court

5     date.

6          Q     And what is your understanding of a failure

7     to disclose personal information?

8          A     I guess maybe a basic reading of it is if I

9     think somebody's about to commit a crime or involved

10    in criminal activity that I can go up and request

11    their personal information and if they fail to

12    provide me with that personal information, then I can

13    time them in custody.

14         Q     But if they provide it to you, then you

15    really can't?  You wouldn't take them into custody,

16    you would ticket them, wouldn't you?

17         A     With that basic scenario, you know, I would

18    need to know what --

19         Q     Who they are?

20         A     No.  I would need to know what crime, you

21    know, are they walking out of the back of a house?

22         Q     Yeah.

23         A     Yeah.  I would take them into custody.  Are

24    they standing on a street corner drinking a 40-ounce,

25    that might be different.

SUPERIOR COURT REPORTING   (419) 241-7417

1          Q     I've got you.  So it would depend on the

2    facts and circumstances as you observed them?

3          A     Yes.

4          Q     So if I understand your testimony, I just

5    want to make sure I've got this right, you don't have

6    any written documentation within the police records

7    of what occurred that day other than your memory?

8          A     That's correct.

9          Q     Okay.

10         A     With I guess the one caveat I would add is

11   after driving there the little bell in my head went

12   off with a guy walking down the middle of the street

13   with a gun.

14         Q     Yeah.

15         A     And I don't know if they said it was in a

16   holster or not, but I seem to remember thinking I

17   wonder if this is one of those instances.

18         Q     Okay.  Now that's a thought you had?

19         A     Um-hum.

20         Q     And you're referring to a previous instance

21   or are you referring to the thing that was on the

22   board?

23         A     Well, it wasn't on a board, but yeah.  I

24   think it was on the board.

25         Q     It's like a notices and bulletin?

                SUPERIOR COURT REPORTING   (419) 241-7417

1       A       Yes and no.  For us it's more of a

2   clipboard and they just as ones come along they just

3   stack them on top and if you want to take the

4   initiative to read through it, some stuff depending

5   on the type of N. and B. it is you have to initial

6   saying yes I did read this, but a lot of stuff is

7   just hey F.Y.I.

8       Q       So prior to this incident you knew people

9   might be walking around with open carry and you ought

10  to be aware of it?

11      A       Yes.

12      Q       So you had that notice somewhere and you

13  were aware of it?

14      A       Yes.

15      Q       And so when -- and I think what you said

16  was as you were sitting there or observing, you were

17  wondering if it was one those situations where you

18  ought to just --

19      A       I think it was prior, prior to me getting

20  there.

21      Q       So you were thinking about that --

22      A       Sure.

23      Q       -- on your way over there?

24      A       I mean like I mentioned, we just don't,

25  generally don't have instances where we run across

1    people that take advantage of open carry.

2         Q     Now I don't know if I asked you this.  Have

3    you ever been disciplined?

4         A     Yes.

5         Q     And what was the circumstances of that?

6         A     The first time I tased somebody who was at

7    the wheel of a motor vehicle, behind the wheel of a

8    motor vehicle.  Well, for what it's worth I was

9    directed to do it.  I felt comfortable about it at

10   the time in that we had the vehicle immobilized but

11   if you're behind the wheel you can't tase somebody.

12        Q     That's a rule like that?

13        A     Yeah.  And it makes perfect sense.  I can't

14   argue the specifics here but that car wasn't going

15   anywhere.

16        Q     Right.  I got you.

17        A     Another time I engaged in some horseplay

18   over the air on the radio and was disciplined for

19   that as well.

20        Q     What do they do in that case?  Just put

21   like don't do that again and put a little mark in

22   your thing or do they give you a couple days off or

23   how do they do discipline?

24        A     For both those instances it's what's called

25   a counseling which is essentially a retraining, don't

SUPERIOR COURT REPORTING   (419) 241-7417

1    do this, don't do that.

2         Q    It's not part of their procedure and --

3         A    Right.  Those instances are, I guess in the

4    big picture are relatively minor and from their

5    perspective and mine it's simply a training issue.

6         Q    Are there any other instances?

7         A    Of discipline?  Not to my knowledge, not

8    that pops out at me.

9         Q    All right.  Now is there a difference

10   between discipline and reprimands and --

11        A    It's --

12        Q    How does it work?

13        A    Counseling, counseling is your first step

14   of discipline, and I've been through the process so

15   I'm familiar.  It's counseling and then I believe

16   it's an oral reprimand, then a written reprimand and

17   once you pass those two steps, then they're looking

18   at a days off type of situation.  To the best of my

19   knowledge, and again I just haven't been through the

20   process enough to --

21        Q    Have you been counseled?

22        A    Yes.  Counseling is the first step and

23   that's the don't tase people behind the wheel of a

24   motor vehicle, don't engage in horseplay on the

25   radio.

```
 1        Q    So those were counseling sessions?

 2        A    Yes.

 3        Q    Have you ever gotten orally reprimanded?

 4        A    No.

 5        Q    So you've never got above the counseling

 6   part?

 7        A    No.

 8        Q    And are those the only two instances you

 9   can recall?

10        A    To the best of my knowledge, yeah.  I want

11   to say there's a third counseling in there but I

12   can't recall for the life of me what it is.  I mean

13   for what it's worth, counseling is --

14        Q    A slap on the hand?

15        A    I wouldn't even say it's a slap on the

16   hand.  It's, hey, don't do that.

17        Q    Okay.  Now have you ever received any

18   complaints by people?

19        A    Yeah, sure.

20        Q    Many?

21        A    No.  I would qualify that though and say if

22   you're -- if you are a hard worker you're going to

23   come across enough people on a regular basis that --

24        Q    That will complain?

25        A    -- they just don't like your level of
```

SUPERIOR COURT REPORTING   (419) 241-7417

```
 1    service that you provide them and they're unhappy

 2    with it.  So I received complaints but nothing that's

 3    ever been substantiated for what it's worth or where

 4    somebody's gone to internal affairs.

 5         Q    That's what I'm asking.  I was going to ask

 6    that next.

 7         A    Right.

 8         Q    So you received some complaints.  Did any

 9    of them ever go to internal affairs or result in any

10    kind of reprimand?

11         A    Well, a lot of complaints do go to internal

12    affairs but --

13         Q    They investigate?

14         A    -- resulting in discipline, the radio issue

15    was an internal affairs complaint.

16         Q    Okay.  And that resulted in retraining for

17    a little bit or something?

18         A    Yeah.  Essentially it's -- they essentially

19    say don't do this again.  I mean it was a pretty

20    simple retraining.  Don't do this and then they keep

21    a copy of that record, depending on the type of

22    discipline it is, that discipline I think they keep a

23    copy of it for six months in your file.

24         Q    Now when you were at the scene with Mr.

25    Northrup --
```

SUPERIOR COURT REPORTING   (419) 241-7417

1         A    Um-hum.

2         Q    -- if I recall you said you didn't get out

3    of your car?

