

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

SHAWN C. NORTHRUP,      :
                    :
       Plaintiff,    :
                    :
   v.              :  Case No:
                    :  3:12-CV-01544-JJH
                    :  Judge Helmick
CITY OF TOLEDO, et al.,  :
                    :
       Defendants.   :

- - -

Deposition of **SHAWN C. NORTHRUP**, a
Plaintiff herein, called by the Defendant as upon
Cross Examination pursuant to the Federal Rules of
Civil Procedure, taken before Vicki L. Plant, Court
Reporter and Notary Public in and for the State of
Ohio, at the offices of Lydy & Moan Ltd.,
4930 Holland-Sylvania Road, Sylvania, Ohio, on
Thursday, January 9, 2014, commencing at 9:00 a.m.

- - -



# SEAGATE
Reporting Service, Inc.

405 Madison Avenue, Suite 900  ~  Toledo, OH 43604
PHONE: 419-241-2070    TOLL FREE: 888-419-2070    FAX: 419-241-4718    WEB: www.seagatereporting.com

2

I N D E X

Deposition of **SHAWN C. NORTHRUP:**

                                                    Page/Line

CROSS EXAMINATION By MR. MADIGAN...........   3     18

- - -

*E X H I B I T S*

                                                    Page/Line

NONE MARKED

- - -

*O B J E C T I O N S*

   Entered by                               Page/Line

MR. ELLIS................................  25    11

- - -

3

1      APPEARANCES:

2      On behalf of the Plaintiff:

3      LYDY & MOAN LTD.:
       Daniel T. Ellis
4      4930 Holland-Sylvania Road
       Sylvania, Ohio  43560  419-517-7741
5

6      On behalf of the Defendants:

7      CITY OF TOLEDO DEPARTMENT OF LAW:
       John T. Madigan
       One Government Center, Suite 2250
8      Toledo, Ohio  43604  419-245-1020

9                     - - -

10             SHAWN C. NORTHRUP,

11  being first duly sworn, as hereinafter certified,

12  testified and said as follows:

13         MR. MADIGAN:     Dan, can we have the

14         usual stipulations as to the

15         qualifications of the court reporter?

16         MR. ELLIS:      I'm sure she's

17         qualified.

18            CROSS EXAMINATION

19  BY MR. MADIGAN:

20  Q  Mr. Northrup, my name is John Madigan as you

21     probably know already, I'm the attorney for the

22     City of Toledo, and we're here to take your

23     deposition, and you sat through the other ones so

24     you know what to expect.

25        I'm going to be asking you questions regarding

4

```
1              this and other things.  If I don't make myself
2              clear or you don't understand it, please feel free
3              to ask me to repeat it and I will.
4                   Do you have any problems testifying today?
5              Are you under any medication or any other thing
6              that would impair your ability?
7       A      I'm okay to testify.
8       Q      Okay.  Do you understand English?
9       A      Yes.
10      Q      First of all, I'd like to ask you:  What is your
11             height?
12      A      6-foot 2.
13      Q      And your weight?
14      A      It varies between 220 and 240.
15      Q      And your date of birth, please.
16      A      8-21 of 1968.
17      Q      Where were you born?
18      A      Montpelier, Ohio.
19      Q      And your present address, please.
20      A      111 Dulton Drive, Toledo.
21      Q      How long have you lived there?
22      A      Since I'm going to say 2001.
23      Q      And you're a resident of Toledo.  And are you
24             employed?
25      A      I'm unemployed right now.
```

5

1    Q    When did you become unemployed?

2    A    I had my own business -- the last four or

3         five years.

4    Q    In 2010, were you employed?

5    A    No.

6    Q    And let's talk about your education.  First of

7         all, how far have you gotten in school?

8    A    I graduated from high school, I went on to

9         studying mechanical engineering in Monroe Community

10        College, went there for a year.  Went back to

11        school at the University of Toledo around 2001 or

12        2002 for two years, and then I went to

13        Statzenberger College to study Microsoft

14        engineering, and got some certifications there.

15   Q    And what did you study at the University of

16        Toledo?

17   A    The University of Toledo I took some computer

18        science classes, but a lot of it was refresher

19        since the last time I was in school was like right

20        out of high school in '88.  I did English Comp,

21        Comp 1 and 2, Algebra 1 and 2, Psychology, you

22        know, stuff like that.

23   Q    So did you get a degree from Monroe Community

24        College?

25   A    No.

6

| | | |
|---|---|---|
| 1 | Q | Did you get a degree from the University of |
| 2 | | Toledo? |
| 3 | A | No. |
| 4 | Q | Did you get any type of certification from |
| 5 | | Statzenberger? |
| 6 | A | Yeah.  I got a certification for computers, |
| 7 | | yeah. |
| 8 | Q | When was that that you got that? |
| 9 | A | Maybe 1999, 2000, somewhere around there. |
| 10 | Q | And do you live with anyone right now? |
| 11 | A | With my wife and my daughter. |
| 12 | Q | And that's on Dulton Street? |
| 13 | A | Yes. |
| 14 | Q | Is your wife employed? |
| 15 | A | Yes. |
| 16 | Q | Where does she work? |
| 17 | A | Toledo Public Schools. |
| 18 | Q | Are you a member of any organizations, clubs, or |
| 19 | | associations? |
| 20 | A | I'm a member of the NRA. |
| 21 | Q | National Rifle Association? |
| 22 | A | Yeah.  And I'm a member at Adams Conservation |
| 23 | | Club. |
| 24 | Q | And any other organizations that you are a member |
| 25 | | of? |

7

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | How long have you been a member of the |
| 3 | | National Rifle Association? |
| 4 | A | As long as I can remember, maybe the last |
| 5 | | 15 years.  I subscribe yearly. |
| 6 | Q | You're not a lifetime member? |
| 7 | A | No, I just renew a subscription every year. |
| 8 | Q | Calling your attention to June 16, 2010, what were |
| 9 | | you wearing that day that you had this encounter |
| 10 | | with the Toledo police department? |
| 11 | A | Tennis shoes, white khaki shorts, and a T-shirt. |
| 12 | Q | Did any of these items that you were wearing have |
| 13 | | any letters or words written on them? |
| 14 | A | The particular shirt I had, yeah.  It said, this |
| 15 | | is the shirt I wear when I don't care, and it was |
| 16 | | something my wife got me.  It was like $5, so it |
| 17 | | would be like a work around the house shirt, had |
| 18 | | holes in it.  That particular day I had been |
| 19 | | putting a radiator in my car. |
| 20 | | She came home from work and said, honey, you |
| 21 | | want to go for a walk, and I said, yeah, sure, |
| 22 | | let's go.  So I didn't think anything of the shirt, |
| 23 | | didn't change clothes, we just asked the kids if |
| 24 | | they wanted to go for a bike ride and they said, |
| 25 | | yeah, so off we went. |

