ORIGINAL

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

SHAWN C. NORTHRUP,          :
                            :
        Plaintiff,          :
                            :
    v.                      :    Case No:
                            :    3:12-cv-01544-JJH
                            :    Judge Helmick
CITY OF TOLEDO, et al.,     :
                            :
        Defendants.         :


- - -


Deposition of **SERGEANT DANIEL RAY**, a

Defendant herein, called by the Plaintiff as upon

Cross Examination pursuant to the Federal Rules of

Civil Procedure, taken before Vicki L. Plant, Court

Reporter and Notary Public in and for the State of

Ohio, at the offices of Lydy & Moan Ltd.,

4930 Holland-Sylvania Road, Sylvania, Ohio, on

Friday, September 27, 2013, commencing at

3:39 p.m.


- - -




# SEAGATE
Reporting Service, Inc.

405 Madison Avenue, Suite 900  ~  Toledo, OH 43604
Phone: 419-241-2070    Toll Free: 888-419-2070    Fax: 419-241-4718    Web: www.seagatereporting.com

2

# I N D E X

Deposition of **SERGEANT DANIEL RAY:**

| | Page | Line |
|---|---|---|
| CROSS EXAMINATION By MR. ELLIS............. | 3 | 14 |
| DIRECT EXAMINATION By MR. MADIGAN......... | 45 | 14 |
| RECROSS EXAMINATION By MR. ELLIS........... | 46 | 15 |

- - -

## E X H I B I T S

| | Page | Line |
|---|---|---|
| PLAINTIFF'S EXHIBIT 6 MARKED.............. | 20 | 24 |

- - -

## O B J E C T I O N S

Entered by                          Page/Line

NONE ENTERED

- - -

3

```
 1        APPEARANCES:

 2        On behalf of the Plaintiff:

 3        LYDY & MOAN LTD.:
          Daniel T. Ellis
 4        4930 Holland-Sylvania Road
          Sylvania, Ohio  43560  419-517-7741
 5
          On behalf of the Defendants:
 6
          CITY OF TOLEDO DEPARTMENT OF LAW:
 7        John T. Madigan
          One Government Center, Suite 2250
 8        Toledo, Ohio  43604  419-245-1020

 9        Also Present:  Shawn Northrup

10                        -  -  -

11                   SERGEANT DANIEL RAY,

12   being first duly sworn, as hereinafter certified,

13   testified and said as follows:

14                   CROSS EXAMINATION

15   BY MR. ELLIS:

16   Q    Sergeant Ray, could you identify yourself

17        please.

18   A    Sergeant Daniel Ray.

19   Q    And could you tell me how long you've been a

20        police officer?

21   A    Twenty-eight years.

22   Q    You heard, I'm Daniel Ellis, I represent

23        Shawn Northrup.  Have you ever had a deposition

24        taken before?

25   A    I've been at them before.
```

4

| | | |
|---|---|---|
| 1 | Q | But never been on the side of the questions? |
| 2 | A | No. |
| 3 | Q | Under what circumstances have you attended |
| 4 | | depositions? |
| 5 | A | I was at a deposition for a wrongful death, that's |
| 6 | | about it. |
| 7 | Q | That was somebody in a police cruiser? |
| 8 | A | That was behind the Toledo Art Museum, the tasing |
| 9 | | deal. |
| 10 | Q | So you went to one of those depositions? |
| 11 | A | I went to one of those depositions. |
| 12 | Q | What was the purpose of you attending those |
| 13 | | depositions? |
| 14 | A | Good question. |
| 15 | Q | You don't know? |
| 16 | A | I was there. |
| 17 | Q | You do understand that everything you say is going |
| 18 | | to be written down, right? |
| 19 | A | Sure. |
| 20 | Q | If you don't understand my questions, just ask me |
| 21 | | to rephrase it and I'll do it, okay? |
| 22 | A | Okay. |
| 23 | Q | And if you don't understand a question, again |
| 24 | | just ask me to clarify it.  And you understand you |
| 25 | | have to tell the truth just like you're in court, |

5

```
1          right?
2     A    Yes.
3     Q    You do understand you have to answer verbally?
4     A    Yes.
5     Q    At any time you realize any of your answers are
6          incorrect, let me know, and I'll give you the
7          opportunity to correct it?
8     A    Yes.
9     Q    If you don't know, don't remember, please let me
10         know.
11    A    Okay.
12    Q    And do you understand these instructions I have
13         given you?
14    A    Yes, sir.
15    Q    Are you on any mood altering drugs that would
16         prevent you from testifying truthfully,
17         accurately, and fully?
18    A    No, sir.
19    Q    Do you have any illness that prevents you from
20         testifying truthfully, accurately, and fully?
21    A    No, sir.
22    Q    Can you tell me what you did to prepare for your
23         deposition today.
24    A    Today, got up, had breakfast.
25    Q    Did you do anything prior to this?
```

6

| | | |
|---|---|---|
| 1 | A | Yesterday I talked to Officer Bright, and |
| 2 | | basically we just discussed with where it's being |
| 3 | | held, and he asked me, do I go in civilian clothes |
| 4 | | or uniform.  I said, no, we go in uniform. |
| 5 | Q | You haven't talked to anybody else? |
| 6 | A | No. |
| 7 | Q | You haven't talked to John? |
| 8 | A | Not yesterday, no. |
| 9 | Q | At any time prior to this deposition? |
| 10 | A | Of course. |
| 11 | Q | Did you review any documents? |
| 12 | A | With John. |
| 13 | Q | What documents did you review? |
| 14 | A | The paperwork that you sent. |
| 15 | Q | Which was? |
| 16 | A | I don't know what you want to call it, the suit |
| 17 | | itself. |
| 18 | Q | The complaint? |
| 19 | A | Right. |
| 20 | Q | You reviewed the complaint? |
| 21 | A | I went through that, yeah.  It's been a while, |
| 22 | | but, yes, I did. |
| 23 | Q | Anything else? |
| 24 | A | Officer Bright's report. |
| 25 | Q | So you reviewed that? |

