IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Shawn C. Northrup | ) | Case No.: 3:12-CV-01544 |
| | ) | |
| Plaintiff, | ) | Judge: Jeffrey J. Helmick |
| | ) | |
| v. | ) | **AFFIDAVIT OF DENISE** |
| | ) | **NORTHRUP** |
| City of Toledo, et al. | ) | |
| | ) | [Daniel T. Ellis (0038555)] |
| | ) | |
| | ) | LYDY & MOAN, LTD. |
| | ) | 4930 N. Holland-Sylvania Road |
| | ) | Sylvania, OH 43560-2149 |
| | ) | Direct Dial: 419-517-7741 |
| | ) | Telephone: 419-882-7100 |
| | ) | Facsimile: 419-882-7201 |
| | ) | |

Denise Northrup, upon her oath and subject to the penalties of perjury, testifies, swears and affirms the following to be true, based upon her best recollection and own personal knowledge:

1. I am an adult, over 21 years of age and competent to testify to facts contained in this Affidavit.

2. I am Shawn Northrup's wife.

3. I am licensed to carry a concealed firearm in the State of Ohio.

4. Around 5:00 on the evening of Wednesday, June 16, 2010, my husband and I went on a leisurely walk around our neighborhood with our daughter Sydney (12 years old), our grandchild Zalas (10 years old) and our dog, a 9 lb. Yorkie named Gizmo. We had routinely done this for several months. Both children were on bicycles while my husband had the dog on his leash.

5. My husband was openly carrying a firearm, in a holster, as allowed by state and federal laws.

6. We walked southwest on Dulton Drive, and as we neared the end of Dulton Drive, we saw a man on a motorcycle driving south on Rochelle Road. The man looked our way and drove past us to the intersection of Rochelle Road and Hill Avenue. He turned right onto Hill Avenue and turned right again into the parking lot of the carry out on the corner. As we turned north onto Rochelle Road, the man parked his motorcycle, he stood on the other side of the street and started yelling that Shawn couldn't "carry a firearm in the open like that." My husband said, "Open carry is legal." The man continued to follow on the other side of the road, yelling that my husband "could not carry a firearm openly like that." I said, "Sir, open carry is legal in Ohio." The man continued yelling and we disengaged from any further discussions with him.

7. We did not respond to his continued comments and walked away, heading north on Rochelle Road. When we approached Bapst Avenue, I turned around and noticed the man was still watching us. After turning on to Bapst Avenue, houses blocked us from the man's view. We then turned north onto Hayes Road and continued on this street across Nebraska Avenue.

8. While walking down Hayes Road, a police car came driving up behind us, heading north. My husband and I moved to the east side of the street and told Sydney and Zalas to ride along the side of the street in front of us to allow the car space to pass. The police car stayed behind us. The officer behind the wheel (Officer Bright) got out of his car and called out to us as he stood by his car. We turned around to face the officer and he called out to us again asking, "Sir, what is your name?"

9. Sydney and Zalas were behind Shawn and me on their bicycles. Shawn was holding on to Gizmo's leash.

    a. Officer Bright had his hand on his sidearm, ready to draw.
    b. Officer Bright asked Shawn to identify himself. Shawn verbally responded with his name.
    c. Officer Bright told Shawn to hand the dog's leash to me and put his hands up. Shawn put his hands up over his head like signaling a field goal. The officer said, "Keep your hands up and don't make any sudden moves towards your gun, or I will shoot you." As Officer Bright walked towards us, he loudly repeated this statement several times in front our children.
    d. Shawn assured Officer Bright that he would not be touching his gun. Our daughter started crying and the officer walked toward us with his hand on his sidearm.
    e. Shawn handed the dog's leash to me as instructed by Officer Bright.