4         A    No.

5         Q    So at the time did you know what they

6    charged him with?

7         A    I did not.

8         Q    So that came later?

9         A    My knowledge of the charges?  Yes.

10        Q    That came later.  Okay.  And does the

11   police department have a policy if you view another

12   officer acting improperly you're required to report

13   it?

14        A    Yes.

15        Q    Have you ever been in a situation where you

16   had to do that?

17        A    I have not.

18        Q    If you saw a police officer making up a

19   charge against somebody, would that be an incident

20   you would report?

21        A    I would think so.

22        Q    I mean you would do that?

23        A    Yeah.

24        Q    Now can you tell me, what is your

25   understanding when it's permissible to approach and

SUPERIOR COURT REPORTING    (419) 241-7417

44

1    question somebody just sitting in their automobile

2    not doing anything?

3          A     If --

4          Q     They're sitting in a parking lot in their

5    car not doing anything.

6          A     And I have nothing that leads me to believe

7    that there's something --

8          Q     No.  You're just driving by and you see

9    them sitting there?

10         A     I'm driving by and I see somebody sitting

11   there I'd probably keep driving by.

12         Q     Now what would be something that would

13   allow you to go and approach them to talk to them?

14         A     Let's say that parking lot that that car is

15   parked in has had a rash of break ins.

16         Q     Now if you saw -- if you were in a

17   restaurant, same thing, what facts would lead you to

18   have to go talk to somebody or go talk to somebody in

19   a restaurant?

20         A     In a restaurant?

21         Q     Any public place, I don't care.  I mean I

22   picked a restaurant, just popped in my head.

23         A     Well, we'll stick with a restaurant.

24   They're drunk and out of control, they're loud,

25   they're belligerent, they're trying to start fights.

SUPERIOR COURT REPORTING   (419) 241-7417

1        Q     So you're looking for facts that would lead

2     to what?  Some reason to talk to them?

3        A     Yeah.

4        Q     Okay.  Now what's your understanding of

5     what probable cause means?

6        A     That a reasonable person believes that

7     something that -- a group of reasonable people, let's

8     say, a reasonable person believes that a crime has

9     been or is about to be committed.

10       Q     And in your training do they talk about

11    what facts and circumstances lead to that and what

12    doesn't?

13       A     They do talk about facts and circumstances,

14    but I think what they kind of try to impress upon you

15    is that there is a standard that you have to meet but

16    everybody's standard is sometimes different depending

17    on your training, your experience, the facts as you

18    know.

19             I pull up and I see Mr. Northrup in

20    handcuffs, you know, Dave pulls up before I got there,

21    we've obviously seen two totally separate so --

22       Q     Right.  That's what I'm trying to find out.

23    You understand as part of your training and

24    experience that police officers appearing at the

25    scene at different times can have different beliefs?

1          A     Yeah.  I would actually even say that

2    police officer viewing the exact same incident can

3    come up with two different, I guess, standards of

4    what should happen, you know, from point A. to point

5    B.

6          Q     Do you know what the purpose of Officer Ray

7    was there?

8          A     I believe that he either showed up because

9    of the -- it was a gun call, a call involving a gun

10   because he either just showed up to be of assistance,

11   which happens on a regular basis, or Dave requested

12   him there.  I'm not sure which.

13         Q     When you have a gun call do you have to

14   have a supervisor?

15         A     No.

16         Q     Okay.  Do supervisors normally appear at

17   gun calls?

18         A     Depending on your supervisor.  Some

19   supervisors are going to show up on every call you're

20   at no matter what because they want a supervisor.

21   Other supervisors aren't going to show up unless you

22   specifically request them to be there.  Some

23   supervisors, depending on manpower or things like

24   that, will go to calls.

25         Q     Well, you can see that from Plaintiff's

```
 1    Exhibit One that Daniel Ray was a supervisor, right?

 2         A    Um-hum.

 3         Q    You said because he's a zero, he's a

 4    supervisor?

 5         A    Yes.

 6         Q    That's how you know that?

 7         A    Yes.

 8         Q    Now he was dispatched within minutes of you

 9    guys --

10         A    Okay.

11         Q    -- so they were all dispatched, somebody

12    dispatched the supervisor or he acknowledged he was

13    going there.  Can you tell from that which it is?

14         A    Looks like Dave and I were dispatched it

15    looks like at 5:13:32 and then Danny, Sergeant Ray

16    was dispatched at 5:14 so --

17         Q    About a minute later?

18         A    Yeah.

19         Q    Now would that be like ASSTER means that

20    he's being dispatched to that or he's saying he'll

21    assist?  I was asking about you because you've got

22    the same thing.

23         A    You dispatch -- Dave is dispatched to the

24    call, Dave's the primary, Dave's the primary unit

25    that's going to the call.  Myself and Sergeant Ray
```

1      were dispatched to assist Dave on that call.

2          Q    So where it says DISPER, that's Dave being

3      assigned to that call, he ought to go there?

4          A    That's my understanding of it.

5          Q    And you two were being assigned to help --

6          A    Yes.

7          Q    -- follow-up or whatever?

8          A    Yes.

9          Q    And then the next thing it says, it looks

10     like ONSCNE is an abbreviation of 821, so that's

11     when --

12         A    That's when Dave arrived on scene.

13         Q    And he's putting himself out there?

14         A    Yes.

15         Q    Is that what that would be, he's telling

16     him them I'm here?

17         A    Yes.

18         Q    And then do you know what ATLOC means?

19         A    At location.

20         Q    Okay.  So that's -- which would be the put

21     out, the at location because that would be --

22         A     Okay.  So the original call was a guy

23     walking down Rochelle carrying a handgun out in the

24     open.  So Dave gets somewhere in the

25     neighborhood of -- okay.  I'm going to go up a little

SUPERIOR COURT REPORTING   (419) 241-7417

1    bit.   21 Rochelle Drive.

2         Q    Right.

3         A    So Dave's somewhere in the neighborhood of

4    21 Rochelle Drive when he puts himself on scene.

5         Q    Okay.

6         A    And then at location he changes his, he

7    changes from 21 Rochelle to 600 block of Hayes.

8         Q    I got you.   That's what -- I was going ask

9    you that.   Do you know what that means?

10        A    Yep.

11        Q    So we are on Hayes Road now?

12        A    Yes.

13        Q    So we're really not on Rochelle anymore?

14        A    Yes.   So then you go down to the next one,

15   the air is closed because he's been dispatched to a

16   gun call.   When you're dispatched to a gun call they

17   close the air which means they stop radio traffic.