8

```
 1   Q    How many children did you have with you?

 2   A    I had my daughter and my grandson.

 3   Q    How old is your daughter?

 4   A    My daughter right now is 16, then she would be 11

 5        or 12.  This was four years ago, almost three and a

 6        half years ago.

 7   Q    And your grandson was her son?

 8   A    No.

 9   Q    You have another child?

10   A    My wife was previously married and had -- she was

11        married so I have a stepdaughter and she's older

12        and she's had a child.  That would make my step

13        grandson, my grandson.

14   Q    I get the picture now.  Not your 11-year-old

15        daughter's son?

16   A    No.

17   Q    You were walking on what street when you

18        encountered the police department?

19   A    I believe it was Hayes.

20   Q    Okay.  And you were wearing a gun at that

21        time?

22   A    Yes.

23   Q    Do you wear a gun every time you go out for a

24        walk?

25   A    Yes.
```

9

```
 1    Q    And why do you wear a gun every time you go out
 2         for a walk?
 3    A    Well, there's several reasons.  I mean, don't
 4         exactly live in a great neighborhood, but it's not
 5         a bad neighborhood, but bad things can happen to
 6         good people at any time.  I take security of my
 7         family seriously, I take my personal security
 8         seriously, and I'm an advocate for firearms to
 9         educate people to let them know they're okay,
10         they're not dangerous.  Open carry is a lawful
11         activity.
12    Q    On that particular day, was it nighttime, morning,
13         afternoon, evening that you were walking?
14    A    I'm saying it was early evening, it was
15         summertime, very bright out.
16    Q    Have you had problems with criminal activity from
17         any of these walks that you've taken?
18    A    Yeah.
19    Q    What type of problems?
20    A    Dulton and Rochelle, two times we were confronted
21         with a pit bull.  One of the houses alongside of a
22         carry out there, and it was always off leash and
23         the one particular time that this happened that
24         really scared us, we were all walking, kids on the
25         bikes, I always carry the dog on its leash.  I have
```

10

1       a Yorkshire terrier, he's like ten pounds.

2           We're walking along talking, all of a sudden

3       his leash went taut, and I turned around and looked

4       and he's nose to nose with the pit bull, and I

5       didn't see where it came from.  I turned around,

6       oh, my God, what's going on, I thought he was going

7       to eat my dog.  My dog is urinating, and luckily

8       the pit bull was wagging its nubby tail, and I'm

9       like, okay, I started pulling my dog back.  And it

10      didn't attack my dog, but it could very well have

11      and there would have been nothing I could have done

12      about it because I didn't have my firearm on me, it

13      was covered up, it was tucked in my shirt.

14          I don't know if I would have shot it, who

15      knows what would have happened, but I felt at that

16      time I should open carry so it would be more

17      readily available.  Also it's more comfortable too

18      because it's so hot out in the summertime.

19   Q   This incident happened when?

20   A   Well, we've been going on these walks regularly

21      since early spring, since the weather broke.  We'd

22      been walking that route dozens and dozens of times.

23      And when did that happen with the dog, I think

24      April, May maybe that happened.

25   Q   Of 2010?

11

1    A    Yes, I believe so.

2    Q    Was that the only incident you had with dogs or

3         hostile people?

4    A    No.  That same dog, like I said, it was usually

5         off leash, and the owners weren't home.  It was a

6         rented house, there were kids.  Every time I saw

7         the dog it was kind of wondering around.  And we

8         didn't see it in the yard sometimes when we'd be

9         walking by, and all of a sudden, it's there

10        trailing us, following alongside of us, you

11        know.

12            We'd just kind of shoo it off, go home, go

13        home.  The neighbors would see this.

14   Q    So that dog never attacked you; is that what

15        you're saying?

16   A    It didn't attack, but you didn't really know what

17        its intentions were being it was a pit bull, and a

18        lot bigger than my dog.

19   Q    Did you have any contact with people that would

20        cause you to fear for your safety during these

21        walks?

22   A    No.

23   Q    Let me ask you this:  Have you ever been convicted

24        of a felony offense in the State of Ohio?

25   A    No.

12

1   Q   Had you ever been arrested before in the State of

2       Ohio?

3   A   Yes.

4   Q   What was that for?

5   A   Let me see, Ottawa Hills railroaded me and

6       arrested me for carrying a concealed weapon in a

7       moving vehicle, which I wasn't in the vehicle and

8       the vehicle wasn't moving, and I didn't have a gun

9       on me.

10   Q   When did that happen?

11   A   2008.

12   Q   What was the result of those charges or that

13      arrest?

14   A   Well, they arrested me, took me to jail -- what

15      was the result of that?

16   Q   Yes.  Were you charged?

17   A   They charged me with a felony.

18   Q   And what happened to that case?

19   A   I hired lawyers, and the first attorney lived in

20      Ottawa Hills --

21          MR. ELLIS:     He just wants to know

22          what happened.

23   A   Instead of battling out in court and spending a

24      whole bunch of money that I didn't want to have to

25      spend like everybody does, and I'd never been

13

1        through the court systems, so I made a bad

2        decision on the first attorney, bad decision on

3        the second attorney, and I ended up taking a plea

4        bargain.

5   Q  What did you plea to?

6   A  Disorderly conduct.

7   Q  Was that as a minor misdemeanor or misdemeanor

8        fourth degree?

9   A  I don't know.

10          MR. ELLIS:     Minor misdemeanor.

11   Q  You didn't do any jail time in other words?

12   A  No.  Just the day or so in jail that I was

13        there.

14   Q  But after you pled no contest or guilty, you

15        didn't do any jail after that, did you, for

16        that?

17   A  No.

18          MR. ELLIS:     Minor misdemeanor, he

19          paid a $75 fine.