7

| | | |
|---|---|---|
| 1 | A | Yes, I did. |
| 2 | Q | When did you review that? |
| 3 | A | That's been a while too to be real honest with |
| 4 | | you. |
| 5 | Q | Any other documents? |
| 6 | A | I don't believe so, no. |
| 7 | Q | What's your date of birth? |
| 8 | A | 6-4-51. |
| 9 | Q | Were you born in Ohio? |
| 10 | A | Toledo, Ohio. |
| 11 | Q | Where are you registered to vote? |
| 12 | A | Fulton County. |
| 13 | Q | So I assume that's where you live? |
| 14 | A | Yes, it is. |
| 15 | Q | Can you give me your educational background. |
| 16 | A | High school. |
| 17 | Q | When did you graduate from high school? |
| 18 | A | 1969. |
| 19 | Q | Can you tell me what high school you graduated |
| 20 | | from. |
| 21 | A | Bedford High School. |
| 22 | Q | Is there any education after high school? |
| 23 | A | I had some college. |
| 24 | Q | Where did you go to college? |
| 25 | A | Owens. |

8

1  Q   What did you take at Owens?

2  A   Law enforcement.

3  Q   And did you complete that program?

4  A   No.

5  Q   What years did you enter and exit Owens?

6  A   I don't recall.

7  Q   Subsequent to Owens, did you have any other

8      education, training?

9  A   Yes.

10  Q   What was that?

11  A   United States Air Force.

12  Q   When did you enter the Air Force?

13  A   1971.

14  Q   When did you leave the Air Force?

15  A   1973.

16  Q   What was your rank when you exited?

17  A   When I exited, I was a buck sergeant.

18  Q   What were you trained in in the Air Force?

19  A   Law enforcement.

20  Q   Can you tell me the training you received as law

21      enforcement in the military.

22  A   In the military.  Basically what they called OJT,

23      on-the-job training.  It scored high enough on my

24      HAP codes for law enforcement that they didn't

25      think it was necessary to send me to any formal

9

```
 1            training.  And I went there and they handed me the
 2            books, read these, and I did, and that was it.
 3       Q    So for the entire two years you were in the
 4            Air Force, were you in law enforcement?
 5       A    Yes.
 6       Q    What was your job in law enforcement; was it a
 7            patrol officer?
 8       A    A patrol officer, yes.
 9       Q    I assume you were on early discharge?
10       A    Yes.
11       Q    Were you in the reserves?
12       A    No.
13       Q    Are you aware that the communications between the
14            dispatch and the police officers are recorded?
15       A    Yes.
16       Q    Do you know what happens to them after they're
17            recorded?
18       A    After they're recorded?
19       Q    Are they retained?
20       A    They're retained, yes.
21       Q    Do you know where?
22       A    No.
23       Q    Have you ever had an incident where you had to go
24            get a copy of a recording?
25       A    I requested.
```

10

| | | |
|---|---|---|
| 1 | Q | How did you do that? |
| 2 | A | Called up the communications bureau, the captain |
| 3 | | or the lieutenant up there, and told him what I |
| 4 | | needed, and they made it. |
| 5 | Q | Do you know how long they retain them? |
| 6 | A | No, sir, I wouldn't have any idea. |
| 7 | Q | You were present during the deposition of |
| 8 | | Officer Bright, correct? |
| 9 | A | Yes, sir. |
| 10 | Q | Anything in the procedures that he said you would |
| 11 | | correct or change? |
| 12 | A | No, sir. |
| 13 | Q | I'll just summarize.  You're normally dispatched |
| 14 | | to a place? |
| 15 | A | Normally, yes. |
| 16 | Q | How do you get dispatched after an officer has |
| 17 | | been dispatched? |
| 18 | A | Well, the dispatcher can either dispatch me or in |
| 19 | | case of a weapons call, I dispatch myself.  It's |
| 20 | | part of our agenda as a command officer.  Any time |
| 21 | | there's a weapon involved or a suicide or an injury |
| 22 | | accident, we're mandated to go.  So I would have |
| 23 | | just told the dispatcher. |
| 24 | Q | So maybe that's what I'll talk about.  Why don't |
| 25 | | we talk about -- you entered the Toledo Police |

11

1            Department when?

2    A      1985, September 20th.

3    Q      Between your discharge from 1973 to 1985, what did

4           you do?

5    A      Let's see, I worked quite a few jobs.

6    Q      Any of them police related?

7    A      Yes.  Not really police related, but through the

8           Toledo Public Schools, but I was not one of their

9           security people.  It was a weird thing.  It was a

10          hall monitor, which I had never heard of before

11          because they didn't have them at Bedford.

12   Q      Do you know when you did that?

13   A      No.  I worked up until I got hired by the police

14          department, but I'm thinking probably from 1982 to

15          when I got hired.

16   Q      When you got hired by the Toledo Police

17          Department, what was your first job?

18   A      Patrol officer.

19   Q      How long were you a patrol officer?

20   A      Sixteen years -- wait a minute, 14 years.

21   Q      And do you know when you were promoted to

22          sergeant?

23   A      October of 1996.

24   Q      What were you promoted to?

25   A      Sergeant.

12

| | | |
|---|---|---|
| 1 | Q | What are the responsibilities of a sergeant? |
| 2 | A | To supervise the patrol officers under his |
| 3 | | command. |
| 4 | Q | What's the job of a patrol officer? |
| 5 | A | It's multifaceted.  I mean, they handle everything |
| 6 | | from the barking dog to a homicide.  I mean, |
| 7 | | respond to all of them.  So I don't know what you |
| 8 | | want me to say. |
| 9 | Q | Well, I guess what I'm asking you is you're |
| 10 | | supervising their conduct.  So what conduct are you |
| 11 | | supervising? |
| 12 | A | We're basically supervising that they do the job |
| 13 | | properly, their demeanor, we field complaints if |
| 14 | | there is one from citizens, make sure that they |
| 15 | | take their calls, and make sure they do the right |
| 16 | | thing at their calls, and complete it. |
| 17 | Q | And I think you said on all firearms and |
| 18 | | homicides, accidents, a supervisor is -- |
| 19 | A | On all weapons calls, injury accidents, fires, and |
| 20 | | suicides. |
| 21 | Q | You're mandated to supervise? |
| 22 | A | Yes.  Mandated to go to the scene, yes. |
| 23 | Q | So on this particular case when you heard a |
| 24 | | firearm was involved, you were told to go or they |
| 25 | | dispatched you? |

13

1   A   No, I probably said I would go.

2   Q   Does a supervisor do the same area?

3   A   I'm on south channel, and I work all the sectors

4       down there which is 5, 6, 7, and 8.