10. Shawn had immediately complied with the officer's instructions and put his hands up. Officer Bright said he was going to take possession of Shawn's firearm for his safety and for my husband's safety. Shawn did not move, and allowed Officer Bright to remove his firearm from its holster. Officer Bright then asked for Shawn's driver's license. Shawn asked if he could reach back and get it out of his wallet, and the officer told Shawn he could. Shawn slowly removed his wallet from his back pocket.

While looking for his driver's license, Shawn asked the officer if he was free to leave or being arrested. The officer only responded to these questions by telling Shawn to get his driver's license out. Simultaneously, I asked what was going on. Shawn handed Officer Bright his driver's license and again asked if he was free to leave. The officer told him no. Officer Bright now had my husband's firearm and his driver's license.

11. Shawn complied with all of Officer Bright's instructions without delay and made no movements toward his firearm or any sudden movements at any time. My husband kept his hands up the entire time, except to hand the dog's leash to me when ordered to do so by Officer Bright, and to remove his wallet to get his driver's license pursuant to Officer Bright's instructions.

12. I again asked the officer what was going on. He said he was doing an investigation, to stay where we were and he would be right back. Officer Bright walked to his police car and called in on his radio. When Officer Bright came back over, he said they had received a call about a man walking his dog with a firearm. I told him we did nothing wrong, and I explained about the man who had approached and followed us while yelling Shawn could not openly carry a firearm. I explained we had walked away and completely disengaged from any discussion with the man. Officer Bright interrupted me and asked Shawn if he had a CCW.

13. I asked again why was he doing this, we did nothing wrong. Officer Bright informed Shawn that by openly carrying a firearm, he was inducing panic. Shawn told the officer that open carry was permissible and legal in Ohio. The officer agreed that was correct, but said again that Shawn was inducing panic.

14. My husband asked if he was being detained or was under arrest. Officer Bright asked if Shawn had a CCW. Shawn again asked if he was under arrest. The officer only responded by asking a 2nd time if Shawn had a CCW. Officer Bright said it would help with the investigation, and asked a 3rd time if Shawn had a CCW. Shawn asked a 3rd time if he was free to go, or being detained or under arrest. Officer Bright said that if Shawn didn't answer his question about his CCW, he would arrest Shawn for inducing panic and take him to jail to spend the night. Shawn told the officer that he had nothing further to say. The officer again threatened arrest. Shawn asserted his right to remain silent and said he would not answer any more questions.

15. Officer Bright told Shawn he was placing Shawn "under arrest for inducing panic." Officer Bright told Shawn to turn around and place his hands behind his back. Shawn handed me his wallet and cell phone and complied with the officer's order without saying anything.

16. The officer put handcuffs on my husband and walked him to the police car. As they walked to the car, Shawn asked Officer Bright to call a superior officer to the scene. Officer Bright said that a superior officer was already on the way.

3

17. Officer Bright told Shawn to get into the police car. My husband told Officer Bright that the handcuffs were too tight. The officer again told Shawn to get into the police car. My husband repeated that the handcuffs were cutting off the circulation to his hands. The officer told Shawn that he had loosened the handcuffs, but Shawn again stated that they were too tight. Officer Bright put Shawn into the back seat of the car.

18. Our daughter was crying again, and we stood by the police car. Sydney asked if Dad was going to jail and I said that he was, but to not worry because we would get him out.

19. As I was trying to calm our crying daughter, Officer Bright came over to me. Officer Bright showed no concern for my daughter's distress and continued to behave as though she were not there. Officer Bright told me that my husband was being a jerk and stated that if Shawn had just shown his concealed carry license, this whole situation could have been avoided. Officer Bright said that if Shawn had a CCW, we could have been on our way in 30 seconds, but instead he was being a jerk, refusing to answer the officer's questions, and would have to spend the night in jail for inducing panic.

20. Officer Bright asked me if my husband had a CCW. I told him it was up to my husband to answer, and that since he had my husband's driver's license and firearm, he could check himself. I told Officer Bright that my husband was not being a jerk. I explained again that we had done nothing wrong, that we had walked away from a man who was harassing and following us.