18        Q    So if he's in an emergency people can

19   respond?

20        A    Yes.

21        Q    I got you.   So everybody's listening?

22        A    Yes.

23        Q    Okay.   And then what is 6:23 is when you

24   got there?   So the next one it says 17:22:28, you're

25   at 600 Hayes?

SUPERIOR COURT REPORTING   (419) 241-7417

```
1          A     Yes.

2          Q     So that's you?

3          A     Yes.

4          Q     And then it looks like you arrived before

5     Officer Ray because -- by seven seconds it looks

6     like?

7          A     That's how the dispatch log reads, but what

8     I can tell you is a lot of times you'll arrive on

9     scene and not immediately say hey I'm here.

10          Q     I'm here, okay.  So you were both on scene

11     relatively close?

12          A     (Indicating.)

13          Q     Okay.  And then when he at 17:24 says open

14     the air, what does that mean?

15          A     That means that -- open the air means

16     you're opening the air to radio traffic again.

17          Q     That you've got it under control?

18          A     That whatever the -- dispatch will close

19     the air no matter what on any kind of a gun call and

20     then they leave it up it up to the officer, officers

21     on scene to open the air when they feel that I guess

22     their safety is ensured.

23          Q     So did you see Officer Bright disarm Mr.

24     Northrup?

25          A     I did not.
```

SUPERIOR COURT REPORTING   (419) 241-7417

```
 1        Q     So before you arrived he was already

 2   disarmed?

 3        A     Yes.  Well, I don't know that.  He was in

 4   handcuffs when I arrived on scene.

 5        Q     Well, do you normally handcuff somebody

 6   with a firearm on their hip?

 7        A     That depends on how you want to, I guess,

 8   handle the situation.  I guess it depends on the

 9   situation.  If I'm -- it depends on the situation.

10        Q     How would you approach somebody, you know,

11   walking down the street with a firearm on his hip and

12   you were dispatched to it?

13        A     Again it depends on the situation but just

14   if I was dispatched to somebody with a firearm on

15   their hip, I don't think that I would disarm them

16   necessarily.  I don't know that I would put them in

17   handcuffs either, but if I got dispatched to somebody

18   walking down the street with a firearm on their hip

19   and I drove up and they had blood all over them, I

20   think I would.

21        Q     Do something?

22        A     Yeah.

23        Q     So again it depends on what you observe --

24        A     Yep.

25        Q     -- and the circumstances and the facts?
```

SUPERIOR COURT REPORTING   (419) 241-7417

1      A    Um-hum.

2      Q    I got you.  Now can you tell me what desk

3  means?

4      A    That means that -- where's desk.  It means

5  that --

6      Q    It says CHGLOC?

7      A    Yeah.  Officer Bright, who was 821, he's

8  going to the desk, he's going to do -- the desk is

9  paperwork.

10     Q    So he's going to the cruiser to write down

11  something?

12     A    Generally you're going to go to the Safety

13  Building or at that -- the Safety Building or the

14  Scott Park district station and do paperwork.

15     Q    Oh, I see.  So the call's over at that

16  point and he's just going back to the office to fill

17  out his paperwork?

18     A    I guess his on-scene involvement is over at

19  that point.  You're technically still on your call

20  till you come back in service but --

21     Q    All right.  Do you know what it means where

22  it says, you know, 823 06/16/10 message from 823C

23  I'll take and IDA?

24     A    Yes.  IDA means you're taking yourself off

25  a call.  Actually IDA means -- I'm sorry.  IDA

1    doesn't mean you're taking yourself off a call.    IDA

2    means that you canceled yourself without any

3    involvement in the call which is --

4        Q    So you didn't have any involvement, you're

5    just saying I'm off?

6        A    With the exception of the phone call to the

7    homeowner that I didn't think was going to be of any

8    assistance, I just took myself off the call.

9        Q    Right.  And then when you say clear, that

10   means you're available again?

11       A    Yes.

12       Q    What's D/I?

13       A    D. is David or IDA, same thing.

14       Q    Okay.  Now --

15       A    I should -- I don't know what D. means

16   because as I went down -- I think it means, I think

17   it means that I took myself off the call and I came

18   back in service because if you look down below

19   there's a 201 and an 806 E., my understanding of E.

20   is you offered assistance, you rendered assistance on

21   the call so I assume because Danny Ray was 806,

22   that's why he puts himself in D.

23       Q    Well, it says clerks too next to the 821C,

24   do you know what that means?

25       A    Yeah, that means Dave went to the clerk to

SUPERIOR COURT REPORTING   (419) 241-7417

```
 1    file his affidavits.

 2         Q    And where do you do that?

 3         A    Depends on the time you're working but in

 4    the afternoon you probably take your affidavits to

 5    the Muni Court building and file them there.  If it's

 6    after hours, Muni Court supplies us with a clerk that

 7    has an office in the Safety Building itself.

 8         Q    And the purpose of filing the affidavit

 9    with the clerk is to?

10         A    Essentially to formally charge somebody.

11    I'm going to charge Mr. Northrup with failure to

12    disclose personal information.

13         Q    So that's what he's doing?

14         A    Yeah.

15         Q    He's filling the --

16         A    The affidavit, yes.

17         Q    When you say affidavit, is that like the

18    ticket?

19         A    A traffic ticket is a little bit different

20    but --

21         Q    Citation would be better?

22         A    Affidavit.

23         Q    It's an affidavit?

24         A    It depends on what you're -- I don't think

25    he gave him a traffic ticket.  He could have given an
```

SUPERIOR COURT REPORTING   (419) 241-7417

```
1    all-purpose citation, but an all-purpose citation

2    you're generally going give somebody a summons and a

3    court date so my understanding is he'd swear out an

4    affidavit which is a little bit more of a longer form

5    document.

6                        MR. ELLIS:        Mark this as

7                   Exhibit Two.

8                        (WHEREUPON Plaintiff's Deposition

9                   Exhibit Two-Combs marked for

10                  identification.)

11        BY MR. ELLIS:

12        Q    I'm going to hand you Plaintiff's Exhibit

13   Two, and if you would just look at the last page, if

14   you can tell me if that's what you're talking about?

15        A    It an all-purpose citation.

16        Q    That's what that is?

17        A    Yep.

18        Q    So that's what you're talking about, that's

19   what he's doing there with the clerk at that point?

20        A    Yes.

21        Q    And that's the first piece of the paperwork

22   you give?

23        A    Yes.  Well, no.  Actually it is.  I believe

24   it is.  I haven't seen an A.P.C. book in a couple

25   years but there's usually three or four copies,
```

```
 1    there's a records section copy, a --

 2         Q    I see it says record section copy on the

 3    top there.

 4         A    Copy for defendant, or a copy for the

 5    officer and I think a copy for the clerk as well.

 6         Q    So this went into your record section, your

 7    police record section?

 8         A    Yep.

 9         Q    So this is not the one he filed, but it's

10    one that -- it would be like this?

11         A    Yes, that's correct.  In fact I think the

12    Court copy is probably the top copy because it's the

13    most legible.

14         Q    So it's like a carbon copy?

15         A    Um-hum.

16         Q    And it serves as a subpoena for the person

17    to show up in court?

18         A    Yes.

19         Q    And I see there's a summons down there with

20    a date that Shawn appears to have signed?

21         A    Yes.

22         Q    And then the rest is like the crime report.

23    Is that something you'd fill out if you were the

24    primary officer?

25         A    Yes.
```