20   Q  That was in what year?

21   A  2008.

22   Q  That's the only prior police contact you've ever

23        had?

24   A  No.

25   Q  Okay.  What other police contacts have you had?

14

| | | |
|---|---|---|
| 1 | A | Police contacts or police arrests? |
| 2 | Q | Let's go with arrest first. |
| 3 | A | You asked arrest earlier, it was that. The other |
| 4 | | one was I got pulled over for speeding and I didn't |
| 5 | | have insurance, I think I just got a ticket then. |
| 6 | | But then I was driving before without insurance and |
| 7 | | I got taken to jail for that. Suspended driver's |
| 8 | | license, I want to say it was 1991, something like |
| 9 | | that. |
| 10 | | I'm trying to think. I think it was '92 or |
| 11 | | '93 I was arrested for speeding -- I was pulled |
| 12 | | over for speeding, the officer asked me if I had |
| 13 | | been drinking, and I said I was at the |
| 14 | | German American Festival. And she goes, well, |
| 15 | | have you been drinking, I said I had a couple |
| 16 | | beers. She goes, well, since you admitted to me |
| 17 | | that you've been drinking, I'm going to write you |
| 18 | | up for a DWI, but when you get downtown and take |
| 19 | | the breathalyzer, and you pass the breathalyzer and |
| 20 | | everything is fine, you can go home. |
| 21 | | And I said, okay, fine, I mean I can't really |
| 22 | | argue with her. So she arrested me, took me |
| 23 | | downtown, took the breathalyzer, passed the |
| 24 | | breathalyzer, but I was arrested. |
| 25 | Q | And there was no charge filed against you for |

15

1        that?

2    A    They dropped the charges of the DWI, but I think

3        they plead down to reckless operation of a

4        vehicle because how could she tell -- the thing

5        was, she told me I was speeding, but I was behind

6        her.  How can I be speeding if I'm behind her, you

7        know.

8    Q    Is that the end of your police arrests?

9    A    Arrests, yeah, not encounters.

10   Q    Prior to June 16, 2010, and your encounter with

11       the Ottawa Hills police, had you ever been stopped

12       or questioned regarding a weapon?

13   A    Yes.

14   Q    When and where was that?

15   A    That was in my own yard.

16   Q    That's on what street?

17   A    111 Dulton Drive, Toledo, Ohio.

18   Q    When did that happen?

19   A    That happened in 2008, might have been May, early

20       spring, by the Toledo Police.

21   Q    Tell me what happened there.

22   A    You want to know.  I was outside, we got home from

23       grocery shopping, I had my whole yard landscaped

24       and stuff like that.  I was out front, you know,

25       looked really nice in the spring, and I try to keep

16

1    it nice looking year around.

2        I have maple crimson trees, they have those

3    little whirlybirds and seedlings start all over the

4    place.  So I went out there, we just got done

5    putting groceries away, and she was going to start

6    making dinner.  I said, I'm going to walk around

7    the yard, pull these things out, pull weeds,

8    whatever.

9        So I was out front underneath my tree pulling

10   weeds, the little whirlybird baby maple trees, and

11   I heard a car drive by, several cars drove by, and

12   my back was to the road.  I had a cover shirt on,

13   it was kind of breezy that day.

14       And the next thing I hear is, do you have a

15   license for that.  And I looked over my shoulder as

16   he's saying this and I turn around, and there's a

17   police car pulled in my yard and there's a guy

18   standing there, you know, do you have a license for

19   that.

20       And I said, can I stand up and turn around,

21   and he said, yeah.  And I said what's going on.  He

22   goes, do you have a permit for that.  I said,

23   permit for what.  He goes, the gun, and I said,

24   yeah, I do, but I'm on private property, I really

25   don't need to have a permit for it.

17

1      And he asked me for my permit, I said, well,

2      can I reach in my back pocket and get it for you.

3      At the time I had a chain on my wallet, so I said,

4      it's hooked on the chain, I'm just going to pull it

5      out because it's on my right side where my gun is,

6      and was wearing a cover shirt.

7      And I opened it up and said there's my gun,

8      I'm going to pull out my wallet because I didn't

9      want to get shot in my own yard.  And I gave my

10     concealed carry permit, and he went back to his car

11     and he was running that, doing whatever he does

12     with it.

13     And I got on my cell phone and called my wife,

14     and I said, you better get out here right now.  So

15     she was in the process of coming out.  And then I

16     called my friend, which is a Toledo police officer

17     which I just saw when I picked my daughter up at

18     school a couple hours earlier, and I was going to

19     call him.

20     And the officer got out of his car and he

21     said, you're making me nervous.  And I'm like,

22     what, I'm making you nervous.  He says, yeah,

23     you're making me nervous with that gun, I'm going

24     to take it.  I'm like, okay, how are we going to

25     do this, you know, he wasn't giving me any

18

1    instructions.  He said he wanted my gun, I

2    didn't know if I was supposed to hand it to him

3    or what.

4         So I said, what are we going to do.  I mean,

5    if you want to take it, I turned my body to him,

6    it's right here, I opened up my shirt, go ahead and

7    do what you got to do.  He came over, took my gun,

8    and then went back in the police car again.

9         At the time my wife was out there, and I said,

10   I'm going to call so and so, and I called my friend

11   who was an off duty cop, and just as I was talking

12   to him, two other police cars come up from two

13   different directions, came skidding to a stop.

14        I got a hold of my friend on the phone, I was

15   like, hey, this is Shawn, can you come over to my

16   house right away.

17        And right then and there, the one officer

18   tackled me over the hood trunk of the car, took my

19   phone away, threw that, closed it, snapped it

20   closed, threw it.  Reached into my pocket, grabbed

21   a hold of my scrotum, squeezed, twisted, and I'm

22   like, what is going on here, what are you guys

23   doing this for.

24        I didn't understand it, I'm in my own yard

25   minding my own business.  And then he patted me

19

1      down, gave a nod to Officer Number 1, he's good,

2      he's okay, he's clean.

3           So then I just stood there, with my wife, and

4      all my neighbors looking out, my neighbors here, my

5      neighbors over here, my neighbors across the

6      street, neighbors over there, people stopping in

7      the street.  This whole ordeal thing is going on in

8      my yard.

9           Whatever he was doing in the car, he was

10     checking serial numbers on my gun to see if it was

11     stolen or something because I saw him holding it up

12     and calling something in.