5   Q   So you could be anywhere?

6   A   I could be anywhere.

7   Q   How many supervisors are normally on duty at the

8       same time?

9   A   Anywhere from two to five.

10  Q   And you're all running around in any of those

11      districts based on calls?

12  A   There are supervisors that are assigned to one

13      sector, like 7 Sector would have a 705, 6 Sector

14      would have a 605, there's a 505 and an 805.

15      There's also auxiliary targets.  I mean, another

16      sector -- if all four of those are closed, then

17      there could be an 806 or can be a 706 or a 606 or

18      whatever.

19  Q   I think you were designated 806.

20  A   So that means that there was an 805.

21  Q   So what is the meaning of 806?

22  A   806 means that I'm an extra sergeant.

23  Q   So you're just a floater then?

24  A   Yes, I fill holes.

25  Q   Because it says here, and I'll show you

14

```
 1          Plaintiff's Exhibit 1, it says Daniel Ray, 806.
 2   A    Okay, yep, I was 806.
 3   Q    So you were the floater?
 4   A    Yes.
 5   Q    What continuing education have you had after you
 6          became a police officer?
 7   A    Training on the department and like I said, some
 8          college, going to Owens.
 9   Q    From the time of your employment with the Toledo
10          Police Department in 1985, was it your
11          understanding that open carry was legal in the
12          State of Ohio?
13   A    In 1985, that I was unaware of.  No, sir.
14   Q    When did you first become aware of the open
15          carry?
16   A    I couldn't give a date.  I just knew it was
17          illegal in Toledo.
18   Q    What was the constitutional permissible way to
19          carry a firearm in Toledo then?
20   A    At that point?
21   Q    Yes.
22   A    I believe only with a CCW.
23   Q    There was no CCW.
24   A    I don't know, sir.  I'm telling you right now I
25          don't know.
```

15

1   Q   So at the time you were a police officer from 1985

2       until the CCW was enacted in 2003, you would say

3       there was no permissible way to carry a firearm in

4       Toledo?

5   A   I'm sure there was, but in 1985 we had -- we had

6       a CCW -- we had a carry concealed weapon law in

7       1985.

8   Q   Do you know what it was?

9   A   No.

10  Q   Do you recall if it was unlawful to carry a

11      concealed firearm?

12  A   No, I don't know, sir.

13  Q   Do you recall whether if you got charged with any

14      concealed firearm, there were three affirmative

15      offenses that could be asserted?

16  A   I know there were affirmative offenses.

17  Q   Do you know what they were?

18  A   No, sir.

19  Q   So your understanding was that it was precluded,

20      but there may have been affirmative offenses, but

21      you don't know what they are?

22  A   In 1985, no, sir, I do not.

23  Q   And anytime prior to 2003, do you know what it

24      was?

25  A   To be able to carry a firearm?

| | | |
|---|---|---|
| 1 | Q | Concealed firearm. |
| 2 | A | Carry a concealed firearm, no, I cannot name them |
| 3 | | exactly.  No, sir. |
| 4 | Q | Did you ever hear of the Cline case? |
| 5 | A | No, sir. |
| 6 | Q | Did you ever charge anybody with carrying a |
| 7 | | concealed firearm while you were a patrol |
| 8 | | officer? |
| 9 | A | Yes. |
| 10 | Q | And do you know what the resolutions of those |
| 11 | | were? |
| 12 | A | No, sir. |
| 13 | Q | Do you know how many times? |
| 14 | A | No, sir. |
| 15 | Q | Did you ever charge anybody with carrying an open |
| 16 | | firearm? |
| 17 | A | No, sir. |
| 18 | Q | So was it only concealed? |
| 19 | A | No.  There was also weapons within a public place, |
| 20 | | but I never charged anybody with it. |
| 21 | Q | Ever charge anybody with inducing panic with a |
| 22 | | firearm? |
| 23 | A | No, sir. |
| 24 | Q | As I understand your testimony, you never charged |
| 25 | | anybody openly carry; is that right? |

17

1   A   I can't recall charging anybody openly.

2   Q   You don't recall ever charging anybody?

3   A   I don't recall.

4   Q   After the concealed carry law came into effect,

5       did you ever charge anybody with open carry?

6   A   I don't recall.

7   Q   When was the first time you became aware you could

8       open carry?

9   A   When was the first time I became aware of open

10      carry in Toledo?

11  Q   Yes.

12  A   I don't know 2010, 2011, somewhere in that area

13      probably.

14  Q   How is it that Officer Comes and Officer Bright's

15      understanding is that you can open carry after 2003

16      and yours isn't until 2010?

17  A   Because we're talking City of Toledo versus

18      State of Ohio is all I can figure.

19  Q   Are you aware of the Attorney General's opinion

20      published that says you can open carry in Ohio

21      prior to 2008?

22  A   No, sir.

23  Q   That was never given to the police officers in

24      Toledo?

25  A   No, I'm saying that I'm not aware.

18

| | | |
|---|---|---|
| 1 | Q | So that was never one of these publications? |
| 2 | A | I don't know, sir. |
| 3 | Q | During any part of your continuing education, were |
| 4 | | you told that there's open carry in Ohio? |
| 5 | A | I don't recall, sir. |
| 6 | Q | How do you supervise people if you don't know the |
| 7 | | status of open carry in Ohio? |
| 8 | A | There's more to supervising than just one |
| 9 | | sergeant, sir. |
| 10 | Q | You understand that this incident occurred in |
| 11 | | 2010, right? |
| 12 | A | Okay. |
| 13 | Q | You understand that? |
| 14 | A | Yes, sir. |
| 15 | Q | What was your understanding on June 25, 2010? |
| 16 | A | June 25th? |
| 17 | Q | Yes. |
| 18 | A | That open carry was allowed. |
| 19 | Q | When you say open carry is allowed, can we agree |
| 20 | | that anybody could walk on the street with a |
| 21 | | firearm strapped on their hip and it would be |
| 22 | | legal? |
| 23 | A | Yes, sir. |
| 24 | Q | And they did not have to have it concealed? |
| 25 | A | That's correct. |

19

1   Q   Now, when you arrived at the scene, what did you

2       observe?