21. Officer Bright said he knew what happened but he wanted to know if Shawn had a CCW because he was trying to do an investigation. He said he knew my husband was probably openly carrying "to express his Second Amendment rights," but he just wanted to know if Shawn had a CCW. I informed Officer Bright that my husband carried a firearm for protection as we had been approached by a pit bull on similar walks in the past.

22. Officer Bright again asked me if Shawn had a CCW. I told Officer Bright that since he had Shawn's driver's license, he could check for himself. Officer Bright seemed irritated and told me I was being uncooperative. I replied that I was not being uncooperative, but it was not my responsibility to tell him anything and he had more than enough information about Shawn to check for himself.

23. After I informed Officer Bright he had the necessary information to check for himself, Officer Bright walked over to the 2nd police cruiser that just pulled up. I assumed this was the supervisor Officer Bright had said was already on the way and later learned it was Sgt. Ray.

24. Officer Bright and Sgt. Ray talked for quite some time. After talking for a significant time, they walked over to Officer Bright's car and let my husband out of the back seat and removed the handcuffs. Shawn asked both officers if he was free to leave. Sgt.

Ray told Shawn no. Officer Bright told him no, he needed to stay. Shawn walked over to stand with me and the children.

25. Officer Bright got into his car. Sgt. Ray went back to his car. Sgt. Ray then exited his car and walked back over to the passenger side of Officer Bright's car. They talked while leafing through the pages of a 3-ring binder. Sgt. Ray was talking on a cell phone.

26. Sgt. Ray eventually walked back around Officer Bright's car to where Shawn and I were standing. Shawn stated open carry was legal. Sgt. Ray agreed but stated that since someone had called about a man with a gun, they had to respond. Sgt. Ray said if Shawn would have just given Officer Bright his CCW permit this whole thing could have been avoided. I said, "My husband cooperated with Officer Bright by giving him his firearm when requested and driver's license, so he had everything he needed." Sgt. Ray walked back to his car.

27. After some time passed another police car pulled up, but that officer did not get out of his car.

28. Finally, Officer Bright and Sgt. Ray approached us. Officer Bright told my husband he was being issued a citation for "failure to disclose personal information" because Shawn had refused to answer the officer's questions regarding whether he had a CCW permit.

29. Shawn responded that he had refused to answer questions after he was told he was not free to leave and was told he was under arrest. Officer Bright then said that the citation was "in lieu of arrest." This confused me, as Officer Bright had already placed my husband "under arrest for inducing panic," and he had handcuffed him and put him in the back seat of his police car.

30. Officer Bright handed Shawn a clipboard with the citation and asked him to sign it. He said this was not admitting guilt, just acknowledging that Shawn had been informed of the court date. Officer Bright told Shawn that he would have to appear in court.

31. My husband signed the citation and Officer Bright gave him a copy. Officer Bright put the clip board back his police car and then asked if he had given Shawn his driver's license back. Shawn said no. Officer Bright retrieved the clipboard then detached Shawn's drivers license and handed it back.

32. Shawn immediately noticed that his driver's license had been broken and told Officer Bright and Sgt. Ray that his license was broken. Almost in perfect unison, both officers stated that "it was like that" when Shawn gave it to him, but Sgt. Ray wasn't present when Shawn gave it to Officer Bright in the first place. Shawn stated that it had not been broken when he handed it to Officer Bright and they were both being unprofessional.

5

33. When Shawn then asked about his firearm, Officer Bright retrieved it and handed the firearm, one loose round and the magazine back to Shawn. Both officers turned and got into their cars and we proceeded to walk back home.

    Further affiant sayeth not.

_____
Denise Northrup

Sworn to before me and subscribed in my presence this **27th day of March, 2014**.

_____
Notary Public

KELLY LYNN RUHLY
NOTARY PUBLIC - OHIO
MY COMMISSION EXPIRES 07-13-2018

Plaintiff's Exhibit C - Affidavit of Denise Northrup    000006