SUPERIOR COURT REPORTING   (419) 241-7417

1       Q    And you didn't have to do that?  You didn't

2   give any input on that, right?

3       A    I did not.

4       Q    Did you look at this?

5       A    I have not.

6       A    All right.  I won't have you do it now

7   then.  Have you looked at your phone records for that

8   day and produced them to the prosecutor?

9       A    I have not.

10       Q    Has he asked you for them?

11       A    Not to my knowledge.

12       Q    Okay.  Would you do that for me?

13       A    Certainly.

14       Q    For that day?

15              MR. ELLIS:         John, would

16          you get that from him?

17              OFFICER COMES:     The one issue

18          is going to I got married and I

19          switched over to my wife's carrier is

20          Verizon.  I'll have to get it through

21          Sprint.  I don't know how simple or

22          difficult that process is going to be.

23       BY MR. ELLIS:

24       Q    I would just like the record for that day

25   in that timeframe.  I don't need the whole thing, I

1    just need that if that would be okay?

2         A    Certainly.

3         Q    Okay.  And that is the phone you used to

4    call the person up here on the screen with the

5    number?

6         A    Um-hum.

7         Q    Okay.  The date was 6/16/10, if it helps

8    you, it says 1730 on the police report if that helps

9    you.  So I would say if you look at that Exhibit A.

10   there it tells you the time in which it started?

11        A    Okay.  Oh, Exhibit One?

12        Q    Yeah, Exhibit One.  It starts at 17:10 and

13   it goes to 21, 21:48 I guess.  Well, whenever you

14   left.

15        A    Okay.

16        Q    You can look at it, I can talk to John

17   about what it is.  And on that particular day you

18   were traveling alone?

19        A    Yes.

20        Q    Besides your radio in the automobile, your

21   cruiser, do you ever call dispatch on your phone?

22        A    Um-hum.

23        Q    And why do you do that?  You have to answer

24   yes or no so she can get it.

25        A    I'm sorry.  We call dispatch --

SUPERIOR COURT REPORTING   (419) 241-7417

1     Q     Would it be yes first, you do call

2     dispatch?

3     A     I do call dispatch, yes.

4     Q     Thank you.

5     A     We call dispatch I guess for any number of

6     reasons, to put yourself -- to log yourself into the

7     dispatch system, you can also do that over your radio

8     but sometimes if you're trying to get -- I guess

9     because of the limitations of the computer screen if

10    you're trying to get more details from dispatch, a

11    lot of times the dialogue box they type in only has

12    so much space in it, so especially on a lengthy call

13    sometimes you might try to call dispatch if you feel

14    the need to access that information.

15    Q     Okay.  And do you use your personal phone

16    for any other reason other than dispatch or maybe

17    call witnesses?  I'm talking in the line of a

18    patrolman's duty.

19    A     I use it to call -- no.  I use it, I use it

20    quite a bit.  I use it to call friends that I work

21    with, I use it to call supervisors, I use it to call

22    our investigations bureau to get their opinions on

23    how to handle something.

24    Q     When you call the investigative bureau, who

25    do you call there?

SUPERIOR COURT REPORTING   (419) 241-7417

```
 1          A      We start out with the desk.  It's common
 2    term is 212 which is our crimes against person's
 3    bureau.  You start off with the -- I don't know if
 4    clerical worker is the right term, but you start off
 5    with the girl at the desk, and then she'll route you
 6    to one of the sergeants depending on who's working
 7    and then --
 8          Q      Do you call them to help you formulate the
 9    charges, is that what you're doing?
10          A      You generally call them if you're I guess
11    unsure of, you know, is this a crime, is it not a
12    crime, you know, that type of stuff.
13          Q      And they help you?
14          A      They'll offer their, I guess, advice.  I
15    don't know if help is the right word.
16          Q      They'll give you advice on where you might
17    be able to cite them or something like that?
18          A      Yes.
19          Q      Where to look?
20          A      Or bring that person down, don't bring them
21    do, you know, whatever.
22          Q      Now do you carry a three-ring binder in
23    your car?
24          A      Currently -- at the time I did.
25          Q      What did you have in the three-ring binder?
```

```
 1          A     Map book, I had the department manual,

 2    updates, things like that, T.N.C., O.R.C., D.U.I.

 3          Q     You had the Toledo Municipal Code?

 4          A     Um-hum.

 5          Q     And then you had the Ohio Revised Code?

 6          A     Um-hum.

 7          Q     The whole thing in there?

 8          A     Not the Ohio -- actually the Ohio Revised

 9    Code I think I had a supplement, but actually on my

10    Smart Phone I had an app that took you right to the

11    Ohio Revised Code.

12          Q     So I could look up different sections?

13          A     Right.

14          Q     So you use your Smart Phone to look up the

15    Ohio Revised Code, too?

16          A     Yes.

17          Q     And you're talking about at the time you

18    had the binder, you don't do it anymore because you

19    have an app?

20          A     No.  Nowadays I have a desk that I keep all

21    my stuff at.

22          Q     But that would be like officers would carry

23    that to help them.  Is that assigned by the Toledo

24    Police Department or is that something they make up?

25          A     Meaning the binder?
```

```
 1        Q     Um-hum.

 2        A     Guys will carry -- it differs from officer

 3   to officer.  Some guys carry volumes of material and

 4   other guys carry the absolute basics, a citation pad,

 5   an A.P.C. pad, a couple crime reports and we -- some

 6   guys don't need it and other guys do.  I don't know

 7   if that answers your question or not.

 8        Q     Well, what you're really saying is some

 9   people have to look it up and some people don't?

10        A     Yes.

11        Q     That's what you're saying, right?

12        A     Yeah.  Or the guys that don't look it up

13   are comfortable asking somebody their opinion and,

14   you know, leaning on them for advice.

15        Q     Well, your supervisor would help you on the

16   scene too, wouldn't he?

17        A     Um-hum.

18                   THE REPORTER:      Yes?

19                   OFFICER COMES:     Yes.  I

20             apologize.

21   BY MR. ELLIS:

22        Q     I try to catch that but I forget.  So I

23   just want to, I'm just going to clear myself and I

24   think I'm going to end your deposition.  You didn't

25   really get out of your car?
```