13          So I asked one of the other two officers, I

14     said, can you get a superior officer out here or

15     something because this is ridiculous and they're

16     like, yeah, one is on the way.

17          So anyway, Officer 1 got out of the car and

18     they all stood three in a row, and we're in my yard

19     and he's telling me how I should carry my gun.  You

20     got a concealed carry permit, you need to keep it

21     concealed.  When I drove by, the wind blew your

22     shirt up, and I saw it.  And I said, what business

23     is it of yours -- you're on my private property

24     right now, why do I have to show you my ID, my

25     concealed carry permit on private property, you're

20

1    trespassing, I told him he was trespassing, leave

2    my property, he didn't.  Then he continued to

3    lecture me on how to carry a firearm.

4        All three of them doing this with their finger

5    pointing it at me, and the one big guy that threw

6    me over the hood of the car, I said, you know what,

7    guys, I don't need to listen to this.  I'm going to

8    go in my house, am I free to go.  No, you're not

9    free to go.

10       And I told them I wasn't going to listen to

11   this, I said I don't need to listen to you guys,

12   you don't know what the heck you're talking about,

13   and that's when Officer Number 1 came up to me and

14   did one of those grabs on my elbow and squeezed it

15   on the nerve, and he said, that's it, you're going

16   in the car.

17       The next thing you know I'm sitting in the

18   backseat of the car with my neighbors getting in

19   their cars, driving by looking at me sitting in

20   the backseat of a car.  And my wife is calling

21   911.

22 Q   Let's get to the end of this.  Did you get charged

23   with anything?

24 A   Don't you want to hear what the officers did to

25   me?

21

1   Q    No, I don't.  I just want to know what happened;

2        how did it end?

3   A    It ended in -- superior officer showed up, my

4        friend that I called that was off duty that day

5        showed up.  The other officers looked at him like

6        what are you doing in our crime scene, get the heck

7        out of here.  He explained to the sergeant,

8        Sergeant McCaleb, how he came to be there, that I

9        called him.

10            The police officers and Sergeant McCaleb

11       talked for a while, then she came over to the car,

12       opened up the door, and said, Mr. Northrup, you can

13       get out of the car now.  I said, okay, am I free to

14       go, can I have my permit and my gun back, and she

15       said, yes, you may, sir.  She gave me my firearm

16       and magazine and my concealed carry permit.

17            And my wife and I told her we want a report

18       made because these officers patrol in this

19       neighborhood, we live in this neighborhood, this

20       was uncalled for, it was unprofessional.  It was

21       uncalled for, you know, and I just wanted a report

22       made.  And she said, I promise you we will make a

23       report of this, and we emphasized how much we

24       wanted a report made because I didn't want this

25       happening again.  This was in my yard.

22

| | | |
|---|---|---|
| 1 | Q | Let me ask you this:  Did you make an internal |
| 2 | | affairs report of that incident? |
| 3 | A | I tried.  Do you know who I talked to? |
| 4 | Q | No. |
| 5 | A | It was Sergeant Russell, internal affairs.  Do you |
| 6 | | know her? |
| 7 | Q | No. |
| 8 | A | She refused to take my complaint.  She said, I'm |
| 9 | | not going to take your complaint, I can't do that. |
| 10 | | Do you have any proof that this happened.  I said, |
| 11 | | no, what do I have to do come in here with a |
| 12 | | videotape. |
| 13 | Q | Let me go to another question:  Did you take any |
| 14 | | legal action against the officers as a result of |
| 15 | | that incident? |
| 16 | A | No.  I did call the chief of police.  We tried |
| 17 | | going that route, we wanted to talk to him, and |
| 18 | | tell him what happened.  I called Sergeant McCaleb, |
| 19 | | she told me to call her Friday because she'd have |
| 20 | | the report, the incident report.  When I called |
| 21 | | her, she said, oh, well, I talked to the detectives |
| 22 | | bureau and they said it wasn't necessary to make a |
| 23 | | report.  So there is no report. |
| 24 | Q | After this incident, how did you feel toward the |
| 25 | | Toledo police officers in their approach to people |

23

1     carrying guns?

2   A  How did I feel?

3   Q  Yes.  Do you feel like they treated people fairly

4      or treated you fairly?

5   A  I thought they were unprofessional.

6   Q  Did you feel that you were being singled out

7      because of the fact that you carry a gun regularly

8      around that neighborhood?

9   A  No.

10  Q  Going back to the carrying of your weapon, you say

11     you use it for protection.  Have you ever used it

12     to stop a criminal act in progress?

13  A  I don't know, it's kind of hard to say.  I talk to

14     my neighbors quite a bit or they talk to me because

15     I open carry around my yard, and my neighbors allow

16     me in their yard, open carry, it's fine with them.

17     They say they feel safer.

18        Last year there were a lot of break ins

19     throughout the neighborhood, and they hit every

20     house in the neighborhood surrounding us except for

21     our street.  And that's when my neighbors came up

22     to me, and they said, hey, maybe it's because you

23     open carry and they decided not to come down our

24     street or whatever.

25        I guess, well, if I was a criminal, I'd drive

24

```
 1        by the houses, see who's home, who's working, and

 2        who's not.  Well, that guy has a gun.  I guess I'll

 3        move on to the next neighborhood.  So does it deter

 4        any crime, I don't know, maybe it did or maybe it

 5        didn't.

 6    Q   Do you see yourself as like a neighborhood watch

 7        person?

 8    A   No.  I take my security seriously, it's not my job

 9        to protect anybody else.  That's up to the Toledo

10        police.

11    Q   Well, let me ask this question:  Do you think the

12        Toledo police do a good job of protecting you and

13        your neighbors in your neighborhood?

14    A   Do I think they do a good job?

15    Q   Yes, from criminal activity.

16    A   I don't know how to answer that really.  What are

17        you trying to get at; can you rephrase it?

18    Q   Do you think the Toledo police presence in your

19        neighborhood deters crime?

20    A   I've never seen the presence in my neighborhood

21        until that day when they stopped in my yard.  I

22        never noticed them.

23    Q   You're saying the police ignore your

24        neighborhood?

25    A   No.  I'm just saying I never noticed them, they
```

25

1    never noticed me.  I really never had to call

2    the police on anything suspicious in the

3    neighborhood.