3   A   I observed Mr. Northrup sitting in the back of a

4       police car.

5   Q   So when you arrived, he was already under

6       arrest?

7   A   Yes, sir.

8   Q   What did Officer Bright tell you?

9   A   He told me that he had taken his firearm away from

10      him, and placed him in the back of the police car

11      since he made a furtive gesture toward his weapon.

12      I said, okay, that's fine.  And I said what are we

13      going to charge him with, and he said inducing

14      panic.

15  Q   Then what did you do?

16  A   I got on the phone and called the detective

17      bureau.

18  Q   And what did you ask them?

19  A   I asked them -- I gave them the scenario of what

20      went on.

21  Q   What scenario did you give them?

22  A   I told them there was a gentleman walking down the

23      street with a gun on his hip, the officer stopped

24      him.  According to the officer, he made a move

25      towards his weapon, and he disarmed him, and placed

20

```
 1           him in custody in the backseat of the car.
 2      Q    Did you tell him he produced his gun?
 3      A    I don't remember if I even said that, no.
 4           Basically, that's what I told the detective, and
 5           the detective told me that basically to just charge
 6           him with what we charged him with, failing to
 7           produce personal information to a law enforcement
 8           officer or however it reads, how they use that, so
 9           it was the ORC.  We don't use it that much, so
10           that's why it came from the detective bureau.
11      Q    Did you tell them that he had given his driver's
12           license?
13      A    Did I tell the detectives that he gave his
14           driver's license?
15      Q    Yes.
16      A    I don't recall.
17      Q    What detective did you talk to?
18      A    Detective Phil Wauford.
19      Q    How do you spell his last name?
20      A    W-a-u-f-o-r-d.
21      Q    Have you produced your cell phone record to
22           Mr. Madigan?
23      A    Yes, I have.
24                (Plaintiff's Exhibit 6 marked.)
25      Q    I'm handing you what's been marked as
```

1        Plaintiff's Exhibit 6, and if you could identify

2        that for me.

3   A   It appears to be the phone records for June 16th,

4        my cell phone.

5   Q   Can you tell me which is your call to

6        Detective Wauford?

7   A   The second page, the one at the top, and there's

8        another one below it.

9   Q   So that would be the ones at 6/16 at 5:43 p.m. and

10       6/16 at 5:46 p.m.?

11  A   Correct.

12  Q   Can you tell me why you called him back?

13  A   I didn't call him back, he called me.

14  Q   What did he say?

15  A   He told me what to charge him with.

16  Q   So you called him first, told him what the

17       situation was, and he said I'll call you back?

18  A   Correct.

19  Q   Then he called you back?

20  A   Yes.

21  Q   And did you call anybody else during this

22       timeframe?

23  A   No.

24  Q   Regarding this incident?

25  A   No.

22

| | | |
|---|---|---|
| 1 | Q | And the 245-3142 number, where does that go? |
| 2 | A | To the detective bureau front desk. |
| 3 | Q | Was Detective Wauford at the front desk? |
| 4 | A | No. |
| 5 | Q | So you had to ask for him? |
| 6 | A | I had to ask for the supervisor up there. |
| 7 | Q | Is he a supervisor? |
| 8 | A | Yes. |
| 9 | Q | Do you do that often? |
| 10 | A | Once in a while. |
| 11 | Q | Under what circumstances do you have to call the |
| 12 | | detective bureau? |
| 13 | A | They vary. |
| 14 | Q | Why did you call him in this situation? |
| 15 | A | Because there was a weapon involved. |
| 16 | Q | Okay.  Do you feel compelled to charge people |
| 17 | | because they carry a weapon? |
| 18 | A | Not an open carry. |
| 19 | Q | Well, that's what occurred here, right? |
| 20 | A | Open carry, that's what we went on, yes. |
| 21 | Q | Why did you feel compelled to call |
| 22 | | Detective Wauford? |
| 23 | A | Because I wanted to run it past the detective. |
| 24 | Q | What did you run past him then? |
| 25 | A | I gave him the scenario. |

```
 1   Q    Did you say you have to charge him with something
 2        because we arrested the guy?
 3   A    I didn't say we had to charge him with something,
 4        but I gave him the scenario because there was a
 5        weapon involved, and I wanted to make sure that I
 6        was doing the right thing.
 7   Q    You didn't charge him with a weapons violation,
 8        right?
 9   A    No.
10   Q    And you participated in the discussion to create
11        the charge that he was charged with, right?
12   A    Yes.
13   Q    Did you direct Officer Bright what to charge him
14        with?
15   A    Yes.
16   Q    So you're the one that decided what charge he was
17        to be charged with?
18   A    Yes.
19   Q    Why did you feel compelled to make a charge when
20        he produced his ID?
21   A    It wasn't because he produced it, it was because
22        he did not produce his ID to the officer.
23   Q    But he did produce his ID.
24   A    Eventually.
25   Q    Well, does the statute say that you have to do it
```

24

```
 1         in a timeframe?
 2    A    I didn't know there was a timeframe on it, sir.
 3    Q    Did you ask Detective Wauford, did you explain to
 4         him that he did produce his ID?
 5    A    I don't recall.
 6    Q    Were you aware that he charged him because he
 7         didn't give him the CCW?
 8    A    No.
 9    Q    Did you tell him to charge him because he didn't
10         give him the CCW?
11    A    No.
12    Q    Did he tell you that he threatened to put him in
13         jail for inducing panic?
14    A    No.
15    Q    Did he tell you that he -- you weren't there prior
16         to him being put in the back of the car; is that
17         correct?
18    A    No, sir.
19    Q    I think I asked that wrong because no, sir, would
20         imply that you were there.
21    A    No, sir, I was not there.  I answered that once
22         before.
23    Q    You showed up when he was in the car, right?
24    A    Yes, sir.
25    Q    So your understanding of facts is what
```