SUPERIOR COURT REPORTING   (419) 241-7417

```
 1        A     Um-hum.

 2        Q     And you didn't give him any input?

 3        A     No.

 4        Q     And you didn't tell him what to charge him

 5   with?

 6        A     No.

 7        Q     Okay.

 8                    MR. ELLIS:          I am going to

 9                end the deposition with the

10                reservation, depending on the phone

11                records, whether I want to ask him some

12                more questions.

13                    MR. MADIGAN:        Okay.  Can I

14                ask him a question?

15                    MR. ELLIS:          Sure

16                absolutely.

17                         *  *  *

18                    DIRECT EXAMINATION

19        BY MR. MADIGAN:

20        Q     Officer Comes, referring to Plaintiff's

21   Exhibit Number One --

22        A     Um-hum.

23        Q     -- that first notation there which takes

24   place at 17:11:40 --

25        A     Um-hum.
```

SUPERIOR COURT REPORTING   (419) 241-7417

1    Q    -- it says here well W.M., what does that

2 mean?

3    A    I guess it's M. C. is mail caller

4 anonymous, white mail walking his dog on Rochelle

5 carrying a handgun out in the open.

6    Q    Does that notation tell you whether the gun

7 was in a holster or in his hand or how he was

8 carrying it?

9    A    It does not.  It just says it's out.

10              MR. MADIGAN:       That's all I

11         have.

12                    * * *

13              RECROSS-EXAMINATION

14    BY MR. ELLIS:

15    Q    Would the dispatcher normally put whether

16 it's in a holster or not?

17    A    Depends on what kind of information the

18 original caller gives them.

19    Q    If the original caller said to them a guy's

20 walking down the street with his pistol in a holster,

21 would you expect them to put that in there?

22    A    I guess I would answer that this way.

23 You're going to get, you're going to get different

24 texts depending on dispatchers.  Some dispatchers are

25 going to put every single word in there, some

```
 1   dispatchers, and oftentimes because of the amount of

 2   material they're trying to process, they're going to

 3   try to whittle it down to something more palatable.

 4         Q     But as you approach the scene you observe

 5   and try to figure it out yourself then?

 6         A     Yeah.

 7         Q     Okay?

 8               MR. ELLIS:           I don't have

 9               any more questions but I still would

10               reserve the right to recall.

11               MR. MADIGAN:         Okay.  Did you

12               want to read over the deposition,

13               Officer Comes?

14               OFFICER COMES:       No.

15               MR. MADIGAN:         We'll waive

16               that.

17               MR. ELLIS:           Thank you,

18               Officer.  It's 3:00, I'm saying it's

19               3:00 in the afternoon.  Officer Bright

20               was supposedly to be here at 1:30 for

21               his deposition.  Now it's 3:00, he's

22               still not here.  We haven't had word

23               from him.

24               John has attempted to contact him,

25               Madigan, and so we're going to suspend
```

SUPERIOR COURT REPORTING   (419) 241-7417

```
1            the depositions because he's not here.

2

3

4              (WHEREUPON the deposition

5         concluded at 3:06 p.m.)

6

7              (Signature Waived.)
                DONALD T. COMES
8

9         *  *  *  *  *  *  *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

        SUPERIOR COURT REPORTING    (419) 241-7417
```

```
1   STATE OF OHIO       :

2   COUNTY OF LUCAS   :      C-E-R-T-I-F-I-C-A-T-E

3              I, ELLEN L. LANGEL, Notary Public in and

4   for the State of Ohio, duly commissioned qualified,

5   do hereby certify that the within named DONALD T.

6   COMES, was by me first duly sworn to testify to the

7   truth, the whole truth and nothing but the truth in

8   the cause aforesaid; that the testimony then given

9   by him was by me reduced to stenotype in the

10  presence of said witness, afterwards transcribed

11  upon a computer, that the foregoing is a true and

12  correct transcript of the testimony so given by him

13  as aforesaid; and that this deposition was completed

14  without adjournment.

15             I do further certify that the signature of

16  the said witness to the transcript of his deposition

17  was waived by the witness and counsel for the

18  respective parties.

19             I do further certify that I am not a

20  relative, employee or counsel of any of the parties

21  hereto, and further that I am not a relative or

22  employee of any attorney or counsel employed by the

23  parties hereto, or financially interested in the

24  action.

25             IN WITNESS WHEREOF, I have hereunto set my
```