4  Q  I'm just trying to figure out what kind of

5    neighborhood you live in.  You talked about first

6    of all kind of having criminal problems and now

7    you're saying that there's no need for police

8    activity because it's a pretty safe neighborhood.

9    What is it, is it a safe neighborhood or an unsafe

10    neighborhood?

11          MR. ELLIS:      I'm going to object to

12          the characterization of his testimony,

13          which is incorrect, and also the manner in

14          which he's asked a compounded question,

15          and it's also argumentative.

16          Now, John, if you wouldn't mind, if

17          you would make it simpler and

18          non-compounded, and let him answer,

19          please.

20  Q  Do you feel you live in a safe neighborhood?

21  A  I would say relatively safe, and relatively is the

22    key word there.

23  Q  Why do you say relatively safe?

24  A  Crime can happen anywhere at any time to anybody.

25    Doesn't matter your income level, your race, color,

26

1     creed, doesn't matter.  Random acts of crime happen

2     all the time.

3  Q  Has there been any criminal acts committed against

4     you and your family in that neighborhood?

5  A  No.

6  Q  Going back to the dog incident, which you talked

7     about earlier, did you report that stray dog at any

8     time to the Lucas County Dog Warden?

9  A  They wouldn't do anything, no, that's why I

10    didn't.  It was usually hanging around the guy's

11    house, I didn't really ever see it chained up, but

12    none of the other neighbors called the Lucas County

13    Dog Warden either or they might have and they might

14    have not done anything about it.  I don't know.

15 Q  To answer my question:  Did you contact the

16    Dog Warden?

17 A  No.

18             MR. ELLIS:       Shawn, you've got to

19             answer his question or it will take all

20             day, we'll be here all day.

21 Q  Let's go back to June 16, 2010, again.  The man

22    that you had the initial encounter with was

23    Allen Rose; you know that don't you?

24 A  Yeah, I know that now.

25 Q  Prior to that date, had you ever met Mr. Rose?

27

1   A   No, not personally, no.

2   Q   Did you know him at all; did you know who he

3       was?

4   A   I didn't know who he was.  I've seen him just

5       because he rides a motorcycle.  I mean, I like

6       motorcycles, I like old cars, I just notice those

7       things.  So, yeah, I've seen him in the

8       neighborhood.  He rides a Harley.

9   Q   Had you and him ever had any conversation before

10      June 16, 2010?

11  A   No.

12  Q   Going to Mr. Rose, tell me exactly how that

13      incident happened with Mr. Rose on that date?

14  A   I was walking with my wife, my dog, had the two

15      kids, my daughter and my grandson, they were on

16      their bicycles, and we had been taking walks for

17      weeks and weeks, same route.

18          And we were going down our street, Dulton, and

19      we got to the intersection of Dulton and Rochelle,

20      and an old canary yellow '55 pickup truck went by,

21      which I was looking at, and then the motorcycle,

22      which I looked at the motorcycle.

23          He went to the intersection of the light, and

24      we're still walking just turning the corner away

25      from them, these vehicles were going the opposite

28

1        direction, and the guy on the motorcycle went to

2        the light and turned around and came back through

3        the carry out.  And we're still walking and we're

4        walking not paying attention anymore, and

5        apparently the guy drove his motorcycle to the

6        very back end of the parking lot and got off the

7        bike.

8            We're walking -- I mean, I heard someone

9        talking or saying something, and we looked back,

10       and it was the guy that was on the motorcycle that

11       was now off the motorcycle walking through yards

12       paralleling us on Rochelle, and saying something to

13       us.

14           So we eventually stopped for a moment to see

15       what he was saying, and he was saying, you can't do

16       that, you can't walk around carrying a gun like

17       that.  Saying, hey, hey, hey, you can't do that,

18       you can't walk around with a gun like that.

19    Q    What did you say?

20    A    I didn't say anything to him at that moment.  My

21       wife had said open carry is legal in Ohio, we're

22       not doing anything wrong, you know, my wife said

23       that.  I was like come on, honey, and kind of

24       grabbed her hand and said let's keep going.  And we

25       started walking away and he still keeps following

29

1    in the yard.  And he's yelling things, and he kept

2    going.  He was kind of being belligerent.

3    Q    What was he yelling?

4    A    He just kept saying, hey, you can't do that, you

5         just can't be walking around the neighborhood with

6         a gun on like that.  And my wife was trying to tell

7         him -- and I'm like, honey, listen, this guy is

8         being aggressive, he's following us, let's just

9         keep moving, let's mind our own business.  You're

10        not going to explain things or change his mind in

11        any way.

12             He kept saying that.  The only thing I said to

13        him was, I said, what are you a cop, are you a

14        police officer, and that's when the profanities

15        flew.  And he started cussing and swearing, and

16        that was it.  I said we're out of here, we kept on

17        walking.

18   Q    During this encounter did you fear for your

19        safety?

20   A    I don't know if I'd necessarily say I feared for

21        my safety, but I was in fear that this guy drove

22        past us, backtracked, came back, and was

23        aggressively on the other side paralleling us,

24        following us.  I didn't see a weapon on him, I kind

25        of felt safe, but it was really weird that some man

30

1      would be approaching a guy with a gun telling him

2      he can't do that and yelling stuff.

3          So I didn't know what his intentions were

4      other than he didn't like the fact that I was

5      carrying a gun and said I couldn't do it, and I

6      just wanted to disengage and keep on moving down

7      the road with my kids.  I had my kids with me, this

8      guy is cussing and swearing.  I don't want my kids

9      hearing that stuff, so I was trying to push

10     everything down the road.

11  Q  Did you reach for your gun at that time?

12  A  No.

13  Q  Did you put your hand on your gun?

14  A  No.

15  Q  You said Mr. Rose did not have a gun?

16  A  I didn't see anything on him, no.

17  Q  When he was yelling and swearing at you -- I'm

18     trying to get this straight -- was he on the

19     motorcycle or was he off the motorcycle?

20  A  He was off the motorcycle.  He had parked it in

21     the carry out, and walked through people's yards

22     following us.

23  Q  Was he on the other side of the street from you at

24     this time?