25

```
 1            Officer Bright told you?
 2    A      Yes.
 3    Q      Did he ever tell you that he threatened to arrest
 4           him?
 5    A      No, sir.
 6    Q      And did he tell you he was going to arrest him
 7           for inducing panic if he did not give him the
 8           CCW?
 9    A      No, sir.
10    Q      Did he tell you that he called him a jerk?
11    A      No.
12    Q      Did he tell you he told his wife she was
13           uncooperative?
14    A      No, sir.
15    Q      Did he tell you he threatened to shoot him?
16    A      No, sir.
17    Q      What exactly did he tell you then?
18    A      He told me exactly what I told you before.
19    Q      But I would like you --
20    A      Again?
21    Q      -- yeah, verse by verse because we kind of lost
22           it.  So exactly what did he tell you that you can
23           recall?
24    A      That I can recall.  I arrived on the scene,
25           Mr. Northrup was in the back of the police car.  I
```

1    walked up to Officer Bright and asked him what was

2    going on.  He told me that when he got there, he

3    made a furtive gesture toward his weapon, and

4    that's why he disarmed him.  I said, okay, fine,

5    that's why he was in the backseat of the patrol

6    car.  I said, what are you going to charge him

7    with, he said inducing panic, and I said, okay.  I

8    walked back to my car, got my phone, and called the

9    detective bureau.

10   Q    You heard him testify just a few minutes ago that

11        he told my client that he was arresting him for

12        inducing panic.

13   A    That's what he told me.

14   Q    He didn't arrest him for doing a furtive motion

15        towards his firearm, did he?

16   A    There's no law against a furtive motion towards

17        your firearm, so how could you arrest him for that.

18        However, it allowed us to disarm him.

19   Q    Well, I don't have a problem with him disarming

20        him, I think that's good police practice.

21   A    I agree.

22   Q    Except in circumstances where you have no probable

23        cause.  Did you ask him what probable cause he had

24        to stop him and question him?

25   A    No, sir, I did not ask him that.

27

| | | |
|---|---|---|
| 1 | Q | Do you know whether he had probable cause? |
| 2 | A | At that time, no, I did not. |
| 3 | Q | Did you at any time say, well, you have to have |
| 4 | | probable cause to stop a guy walking the street |
| 5 | | with his firearm.  What did this guy do for you to |
| 6 | | stop him? |
| 7 | A | I did not ask him that question. |
| 8 | Q | Did you at any time talk to the person that made |
| 9 | | the complaint? |
| 10 | A | No, sir. |
| 11 | Q | Did you ever talk to Officer Comes on what the |
| 12 | | complainant said? |
| 13 | A | I think I directed him to go talk to the phone |
| 14 | | caller. |
| 15 | Q | Did he leave to go do that? |
| 16 | A | I believe so. |
| 17 | Q | Because he testified he just called him on the |
| 18 | | phone. |
| 19 | A | I don't know, sir.  He's in the back from us. |
| 20 | Q | He never got out of his car? |
| 21 | A | I don't know. |
| 22 | Q | Well, did he get out of the car while you were |
| 23 | | there? |
| 24 | A | I don't believe so. |
| 25 | Q | Did you call dispatch and ask what the complainant |

28

```
1          said?
2    A     No.
3    Q     Is that something you'd normally do?
4    A     No.
5    Q     At the time you instructed Officer Bright to
6          charge him with failing to provide his information,
7          did you ask the detective whether that was relating
8          to the CCW?
9    A     No.
10   Q     What is your understanding of what would have
11         happened if you wouldn't have charged Mr. Northrup
12         at all, just let him go?
13   A     That would depend on Mr. Northrup.
14   Q     What do you mean by that?
15   A     Well, we can always release somebody, explain to
16         them what the circumstances are, and an
17         understanding person says, okay, I understand.
18   Q     Did you understand that when you arrest somebody
19         and put him in the back of the car, you have to
20         do that under the circumstances of probable
21         cause?
22   A     Yes.
23   Q     You understand that part of your supervisory
24         obligations are to make sure that your police
25         officers follow the laws; is that right?
```

29

1    A    Yes.

2    Q    In what manner did you insure that Officer Bright
followed the law in placing Mr. Northrup under
arrest?

5    A    From the information that the officer gave me.

6    Q    Which was essentially that he was walking down the
street and made a furtive motion towards his
firearm, so he put him under arrest?

9    A    No.  The information that he gave me is he was
arresting him for inducing panic.

11    Q    Did he give you the facts and circumstances under
which he was inducing panic?

13    A    No, sir.

14    Q    And did you ask him for those facts and
circumstances?

16    A    No, sir.

17    Q    Why is that?

18    A    I didn't feel it was relevant at the time.  The
officer there, he was the one there making the
decision.

21    Q    What's your understanding of what inducing panic
is?

23    A    Causing alarm to others.

24    Q    Did you ask him what he did to cause alarm to
others?

30

```
 1    A    I did not, sir.

 2    Q    You would agree with me though that if a person is

 3         walking down the street with a firearm openly

 4         carrying, he's walking down the street, that is not

 5         inducing panic?

 6    A    Correct.

 7    Q    Besides these two calls to the detective, did you

 8         talk to anyone else about this incident at the

 9         scene?

10    A    No.

11    Q    When you go to a scene as a supervisor, what's

12         your primary responsibility?

13    A    My primary responsibility as a supervisor is to

14         supervise the officer that's there.  First off,

15         protect life, that's primary for any police

16         officer.  And then once again, supervise the

17         officer and make sure the officer is not doing

18         anything that would be inappropriate, demeanor

19         wise, this type of thing.

20    Q    Well, you understand don't you that if a police

21         officer arrests somebody without cause, that's an

22         issue for the Toledo Police Department?

23    A    Could be.

24    Q    What do you mean could be?

25    A    Could be.  I don't know, sir.  I'm not an
```