68

```
 1   hand and affixed my seal of office at Toledo, Ohio,

 2   on this 6th day of January, 2014

 3                         ELLEN L. LANGEL

 4                    Notary Public in and for the
                           STATE OF OHIO
 5

 6   My Commission Expires:  February 9, 2017

 7               * * * * * * * * *

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Incident History for: TOP10130812

Received:      17:10.21
Entered:      6/16/2010 17:11:40    By: TPC6 / 8360        Entry Time:      0.00:1.00:19.00
Dispatched:   6/16/2010 17:13:32    By: TPD3 / 8429        Wait Time:       00:01:52
Route:       6/16/2010 17:13:32                       Dispatched Time:   00:00:00
Onscene:      6/16/2010 17:19:20                       Enroute Time:     00:05:48
Closed:       6/16/2010 21:21:48                       Onscene Time:    04:02:28

Type:   WEAPONS  (WEAPON VIO./MAN W/GUN/KNIFE)            Premise: NN
Severity: 2    Priority: 2       DPR:            DSPO: C    Alarm Level:     Tract: 8600
Group: TOP8    Beat: B820      Police Area: 636       Fire Area: 1414      EMS Area: N-5
LOC: 21 ROCHELLE RD ,TO
Name: WISE DEBORAH         Addr: 21 ROCHELLE RD ,TO     Phone: 7427934

| | | | | |
|---|---|---|---|---|
| 6/16/2010 17:11:40 | 8360 | ENTRY | | M/C ANON .. W/M WALKING HIS DOG ON ROCHELLE CARRYING A HAND GUN OUT IN THE OPEN |
| 6/16/2010 17:13:22 | 8429 | HOLD | | |
| 6/16/2010 17:13:32 | 8429 | DISPER | 821C | #Q2346 BRIGHT,DAVID R. |
| 6/16/2010 17:13:32 | 8429 | ASSTER | 823C | #Q2360 COMES,DONALD |
| 6/16/2010 17:14:07 | 8429 | ASSTER | 806 | #Q1814 RAY,DANIEL A. |
| 6/16/2010 17:16:01 | 8429 | MISC | 821C | , 6'4 LONG PONYTAIL TAN PANTS WHT SHIRT WALKING ON BAPST TWDS HOLLAND SYLVANIA |
| 6/16/2010 17:19:20 | 8429 | ONSCNE | 821C | |
| 6/16/2010 17:22:05 | 8429 | ATLOC | 821C | [600 HAYES ] |
| 6/16/2010 17:22:09 | 8429 | MISC | 821C | , AIR CLOSED |
| 6/16/2010 17:22:28 | 8429 | CHGLOC | 823C | [600 HAYES] |
| 6/16/2010 17:22:35 | 8429 | CHGLOC | 806 | [600 HAYES] |
| 6/16/2010 17:24:47 | 8429 | MISC | 821C | , OPEN THE AIR |
| 6/16/2010 17:26:08 | 8429 | ONSCNE | 806 | |
| 6/16/2010 17:58:38 | 8517 | CHGLOC | 821C | [DESK] |
| 6/16/2010 17:58:48 | 8517 | MISC | 823C | , 06/16/10 17:58:35 MESSAGE FROM: 823C I'LL TAKE AN IDA FROM THIS |
| 6/16/2010 17:58:51 | 8517 | CLEAR | 823C | D/I |
| 6/16/2010 18:10:21 | 8517 | ONSCNE | 821C | |
| 6/16/2010 18:14:30 | 8517 | ASSTOS | 201 | [600 HAYES] #Q2098 TROENDLE,MICHAEL |
| 6/16/2010 18:14:34 | 8517 | CHGLOC | 201 | [SCOTT PARK] |
| 6/16/2010 18:21:29 | 8517 | ONSCNE | .201 | |
| 6/16/2010 18:26:20 | 8517 | CHGLOC | 806 | [SP] |
| 6/16/2010 18:29:57 | 8517 | ONSCNE | 806 | |
| 6/16/2010 18:50:44 | 8517 | CLEAR | 201 | D/E |
| 6/16/2010 21:03:33 | 8429 | CHGLOC | 821C | [CLERKS] |
| 6/16/2010 21:07:18 | 8429 | CLEAR | 806 | D/E |
| 6/16/2010 21:18:06 | 8517 | ONSCNE | 821C | |
| 6/16/2010 21:21:48 | 8517 | CLOSE | 821C | 06/16/10 D/C |
| 6/16/2010 21:21:48 | 8517 | CLEAR | 821C | D/C |



PLAINTIFF'S DEPOSITION EXHIBIT

PENGAD 800-631-6989

1 Comes
8/21/13 82

JUL. 7. 2014 2:46PM   CITY TOLEDO PROSECUTOR4192451083          No. 6264   P. 15

## CRIME REPORT

**POLICE DEPARTMENT**
TOLEDO, OHIO Form 38.1(a) Rev. 3/97

| | UCR Code | 1. VICTIM Last, First, Middle (Firm Name if Business) | 2. Report No. |
|---|---|---|---|
| | | State Of Ohio | 034128-10 |

| 3. Crime (List Additional in Narrative) | 4. Location of Occurrence | 5. R.A. |
|---|---|---|
| FAILURE TO DISCLOSE PERSONAL INFORMATION | 702 Hayes | |

| 6. HATE/BIAS ☐ | If Hate/Bias Give Type | 7. Type of Premises or Business Where Offense Was Committed |
|---|---|---|
| JUVENILE ☐ | 8. Victim Injured | Street |
| GANG RELATED ☐ | Treatment | 9. Date and Time Occurred 6-16-10 1730 | 10. Date and Time Reported 6-16-10 1730 |
| BAR ☐ | 11. Reporting Person's Name (Last, First, Middle) | 12. Victim's Race | Sex | Age | D.O.B. | Social Security Number |
| OFFICER ASSAULTED ☐ | Listed Officer | | | | | |
| CRIME ANALYSIS ☐ | 13. Reporting Person's Residence Address | 14. Res. Phone | 15. Victim's Residence Address | City | Zip | 16. Res. Phone |
| | 17. Reporting Person's Business Address | 18. Bus. Phone | 19. Victim's Business Address | City | Zip | 20. Bus. Phone |

| 21. WITNESS | WITNESS NO. 1 NAME (Last, First, Middle) | Age | Residence Address | Zip Code | Res. Phone | Bus. Phone |
|---|---|---|---|---|---|---|
| | WITNESS NO. 2 NAME (Last, First, Middle) | Age | Residence Address | Zip Code | Res. Phone | Bus. Phone |

| 22. VEHICLE | Color | Year | Make | Model | Style | License No. (State, Year) | V.I.N. |
|---|---|---|---|---|---|---|---|
| | Registered Owner's Name | | Registered Owner's Address | | | HOLDER | TOWED BY: |

| 23. SUSPECT | SUSPECT NO. 1 - NAME (Last, First, Middle) | 24. Race | 25. Sex | 26. Age | 27. D.O.B. | 28. Hgt. | 29. Weight | 30. Hair | 31. Eyes |
|---|---|---|---|---|---|---|---|---|---|
| | Northrup, Shawn C. | W | M | 41 | 8-21-68 | 6-2 | 240 | BRO | BRO |
| | 32. Address (Apt. No.) Zip Code | | | | 33. Date and Time of Arrest | | 34. F.C.O./Summons Crt. Date | | |
| | 111 Dutton Toledo   43615 | | Phone | | 6-16-10 1730 | | 6-25-10 1300 | | |
| | 35. Relation to Victim | | 37. Arrest warrant/attachment ☐ on view | | | 38. Arrest Number | | | |
| | | | T.P.O. | | | APC 40266 | | | |
| | 39. Clothing and Other Identifiers (Scars, Marks, Tattos) | | 40. Weapon(s) | | | | | | |

| 2. Records Use Only | SUSPECT NO. 2 - NAME (Last, First, Middle) | 24. Race | 25. Sex | 26. Age | 27. D.O.B. | 28. Hgt. | 29. Wgt | 30. Hair | 31. Eyes |
|---|---|---|---|---|---|---|---|---|---|
| 034128-10 | 32. Address (Apt.) Zip Code | | | | 33. Date and Time of Arrest | | 34. F.C.O./Summons Crt. Date | | |
| | | | Phone | | | | | | |
| | 35. Relation to Victim | 36. Social Security # | 37. Arrest warrant/attachment ☐ on view | | | 38. Arrest Number | | | |