25  A  Yes.

31

```
1   Q   How long did this incident take?

2   A   How long did it take?

3   Q   Yeah.  How long did it last?

4   A   It wasn't very long, it was really quick.  Maybe

5       30 seconds, the whole thing, walking, him yelling

6       back and forth, my wife engaging him saying it's

7       open carry, me saying are you a police officer, him

8       cussing.  It was just kind of as we were still

9       walking.  I didn't want to have anything to do with

10      the guy.

11  Q   Did you try to explain to him your constitutional

12      right to carry a gun?

13  A   No.

14  Q   Now, after that happened, how long was it before

15      the police came up to you?

16  A   We kept walking our normal route, which took us

17      down Rochelle.  Probably five to eight minutes, it

18      probably takes us to walk to where we were to

19      where the police showed up.  Five to eight

20      minutes.

21  Q   Tell me how that happened.

22          MR. ELLIS:        Excuse me, what

23          happened?

24  Q   Tell me what happened when the police showed up.

25  A   My kids are riding their bikes, there's no
```

32

1        sidewalks or anything like that, so we have them

2        ride up and go up two houses and turn around and

3        keep doing a loop.  So my daughter was coming back

4        and she's like, Daddy, there's a police car coming

5        down the street.  So I got my phone out, got my

6        recorder going.  I kind of anticipated this.  I

7        figured that guy was weird as he was, my wife saw

8        him on the phone up by the street as we're walking,

9        she looked back and he was on the phone.

10   Q   Let me stop you for just a second.  You're talking

11        about Mr. Rose was on the phone?

12   A   Yeah, she saw him on the phone.

13   Q   Go on.

14   A   Then my daughter was turning around and she says,

15        Daddy, there's a police car coming up, okay, honey,

16        thanks, just keep riding your bike.  So I got my

17        phone out and started recording, and shortly

18        thereafter I hear, hey, excuse me, something along

19        those lines.  And we stopped and I had my phone

20        here and a dog leash here, and he said, excuse me,

21        can you turn around, and I turned around.  It was a

22        police officer.

23           MR. ELLIS:     Excuse me for a minute.

24           Would you let the record reflect he was

25           holding his hands in front of him when he

33

1              was describing that.

2    Q    Go on.

3    A    What do you want to know next?

4    Q    What happened next.

5    A    I was turned around and my phone in one hand about

6         this level, shoulder height, and my retractable dog

7         leash in the other hand, my wife is beside me --

8              MR. ELLIS:      The leash is in his

9              right hand and phone in his left hand.

10   A    He said what's your name, and I told him I'm

11        Shawn Northrup, he kept walking closer, he had his

12        hand on his firearm, and he said he's going to

13        remove my firearm.  And I said, okay, go ahead.  He

14        told me turn around and he said if I go for the

15        weapon, he's going to shoot me.  Right then and

16        there my daughter starts balling hysterically.

17        Don't worry, you know.  And he takes my firearm, he

18        has me hand over the dog leash to my wife, which I

19        did, I still had my phone in my hand, he took my

20        gun and he said I could turn around, which I did,

21        and I still had my phone in my hand recording --

22   Q    Hold on for just one second.  Which side of your

23        body was your gun on?

24   A    On my right side.

25   Q    Go ahead continue.

34

| | | |
|---|---|---|
| 1 | A | It was on my right hip.  So he had my firearm and |
| 2 | | tucked it under his arm, left arm, and then he |
| 3 | | said, do you have a driver's license and I said, |
| 4 | | yes, and he said, can I see it.  I'm like, is it |
| 5 | | okay to reach and get it, he said, yep, go ahead |
| 6 | | and get it.  So I got out my wallet and gave him my |
| 7 | | driver's license, and at that point, I had my |
| 8 | | wallet in my hand and phone in my hand still. |
| 9 | Q | How many times did the officer ask you for your |
| 10 | | driver's license? |
| 11 | A | One time. |
| 12 | Q | How long after he asked you did you give it to |
| 13 | | him? |
| 14 | A | Immediately after I asked if I could reach into my |
| 15 | | back pocket and get it out of my wallet because I |
| 16 | | didn't want him shooting me, he already said he was |
| 17 | | going to shoot me.  I didn't want to make any |
| 18 | | sudden moves, I didn't want to give him any reason |
| 19 | | to shoot me, I didn't want to be shot in front of |
| 20 | | my daughter. |
| 21 | Q | Just answer the question, please.  I don't need |
| 22 | | the narrative.  You had already given him your -- |
| 23 | | he had already taken your gun away? |
| 24 | A | Yes. |
| 25 | Q | You didn't have your gun anymore when he asked for |

35

1          your license?

2     A    Correct.

3     Q    Go ahead, what happened after you gave him your

4          license; what did he do, what happened?

5     A    I gave him my license, he looked at it -- the only

6          thing I really said to him at that point was what's

7          this about, and he said he was conducting an

8          investigation, you know, I'm conducting an

9          investigation right now and I'll let you know in a

10         little bit here once I figure stuff out.

11             So I knew right then and there he was

12         conducting an investigation, obviously I'm the

13         object of his investigation.  He just came up,

14         disarmed me, I wasn't doing anything wrong, I

15         wasn't breaking any laws, walking down the street

16         with my kids.  Hadn't done anything recently, so I

17         had my gun and my ID.

18             I did ask him what was going on, and he said

19         I'm conducting an investigation.  And then he asked

20         for if I had a concealed carry permit to carry.

21         And at that point, I said, well, am I free to go,

22         am I under arrest here, and he wouldn't answer me.

23         And he kept on asking questions, do you have a

24         concealed carry permit, and he's being really

25         forceful and really aggressive, and I knew at that

36

1    point he's up to no good.

2        And I said am I free to go and he wouldn't

3    answer.  He turned to my wife and said, does he

4    have a concealed carry permit, and my wife said to

5    him, you've got his gun, you've got his driver's

6    license, you can find out for yourself, something

7    along those lines.

8        Then he came back to me and goes, you know, I

9    can arrest you for inducing panic right now.  Do

10   you have a concealed carry or not.  And I said, I

11   have nothing to say to you, Officer.  Am I free to

12   go and he turned back to my wife, and says, listen,

13   I'll take him to jail, he'll spend the night in

14   jail tonight.  Do you want your husband to go to

15   jail, do you want him to go to jail.