31

| | | |
|---|---|---|
| 1 | | attorney, sir.  I don't know. |
| 2 | Q | Well, you're a supervisor. |
| 3 | A | I'm a supervisor. |
| 4 | Q | Well, is it lawful for the police officers to use |
| 5 | | their authority as a police officer, and arrest |
| 6 | | people for no reason? |
| 7 | A | No, sir. |
| 8 | Q | Is it okay for a police officer to grab a guy off |
| 9 | | the street and throw him in the back of a car? |
| 10 | A | No, sir. |
| 11 | Q | Is it all right for a police officer to stop |
| 12 | | people walking down the street and ask them |
| 13 | | questions? |
| 14 | A | A police officer can ask anybody questions, sir. |
| 15 | Q | Well, can they approach somebody and ask them |
| 16 | | questions as an intent to charge them with |
| 17 | | something? |
| 18 | A | I don't know, sir, |
| 19 | Q | You don't know that? |
| 20 | A | How would I know that.  It depends on the |
| 21 | | circumstances. |
| 22 | Q | Well, I'm asking with your training and your |
| 23 | | experience as a supervisor, is it all right for |
| 24 | | your police to go and question people walking down |
| 25 | | the street that aren't doing anything for the |

```
 1            purposes of charging them with a crime?
 2     A      No.
 3     Q      If you saw that happen, what would you do as a
 4            supervisor?
 5     A      I would reprimand the officer.
 6     Q      You wouldn't help him cover it up?
 7     A      No, sir.
 8     Q      And you never told Officer Bright that we have to
 9            charge him with something because you've already
10            arrested him?
11     A      Possibly.  He's under arrest, so there are other
12            charges.  Just because someone is charged with one
13            thing, that does not mean that's the primary
14            charge.
15     Q      And he was only charged with one thing here,
16            right?
17     A      Apparently.
18     Q      Well, you're the one that prepared and charged him
19            with that.  Did you find anything else?
20     A      Find anything else what?
21     Q      To charge him with, other crimes.
22     A      No, sir.  At the time, I think the inducing panic
23            was the charge.
24     Q      Under what facts?
25     A      The facts that we had at the time.
```

33

```
 1    Q    What facts are you relying on?

 2    A    The facts that were related by the officer.

 3    Q    What, that he's walking down the street with a

 4         firearm?

 5    A    That's only part of it.

 6    Q    What's the rest of it?

 7    A    The rest of it is furtive movement for his weapon,

 8         the other part was he was refusing to give any

 9         information to the officer when he was asking him.

10    Q    Now, you believe that an officer could approach me

11         and interrogate me for the purposes of charging me

12         when I haven't done anything yet?

13    A    First off, I don't know any officers that

14         interrogate except detectives.

15    Q    How about asking questions?

16    A    Asking questions.  Any police officer can ask a

17         question of anyone, sir.

18    Q    If you ask him questions for the purposes of

19         charging him with a crime, do you have an

20         obligation to advise him of his Miranda rights?

21    A    Depends on what type of crime it is.

22    Q    How about after you throw him in the back of the

23         car with handcuffs on?

24    A    No, sir.

25    Q    You don't think you have to Mirandize the guy?
```

34

1   A   No, sir.

2   Q   You don't think at the time of an arrest, you have

3       to Mirandize somebody?

4   A   Not for a misdemeanor, sir, no.

5   Q   Is inducing panic a misdemeanor or a felony?

6   A   A misdemeanor.

7   Q   What class misdemeanor?

8   A   I don't know, sir.

9   Q   Would you agree with Officer Bright's testimony

10      that because he was sent to the scene with a man

11      carrying a firearm in the street is sufficient to

12      justify a stop?

13  A   Talk to the person, yes, it is.

14  Q   And do you believe that's sufficient probable

15      cause?

16  A   Probable cause is used for arrests, not to stop

17      and talk to somebody, sir.

18  Q   Well, you heard the testimony, he said he was

19      operating under the opinion that he had induced

20      panic because a man was carrying a firearm.  Is

21      that sufficient to stop and talk to somebody to

22      charge him with that crime?

23  A   Is that sufficient?

24  Q   Is that sufficient probable cause as you

25      understand probable cause in your 27 years of

35

1          experience?

2     A    What he had was reasonable suspicion to begin with

3          to talk to the individual where he could develop

4          probable cause.

5     Q    Reasonable suspicion is generated by what facts as

6          you understood them?

7     A    Reasonable suspicion is someone calling in and

8          making a complaint.  If you've got a suspicious

9          person and someone calls in, says there's a guy

10         crawling around the house, that's reasonable

11         suspicion.  We can stop and talk to that

12         individual, and through talking to him, it

13         becomes apparent that there's probable cause for

14         an arrest.

15    Q    I call you and say, I see a guy walking down the

16         street with a firearm, nothing more.  Is that

17         reasonable suspicion for you to have probable cause

18         to go up and talk to him?

19    A    It's reasonable suspicion to talk to him.

20    Q    On what basis?

21    A    On what basis, because we got a complaint on him.

22    Q    So I can see somebody walking down the street and

23         because I call, that gives you the opportunity in

24         your mind for probable cause to exist because

25         that's reasonable suspicion?