| | | | T.P.O. | | | | | | |
| | 39. Clothing and Other Identifiers (Scars, Marks, Tattos) | | 40. Weapon(s) | | | | | | |

| 41. PREMISES TYPE | | 42. POINT OF ENTRY | 43. LOCATION | 44. METHOD USED |
|---|---|---|---|---|
| 1. ☐ Single Family | 8. ☐ Hospital/Medical | 15. ☐ Parking Lot/Garage | 1. ☐ Door | 1. ☐ Front | 1. ☐ Open/Unlocked |
| 2. ☐ Apt/Duplex | 9. ☐ Office Bldg | 16. ☐ Park/Playground | 2. ☐ Window | 2. ☐ Rear | 2. ☐ Body/Force |
| 3. ☐ Hotel/Motel | 10. ☐ Manufacturer | 17. ☒ Highway/Street | 3. ☐ Garage Door | 3. ☐ Side | 3. ☐ Pry/Cutting |
| 4. ☐ School | 11. ☐ Shopping Mall | 18. ☐ Field/Woods | 4. ☐ Adjacent Premise | 4. ☐ Roof | 4. ☐ Break Glass |
| 5. ☐ Church | 12. ☐ Chain Store | 19. ☐ Other | 5. ☐ Wall | 5. ☐ Other | 5. ☐ Other Method |
| 6. ☐ Bar/Restaurant | 13. ☐ Small Business | | 6. ☐ Upper Floor | | 6. ☐ Unknown |
| 7. ☐ Bank | 14. ☐ Gas/Convenience Store | | 7. ☐ Other | | |

| 46. PROPERTY | | | | | | |
|---|---|---|---|---|---|---|
| QTY. | S R D | PROPERTY DESCRIPTION | MODEL | SERIAL OR OAN# | VALUE |
| | S☐R☐D☐ | | | | |
| | S☐R☐D☐ | | | | |
| | S☐R☐D☐ | | | | |
| | S☐R☐D☐ | | | | |

| 46. WHO NOTIFIED/AT SCENE: 805, 201, 212, 281 | | TOTAL | $0.00 |
|---|---|---|---|

| 47. Report Made By: | Officer(s) Name(s) I.D. # Unit No./Section | 48. Officer Assigned to Case | 49. Supervisory Approval |
|---|---|---|---|
| Bright, D. #2346 | 821C/2-5 | | |

50. DISPOSITION: A☐Death of Offender B☐Prosecution Declined C☐Extradition Denied D☐Victim Refuses to Cooperate E☐Juvenile/No Custody F☐Cleared by Arrest - Adult G☐Cleared by Arrest - Juvenile H☐Warrant Issued I☐Investigation Pending J☐Inactive K☐Unfounded L☐Adjusted U☐Unknown

PLAINTIFF'S DEPOSITION EXHIBIT
2 comes
8/21/13
PENGAD 800-631-6989

Jul. 7. 2010 2:46PM    CITY TOLEDO PROSECUTOR4192451083    No. 6264    P. 11

| 3. Crime FAILURE TO DISCLOSE PERSONAL INFORMATION | 1. Victim (Last, First, Middle) State Of Ohio | 4. Location of Occurrence 702 Hayes | | 2. Report No. 034128-10 |
|---|---|---|---|---|

51. EVIDENCE: (Where Found, By Whom, Disposition)

| 52. N A R R A T I V E  I T E M | DETAILS: (Address the categories listed below, where applicable, in the order they appear)<br>(1) List additional victims/crimes  (2) List additional witnesses  (3) List additional suspects, descriptions, charges.<br>(4) If juvenile involved as victim or suspect, list parent's (last, first, middle), phone number, school attended, and whether notified.<br>(5) Indicate time and location where victims and witnesses may be contacted for later follow-up.<br>(6) Itemize additional property taken: give name, brand, model, serial no., caliber of guns, identifying marks and value of each item.<br>(7) List additional physical evidence, where found, by whom, disposition and identifying marks.<br>(8) Provide additional description on vehicle (unusual paint, body, marks or damage). Describe additional vehicles.<br>(9) If vehicle stolen, give Title number and value. Car unlocked, keys in ignition? List name of insurance and/or finance company.<br>(10) If offense was hate/bias oriented, explain circumstances.<br>(11) Reconstruct the incident - include all necessary elements of the crime. |
|---|---|

| 11 | On the date and time listed, the pro called 911 for a white male walking his dog through the |
|---|---|
| | neighborhood with a gun on his hip in the open and wanted it checked out.  The pro gave the |
| | description of a white male wearing a white t-shirt, tan shorts, with a brown pony tail.  Upon arrival |
| | this officer spotted a male walking down Hayes that matched the description given.  As this officer |
| | drove up, closer to the suspect, this officer did observe the listed suspect wearing a black semi- |
| | automatic handgun on his hip in the open, holstered.  This officer proceeded to stop the suspect to |
| | conduct an investigation as to weather the suspect was leagally carrying the weapon or violating the |
| | Weapons Under Disability Act.  During the stop, this officer first asked the suspect to hand over the |
| | dog leash to his wife, which he did immediately.  The suspect was then told to raise his hands |
| | away from his weapon, due to this officer not knowing the suspect along with not knowing what his |
| | intentions were with the weapon.  The suspect refused to raise his hands away from the weapon, |
| | instead he grabbed his cell phone and started to fumble around with it near the weapon.  This |
| | officer had to repeat his command to the suspect to hand over the cell phone to his wife and raise |
| | his hands several more times.  Once the suspect raised his hands, the suspect was told to turn |
| | around away from this officer.  Once again the suspect first refused to turn around and asked what |
| | this was all this about.  The suspect was told he would be informed as to the nature of the stop once |
| | this officer had secured the suspect's weapon off his hip for the safety of the suspect and this officer's |
| | safety.  The suspect finally turned around and the weapon was secured by this officer.  After being |
| | told the nature of the stop, the suspect stated he was legally carrying his weapon and then was |
| | asked for his identification.  The suspect refused to hand over his I.D. after being asked to see it |
| | several times.  The suspect finally handed over his I.D.  and refused to answer anymore questions. |
| | The suspect continued to show aggressive behavior and was still very confrontational toward this |

To insert additional pages, select "Insert" on Menu Bar, then "File". Click on 'G0 36_1 Page 2'.

Jul. 7. 2010  2:46PM  CITY TOLEDO PROSECUTOR4192451083  No. 6264  P. 2

| 3. Crime<br>FAILURE TO DISCLOSE PERSONAL INFORMATION | 1. Victim (Last, First, Middle)<br>State Of Ohio | 4. Location of Occurrence<br>702 Hayes | 2. Report No.<br>034128-10 |