16       And he looked back at me, he's like, I will

17   take you to jail, I will arrest you for inducing

18   panic.  He goes, do you have a concealed carry

19   permit, this is the last time I'm asking you.  And

20   I said, am I free to go.  He goes, okay, you're

21   under arrest, turn around, put your hands behind

22   your back.  I still had my phone and my wallet in

23   my hand, can I give this to my wife.  Handed her

24   the phone, handed her the wallet, and turned around

25   and put my hands behind my back.

37

```
 1              He handcuffed me really tight and I asked him
 2         to loosen them up, which he did something and said
 3         he loosened them up, but I still told him, these
 4         are way too tight.  I don't know if he was doing
 5         that because he was mad at me because I wasn't
 6         answering his questions.  He seemed really
 7         agitated, being really aggressive with me, raising
 8         his voice, being assertive and demanding and stuff.
 9         I was asking him if I was free to go because if I
10         wasn't under arrest, I wanted to leave.
11    Q    So what happened after he put you in handcuffs?
12    A    He did something with the cuffs, but they were
13         like still too tight, and put me in the car.
14    Q    What part of the car?
15    A    In the backseat.
16    Q    Then what happened?
17    A    I sat there in the car.
18    Q    What did you officer do?
19    A    I couldn't hear him, but I could see him walking
20         around doing stuff.
21    Q    Did any other officers come at this time?
22    A    Yes.  I had been in the backseat for a few minutes
23         maybe, and a police car pulled up behind us kind
24         of, and then within a minute or so after that
25         another police officer showed up.
```

38

1    Q    Did you hear what those officers had to say, if
2         anything?
3    A    No, but they were talking quite a bit.
4    Q    What did any of the officers do with you?
5    A    Well, before the other two officers arrived,
6         Officer Bright was asking my wife and doing the
7         finger pointing.  He was probably asking her, did
8         he have a concealed carry permit.  I don't know
9         what he was saying, it was hard to hear, the radio
10        was on in the car, but I could see that he was
11        really grilling her, interrogating her, trying to
12        get information about me or what not.  Now I know
13        after talking to my wife, yeah, that's what he was
14        doing.  And she refused to answer any of his
15        questions.  She told him, you've got his gun,
16        you've got his driver's license, all the
17        information is right there.
18   Q    But you didn't answer my question.  What did
19        Officer Bright eventually do with you or any other
20        officer?
21   A    Well, eventually he would release me after about
22        35, 40 minutes, but in the meantime he was
23        consulting with who I know now was Sergeant Ray, I
24        don't know what his rank is.  I think it's Ray.
25   Q    Right.

1    A    He was talking to him and he came back in his car,

2         got a notebook out, big three-ring binder, big

3         thick thing.  He was back at Sergeant Ray's car

4         leaning in the window, they were flipping through

5         pages in the book.  Sergeant Ray was on the phone

6         because I was turned around trying to watch to see

7         what was going on.  So they did that for quite a

8         while back and forth, and they were talking and

9         talking.  You know, I was just looking out the

10        window.  My wife is standing there and my daughter

11        is crying, you know.  Eventually he did come and

12        let me out of the car and uncuff me.

13   Q    Were you issued any type of citation?

14   A    Yeah.  He gave me a citation for failure to show

15        ID.

16   Q    That's what you think it was?

17   A    Properly identify myself or something like that.

18        It was a general citation.

19   Q    So you weren't taken anywhere by the officers; is

20        that correct?

21   A    No.  I sat in handcuffs in the back of the car.

22   Q    How long did this incident take place; how long

23        did it last?

24   A    It seemed like quite a while, I'm thinking like

25        30, 40 minutes.

40

```
 1    Q    You have all this recorded?

 2    A    I had a lot of it recorded, yeah.

 3    Q    Does your phone show the time beginning of

 4         recording and the time it ended?

 5    A    I don't know.  It was an LG Chocolate phone.  It

 6         wasn't a Smart phone, they didn't have Smart phones

 7         then.  All they had was a record button.

 8    Q    Did you go to court for this citation that was

 9         issued to you?

10    A    Yes.

11    Q    How many times did you appear in court?

12    A    I had to get an attorney, go to court with me, and

13         we went there one time.

14              MR. ELLIS:        How many times did you

15              actually go to court?

16    A    Three times.

17    Q    Well, I'm asking him if he recalls.  You

18         personally were in court three times; is that what

19         you're saying?

20    A    Yes.

21    Q    What was the outcome of that particular charge

22         that they charged you with, failure to produce

23         identification?

24    A    They decided to drop charges.

25    Q    Who made that decision?
```

41

```
 1    A    I don't know.

 2    Q    When you were in court when that decision was

 3         made, was the officer there?

 4    A    Yes, I believe so.  I saw him there the first

 5         time, yeah.

 6    Q    The first time he was there?

 7    A    Yeah.

 8    Q    The last time was he there?

 9    A    I don't recall.

10    Q    That would have been Officer Bright?

11    A    Yes.

12    Q    Let's go back to the handcuff incident.  You

13         produced photographs -- I saw the photographs in

14         your complaint of the marks that they left on your

15         wrists.  Did you receive medical treatment for

16         those wrist marks?

17    A    No, I didn't go to the doctor for that.

18    Q    Did you treat them with anything?

19    A    There's really not much you can do about it.

20         Three fingers up to your index finger go numb,

21         can't really feel them for about three or four

22         days.  Then for the next week to week and a half,

23         maybe two weeks they feel tingly, like pins and

24         needles, like they're asleep, and then you finally

25         get sensation back.
```

42

```
1    Q    Do you have any effects from that handcuffing
2         today?
3    A    I don't believe so, no.
4    Q    You didn't make any request for medical assistance
5         from the police officers, did you?
6    A    No.
7    Q    When the officer was disarming you, where was your
8         wife standing?
9    A    Depends on what point he was disarming me because
10        at one point I was facing him and he told me to
11        turn around, and then she was on my right and she'd
12        then be on my left.  You tell me at which point you
13        want.
14   Q    More importantly, how far away from you was she?
15   A    She was standing right besides me.
16   Q    You're showing arm's length?
17   A    Three or four feet.
18   Q    Was she standing like beside you or was she
19        standing behind you or in front of you?
20   A    She was beside me maybe a foot back maybe, if
21        that, but not behind me, just behind me here.
22   Q    At any point did you try to hand your gun to the
23        officer?
24   A    No, I just followed his instructions.
25   Q    I forgot to ask this question, which I think is
```