36

| | | |
|---|---|---|
| 1 | A | That's not probable cause, sir. |
| 2 | Q | Reasonable suspicion is part of probable cause; is |
| 3 | | it not? |
| 4 | A | It leads to probable cause, yes.  There's a |
| 5 | | reasonable suspicion to believe that a crime has or |
| 6 | | is about to be committed. |
| 7 | Q | That's probable cause, that's the definition? |
| 8 | A | Yeah, that's probable cause. |
| 9 | Q | So you're saying that because somebody calls and |
| 10 | | says, he's walking down the street with a firearm, |
| 11 | | that's probable cause to interrogate him or ask him |
| 12 | | questions? |
| 13 | A | It's not probable cause to interrogate him, |
| 14 | | however, it does allow us to talk to the person. |
| 15 | | He can walk away. |
| 16 | Q | Were you told that he asked to walk away and he |
| 17 | | was told he was not free to leave? |
| 18 | A | No, sir. |
| 19 | Q | Do you think threatening to shoot him and |
| 20 | | disarming him is an opportunity for him to walk |
| 21 | | away?  Would you walk away under those |
| 22 | | circumstances? |
| 23 | A | I don't know if that even happened, sir.  I don't |
| 24 | | know, I wasn't there. |
| 25 | Q | You heard him say I disarmed him and told him -- |

37

```
 1              I might have said I'd shoot him, I might have said

 2              that; did you hear that?

 3    A         I'm not sure about that.

 4    Q         Well, let's say he took his firearm and told him

 5              to turn around and raise his hands; do you think

 6              he's free to leave?

 7    A         Not at that point.

 8    Q         When he tells him to turn and raise his hands,

 9              he's not free to leave, is he?

10    A         Probably not.

11    Q         Do you think a reasonable person would think he

12              could leave?

13    A         No, not at that point.

14    Q         If I put it in terms of legal ease, you believe

15              the articular reasonable suspicion is a call from

16              911 to dispatch you, that's sufficient?

17    A         It's sufficient because you have a complaint.

18    Q         Do you know that the complainant said, I'm not

19              sending a crew out if it's okay to carry openly?

20    A         No, sir.

21    Q         Would that change your position if the complainant

22              told him that?

23    A         Would that change the position? Yeah, I'd tell

24              him that -- well, wait a minute. Rephrase the

25              question.
```

38

1    Q    The complainant told the dispatcher, I'm not
2         sending out a crew if it's okay to carry openly.
3    A    The complainant told the dispatchers he was not
4         sending out a crew?
5    Q    He said, I'm not asking to send out a crew if open
6         carry is okay in Ohio.
7    A    Okay, that's fine.
8    Q    That's what the dispatcher knew.
9    A    That's not what we knew.
10    Q    But that's my point.  You're saying that because
11         she sent you out on a call, that gives you probable
12         cause.  I'm asking:  What's the reasonable
13         suspicion that he engaged in a crime or suspicious
14         of a crime?
15    A    At that point he's just a suspicious person, and
16         we can stop and talk to anyone, sir.
17    Q    Why is he suspicious?
18    A    Because of the complaint.  We have to follow
19         through on a call.  We can't just say, okay, we're
20         just not going to go.
21    Q    I understand that.  Did you ask the dispatcher
22         what he was doing?
23    A    No.
24    Q    He's just walking down the street with a dog,
25         that's what he was doing.

39

| | | |
|---|---|---|
| 1 | A | Don't know, sir.  We go because the dispatcher |
| 2 | | sent us. |
| 3 | Q | You didn't see this display here, on your |
| 4 | | terminal?  It's on yours too? |
| 5 | A | Sure it is. |
| 6 | Q | It says that white male walking his dog on |
| 7 | | Rochelle carrying a handgun out in the open, |
| 8 | | okay? |
| 9 | A | Yeah. |
| 10 | Q | Now, you believe that that's enough to create |
| 11 | | suspicion to talk to a guy? |
| 12 | A | That's enough to talk to somebody.  Yes, sir, it |
| 13 | | is. |
| 14 | Q | What would you talk to him about? |
| 15 | A | Say how you doing, sir, what's going on.  Tell me |
| 16 | | what's going on.  We got a call on you, that's |
| 17 | | basically how we open it up. |
| 18 | Q | You wouldn't observe him for a while? |
| 19 | A | No, sir. |
| 20 | Q | You'd just go up and start talking to him? |
| 21 | A | Yes, sir. |
| 22 | Q | And when he says I am free to leave and you don't |
| 23 | | say you can go, do you think you can continue to |
| 24 | | talk to him? |
| 25 | A | I didn't say that, sir. |

40

1   Q    When that happens, what do you think should

2        occur?

3   A    If he said I'm free to leave, he should have

4        left.

5   Q    You would agree with me, I think, that without

6        probable cause, you're not able to stop or question

7        or arrest anyone?

8   A    No, that's not true.  Probable cause is for an

9        arrest.  You can stop someone to talk to them, yes,

10       you can approach them at any time.

11  Q    So you think that without probable cause, you can

12       stop to talk to anyone and arrest them?

13  A    I didn't say that, sir.  You said that.  I said

14       that you can stop to talk to anyone you want to.

15  Q    Do you think Officer Bright stopped my client to

16       talk to him just because he happened to be walking

17       down the street or to charge him with a crime?

18  A    He was sent there by the dispatcher to talk to

19       him, and see what's going on.

20  Q    He went there to investigate whether a crime had

21       been committed?

22  A    Possibly.

23  Q    Why was he sent there then?  What's the whole

24       purpose then?

25  A    The dispatcher sent him.  They have priorities up

41

1      there and they take a look and they dispatch the

2      crews.  The crews go and they determine what needs

3      to be done.

4    Q  Do you understand that probable cause comes from

5      the knowledge of the police officer on the scene?

6    A  Yes, in most cases, and some don't.

7    Q  If you were sent to a scene of a man walking down

8      the street, walking his dog with his wife and two

9      children with a firearm on his hip and doing

10     nothing more, would you observe him or just stop

11     him?

12   A  I would talk to him.

13   Q  So you would stop him.

14   A  I would talk to him.

15   Q  If he was doing that without dispatch, you would

16     not talk to him?

17   A  Without dispatch, I probably wouldn't talk to him.

18     I'd probably just wave to him.

19   Q  Why is that?

20   A  Because it's different, you're not dispatched to

21     it.

22   Q  So if I understand what you're saying, and I think

23     I'm finally getting it.  If the dispatch sends you,

24     you have to go talk to them?