|---|---|---|---|

**51. EVIDENCE:** (Where Found, By Whom, Disposition)

| | |
|---|---|

**52.**
**N A R R A T I V E  I T E M**

**DETAILS:** (Address the categories listed below, where applicable, in the order they appear)

(1) List additional victims/crimes   (2) List additional witnesses   (3) List additional suspects, descriptions, charges.

(4) If juvenile involved as victim or suspect, list parent's (last, first, middle), phone number, school attended, and whether notified.

(5) Indicate time and location where victims and witnesses may be contacted for later follow-up.

(6) Itemize additional property taken: give name, brand, model, serial no., caliber of guns, identifying marks and value of each item.

(7) List additional physical evidence, where found, by whom, disposition and identifying marks.

(8) Provide additional description on vehicle (unusual paint, body, marks or damage). Describe additional vehicles.

(9) If vehicle stolen, give Title number and value. Car unlocked, keys in ignition? List name of insurance and/or finance company.

(10) If offense was hate/bias oriented, explain circumstances.

(11) Reconstruct the incident - include all necessary elements of the crime.

| 11 | officer; and was wearing a T-shirt stating "This is the shirt I wear when I don't give a shit" and within arms reach of this officer. Due to past experiences, all these actions and manner of dress caused this officer to be concerned for his personal safety, who was still alone because back-up crews had not arrived on scene. So the suspect was put in cuffs and place into the patrol vehicle for the officer's safety to be able to continue the investigation. It was determined that the suspect was legally able to carry a weapon. The suspect was issued an A.P.C. for failing to hand over his I.D. when it was requested. The suspect was released from the scene with his weapon. |
|---|---|

To insert additional pages, select "Insert" on Menu Bar, then "File". Click on 'GO 38_1 Page 2'.

Jul. 7. 2010  2:46PM  CITY TOLEDO PROSECUTOR4192451083  No. 6264  P. 13

| 3  APPROVED DISPOSITION | | | |
| --- | --- | --- | --- |
| ☐ Unfounded | ☐ Cleared - No Arrest | | |
| ☐ Cleared by Arrest | ☐ Adjusted | | |
| ☐ Investigation Continues | ☐ Inactive Case | | |

**TOLEDO POLICE DEPARTMENT**
**SUPPLEMENTAL CRIME REPORT**

TPD 38.3                                                 Rev. 4/95(a)

| 1  VICTIM Person Reporting Offense | 2  Records Section No. |
| --- | --- |
| 4  Location of Occurrence | **State Of Ohio** | |
| **702 Hayes** | | **034128-10** |
| 5  Type of Premises or Name of Business Where Offense Was Committed | 6  Victim's Race, Sex, Age D.O.B. | 7  Date & Time of this Report |
| **street** | | **6-16-10  2000** |
| 8  Date & Time Occurred  9  Date & Time Reported | 10  Address of Victim/Person Reporting | 11 Phone |
| **6-16-10  1730      6-16-10  1730** | | |

| 12  Form Used As:    CONTINUATION SHEET    SUPPLEMENTAL | FOLLOW-UP | R.R.E. | 13  Further Police Action Req'd. |
| --- | --- | --- | --- |
| ☐ FOR CURRENT REPORT    ☒ INFORMATION | ☐ INVESTIGATION | ☐ DISPOSITION | ☐ YES    ☐ NO |
| 14  Type of Report Continued: | 15  Offense Reported as: | 16  Change to: | |
| ☒ CRIME    ☐ JUVENILE    ☐ FOLLOW-UP | ☐ TMC    ☐ ORC | ☐ TMC    ☐ ORC | |

| 17  (To Be Completed By Officer Preparing Felony Package) | | | | |
| --- | --- | --- | --- | --- |
| IDENTIFICATION | STATEMENT | SEARCH | Arrest Date: | Prelim. Date: |
| ☐ On View | ☐ None | ☐ Incident to Arrest | Criminal History:    ☐ YES    ☐ NO | |
| ☐ One on One | ☐ Oral | ☐ Waiver of Search | Printout Enclosed:    ☐ YES    ☐ NO | |
| ☐ Line Up | ☐ Taped    ☐ Written | ☐ Search Warrant | Investigator(s): | |
| ☐ Photo | ☐ Waiver of Rights    P R Number | | Duty Hrs.    Phone: | |

18

The original caller for this incident is Allen Rose 21 Rochelle Toledo Oh 43625  567-742-7934

| 19  Officer Reporting - I.D. No. | 20  Typed by: Date/Time | 21  Supervisor's Approval | Date | Time |
| --- | --- | --- | --- | --- |
| david richard bright | drb    **6-16-10  2000** | | | |

Jul. 7. 2010  2:46PM   CITY TOLEDO PROSECUTOR4192451083            No. 6264   P. 14

CASE NO. .......................

RID NO. .......................            REC. NO. 034128-10

☒ STATE OF OHIO   ☒ CITY OF TOLEDO

Name ...............................................

Street ...............................................

City, State, Zip: Toledo  OH  43613

| SEX | HEIGHT | WEIGHT | HAIR | EYES | RACE | OTHER |
|-----|--------|--------|------|------|------|-------|
| M | 6-1 | 240 | Bro | Bro | W | |

D.O.B.                    S.S.N.

6-1-68

ALIAS                                      PHONE

PLACE OF EMPLOYMENT

| DATE | MONTH | | YEAR | TIME |
|------|-------|--|------|------|
| 16 | June | | 2010 | 130 |

DESCRIPTION
OF OFFENSE  Refused to disclose
Personal information

LOCATION OF VIOLATION

In Violation Of.  ☒ ORC ☐ TMC #   2921.29(A)(1)

CIRCLE ONE ➔ MISD   1   2   3 (4) M

**IT IS IMPORTANT THAT THE VIOLATOR READ THE IN-
STRUCTIONS ON THE REVERSE SIDE OF THIS FORM.**

☒ ■  Summons in lieu of arrest without warrant and complaint on
      such summons. Rule 4(A)3 READ NOTICE #1

☐ ●  Summons after arrest without warrant and complaint on such
      summons. Rule 4(F) Read Notice #1

☐ ★  Minor misdemeanor citation. Rule 4.1  READ NOTICE #2

IF YOU FAIL TO APPEAR AT THE TIME AND PLACE STATED
BELOW A WARRANT MAY BE ISSUED FOR YOUR ARREST.

SUMMONS

You are ordered to appear at 1:20 P. M. on the 25 day
of July 20 10, in the
Toledo Municipal Court, 555 N. Erie St., Toledo, Ohio.

x _____
       SIGNATURE OF DEFENDANT

This complaint with summons was served personally on the defendant on
_____ June 16 20 10

_____
       SIGNATURE OF ISSUING OFFICER

Officer's Name (print)                    I.D. No.

_____                   234K

RECORDS SECTION COPY
40266