43

| | | |
|---|---|---|
| 1 | | kind of important:  What type of weapon did you |
| 2 | | have on that day? |
| 3 | A | It's a Glock firearm. |
| 4 | Q | That is a 9-millimeter; is that correct? |
| 5 | A | Yes, correct. |
| 6 | Q | Was it loaded? |
| 7 | A | Yes. |
| 8 | Q | How many rounds was it loaded with? |
| 9 | A | The magazine holds 17. |
| 10 | Q | You had it loaded with 17 rounds? |
| 11 | A | Yes. |
| 12 | Q | The Glock is a semi-automatic pistol; is that |
| 13 | | correct? |
| 14 | A | Yes. |
| 15 | Q | Is it primarily made of plastic? |
| 16 | A | I don't know.  I guess in layman's terms, yeah, it |
| 17 | | would be plastic, but it was polymer. |
| 18 | Q | How heavy is it? |
| 19 | A | Relatively heavy. |
| 20 | Q | In pounds, would you be able to estimate how heavy |
| 21 | | it is? |
| 22 | A | Not really, I don't think so.  I mean, I could |
| 23 | | look up the specs on it and tell you how much it |
| 24 | | weighs. |
| 25 | Q | When you were carrying the weapon that day, was |

44

1       there a round in the chamber?

2    A  Oh, yeah.

3    Q  Have you ever had any incidents with the police

4       since the incident as far as with carrying your

5       gun?

6    A  No.  I haven't carried openly since then.

7    Q  Have or haven't?

8    A  Have not.

9    Q  And why not?

10   A  Don't want to be harassed, threatened of being

11      shot, I don't want to be shot.  You know,

12      apparently they don't like citizens exercising

13      their rights.

14   Q  Okay.  You've never been shot by the police, have

15      you?

16   A  No.

17   Q  Do you still have your concealed carry permit?

18   A  Yes.

19   Q  Do you carry your weapon concealed these days?

20   A  Yes.

21   Q  When this all was going on, you said you had your

22      dog with you.

23   A  Yes.

24   Q  When the officer disarmed you, took your gun, what

25      happened with the dog, who got the dog?

45

1    A    My wife did, she took the leash.

2    Q    She took the leash?

3    A    Yes.

4    Q    At any time did the officer ask you to give him

5         the leash?

6    A    To give the officer the leash, no.

7    Q    Did the officer ask you to give the leash to your

8         wife?

9    A    Yes, he did.

10   Q    How many times did he ask you to give the leash to

11        your wife?

12   A    One time.

13   Q    Did you do it at that point?

14   A    Absolutely, yes.

15   Q    You were here for the testimony of Officer Bright

16        when he said that you made a furtive movement

17        toward him; do you recall him saying that?

18   A    I was here when he said it, yes.

19   Q    Do you agree with that statement?

20   A    Absolutely not.

21   Q    You at no time made a movement toward your pistol

22        you had on you?

23   A    No, I wasn't going to make any move.  One of the

24        first things he said was if you go for your gun,

25        I'm going to shoot you.  I didn't want to get

46

```
 1          shot in front of my children and my wife in the

 2          streets, so I did everything that he asked,

 3          everything.

 4     Q    When he made that statement to you, if you go for

 5          your gun, I'm going to shoot you, where exactly

 6          were your hands at that point?

 7     A    He had asked me to turn around and put my hands in

 8          the air after I handed over my leash, so the only

 9          thing I had was my phone and an open hand.

10     Q    The open hand was your right hand?

11     A    Yes, correct.

12     Q    Your gun at that point was still on you?

13     A    Yes.

14              MR. ELLIS:      Can you put on the

15              record he had his hands raised indicating

16              what he was doing.

17              MR. MADIGAN:      I have nothing further.

18              MR. ELLIS:      You might want to ask

19              him about the recording because he lost

20              part of it.

21              MR. MADIGAN:      I was going to ask you

22              for it.

23              MR. ELLIS:      Well, no, I've got part

24              of the recording because when he went to

25              re-record, he erased the original
```

47

```
 1                    recording.  You might want to question him
 2                    about that.
 3    Q    I'll ask you about the recording.  Tell me what
 4         happened to the recording that you made.
 5    A    When I got out of the police car, I asked my wife
 6         for the phone because I wanted to make sure it was
 7         still recording and it was.  It was really sunny
 8         that day -- you have to touch the phone to make it
 9         light up brighter so you can see it, and when I did
10         that, it stopped recording, and if you don't press
11         save recording, it does not save it.  So it was
12         gone.  I'm just like I was really mad that I did
13         that.  So I started recording again from that point
14         on, that's what I have, when I got out of the
15         police car.
16    Q    So the recording that you actually have was from
17         after you were handcuffed and put in the car?
18    A    After I was handcuffed and put in the car and then
19         released out of the car.
20    Q    Is that where that recording starts; is that what
21         you're saying?
22    A    Yes.
23              MR. ELLIS:      I have that part and I
24              will give it to you.
25              MR. MADIGAN:      Okay.  I have nothing
```

48

1          further.

2          MR. ELLIS:     Shawn, you can waive

3          signature, but I recommend you reserve

4          your signature.

5          THE WITNESS:    I'll reserve

6          signature.

7          (Deposition concluded at 10:14 a.m.)

8

9

10                   SHAWN C. NORTHRUP

                      - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2    STATE OF OHIO        )
                          ) SS.
3    COUNTY OF LUCAS      )

4              I, Vicki L. Plant, Court Reporter and

5    Notary Public for the State of Ohio, do hereby certify

6    that **SHAWN C. NORTHRUP** was by me first duly sworn; that

7    the testimony given was reduced to stenotype; that the

8    foregoing is a true and correct transcript of the

9    testimony so given; that this deposition was taken at

10   the time and place in the foregoing caption specified.

11             I do further certify that I am not a

12   relative, employee, or attorney of any of the parties

13   or counsel employed by the parties hereto or

14   financially interested in this action, **nor am I or the**

15   **court reporting firm with which I am affiliated under a**

16   **contract as defined in Civil Rule 28(D).**

17             IN WITNESS WHEREOF, I have hereunto set my

18   hand and affixed my notarial seal of office at Toledo,

19   Ohio, this 15th day of January, 2014.

20

21

22

23   _____
                  VICKI L. PLANT
24            Notary Public in and for the
                   State of Ohio

25   My Commission expires August 17, 2016.