25   A  Absolutely.

42

```
1   Q   That's your view?

2   A   That's my view.  If we get dispatched, we go out.

3       That's what we get paid to do is to be nosey.

4   Q   I understand that.  And the part of being nosey is

5       to observe somebody, isn't it?

6   A   We can observe as you're walking up to them and

7       observe them as you're driving up to them.  There's

8       no timeframe.

9   Q   At some point you know the guy isn't doing

10      anything wrong, and you have to call the detectives

11      to try to find something, right?

12  A   I'm not sure.  I called because there was a weapon

13      involved, just to make sure I knew exactly what I

14      was supposed to do.

15  Q   I don't understand that.  What are you asking him

16      about?

17  A   I called up, I explained exactly the scenario that

18      the officer gave to me.

19  Q   And he wanted to charge him with inducing panic.

20  A   He wanted to charge him with inducing panic.

21  Q   What did the detective say?

22  A   After we discussed it, the detective said, hold

23      on, I'll call you back, he called me back and said,

24      no.  All you've got is the failure to disclose

25      personal information or whatever it is.
```

43

1   Q   I understand it's failure to disclose personal

2       information, which you both used at the scene

3       because I can hear you talking too.

4   A   Right.

5   Q   Okay.  Now, that's not the same as failing to give

6       your ID, is it?

7   A   No.

8   Q   Were you aware and did you hear Officer Bright say

9       to him that I'm giving you this ticket because you

10      refused to tell me whether you had a CCW?

11  A   I don't recall that.

12  Q   You don't recall hearing that?

13  A   No, I don't.

14  Q   You don't recall him saying that?

15  A   I don't recall.

16  Q   Were you present at the point in time when he gave

17      him the ticket?

18  A   Yeah, I was standing back.

19  Q   Did you see him?

20  A   No.

21  Q   So you couldn't hear what he said to him?

22  A   No.

23  Q   In this particular scenario once dispatched, you

24      don't think it was prudent for the police officers

25      to observe him for a while and say he was just

44

| | | |
|---|---|---|
| 1 | | walking down the street with his kids? |
| 2 | A | No, sir. |
| 3 | Q | So you think he should have stopped him and |
| 4 | | interrogated him until he could arrest him? |
| 5 | A | I didn't say that, you said that.  I said he could |
| 6 | | stop him and talk to him. |
| 7 | Q | Okay.  Were you there when Mr. Northrup complained |
| 8 | | of his license being broken? |
| 9 | A | No. |
| 10 | Q | You don't remember saying to him that it was |
| 11 | | broken when he first handed it? |
| 12 | A | I may have. |
| 13 | Q | How did you make that determination? |
| 14 | A | That I may have said that to him? |
| 15 | Q | Yes. |
| 16 | A | Because I may have said that to him. |
| 17 | Q | How did you make the determination that maybe it |
| 18 | | was broken when he handed it to him when you |
| 19 | | weren't there? |
| 20 | A | I don't know, sir. |
| 21 | Q | Now, when you're supervising Officer Bright, did |
| 22 | | you hear my client complain of the handcuffs being |
| 23 | | too tight? |
| 24 | A | No, sir. |
| 25 | Q | You didn't see the ligature marks? |

45

1  A    Not at the scene, no, sir.

2  Q    And you would agree with Officer Bright's

3       testimony that you need to have a thumb between the

4       handcuffs?

5  A    It's usually the fingertip.

6  Q    Did you speak with anyone else at the scene

7       besides Mr. Northrup or Officer Bright?

8  A    I don't think so.

9  Q    Did you talk to Mrs. Northrup?

10 A    I don't recall talking to her.

11          MR. ELLIS:        I don't have any more

12          questions.

13                      -  -  -

14              DIRECT EXAMINATION

15 BY MR. MADIGAN:

16 Q    Sergeant Ray, in your course of being a police

17      officer, approximately how many people have you put

18      in handcuffs?

19 A    A thousand or more.

20 Q    Using the procedure which you said is the proper

21      one, which is a finger between the cuffs, is it

22      possible for a person to have ligature marks if

23      you've done that procedure correctly?

24 A    Absolutely.

25 Q    And why is that possible?

1    A    Because they pull on the handcuffs and they push

2         on the handcuffs.  Some people literally make those

3         marks.

4    Q    Sergeant Ray, Officer Bright testified as to

5         furtive movement, and in this case it was furtive

6         movement with a person armed with a gun.  What is

7         the police officer's training as far as how to deal

8         with that situation when he sees a furtive movement

9         in his presence?

10   A    A furtive movement like that toward a handgun, the

11        officer would have been justified in drawing his

12        weapon and then disarming the individual.

13                  MR. MADIGAN:     I have nothing further.

14                            - - -

15                  RECROSS EXAMINATION

16   BY MR. ELLIS:

17   Q    Would he have been justified in shooting him?

18   A    Simply from furtive movement?

19   Q    Yes.

20   A    No.

21   Q    And you heard him testify that his firearm was

22        clipped shut, right?

23   A    Correct.

24   Q    Does it make any sense to make a furtive movement

25        and cooperate with Officer Bright in the manner

47

```
 1        that he did?

 2   A    I don't know, sir, that's up to him.

 3                MR. ELLIS:        I have nothing further.

 4                MR. MADIGAN:      We'll waive signature.

 5                (Deposition concluded at 4:34 p.m.)

 6                (Signature waived.)

 7                      -  -  -

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2    STATE OF OHIO      )
                         ) SS.
 3    COUNTY OF LUCAS    )

 4              I, Vicki L. Plant, Court Reporter and

 5    Notary Public for the State of Ohio, do hereby certify

 6    that SERGEANT DANIEL RAY was by me first duly sworn;

 7    that the testimony given was reduced to stenotype; that

 8    the foregoing is a true and correct transcript of the

 9    testimony so given; that this deposition was taken at

10    the time and place in the foregoing caption specified.

11              I do further certify that I am not a

12    relative, employee, or attorney of any of the parties

13    or counsel employed by the parties hereto or

14    financially interested in this action, nor am I or the

15    court reporting firm with which I am affiliated under a

16    contract as defined in Civil Rule 28(D).

17              IN WITNESS WHEREOF, I have hereunto set my

18    hand and affixed my notarial seal of office at Toledo,

19    Ohio, this 11th day of October, 2013.

20

21

22

23              _____
                VICKI L. PLANT
24              Notary Public in and for the
                         State of Ohio

25    My Commission expires August 17, 2016.
```