

# SEAGATE

## Reporting Service, Inc.

405 Madison Ave., Suite 900
Toledo, OH 43604

Local
419-241-2070
Toll Free
888-419-2070

www.seagatereporting.com

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | | |
|---|---|---|
| SHAWN C. NORTHRUP, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No: |
| | : | 3:12-CV-01544-JJH |
| | : | Judge Helmick |
| CITY OF TOLEDO, et al., | : | |
| | : | |
| Defendants. | : | |

&mdash; &mdash; &mdash;

Deposition of ALAN ROSE, a Witness herein,

called by the Plaintiff as upon Cross Examination

pursuant to the Federal Rules of Civil Procedure,

taken before Vicki L. Plant, Court Reporter and

Notary Public in and for the State of Ohio, at the

offices of City of Toledo Department of Law, One

Government Center, Suite 2250, Toledo, Ohio, on

Thursday, February 6, 2014, commencing at 1:30 p.m.

&mdash; &mdash; &mdash;

I N D E X

Deposition of ALAN ROSE:

                                           Page/Line

CROSS EXAMINATION By MR. ELLIS.............  3    13

- - -

E X H I B I T S

                                           Page/Line

PLAINTIFF'S EXHIBIT 1 MARKED............... 26    10

- - -

O B J E C T I O N S

Entered by                                 Page/Line

MR. MADIGAN................................  8    16

- - -

```
 1      APPEARANCES:

 2      On behalf of the Plaintiff:

 3      LYDY & MOAN LTD.:
        Daniel T. Ellis
 4      4930 Holland-Sylvania Road
        Sylvania, Ohio  43560  419-517-7741
 5
        On behalf of the Defendants:
 6
        CITY OF TOLEDO DEPARTMENT OF LAW:
 7      John T. Madigan
        One Government Center, Suite 2250
 8      Toledo, Ohio  43604  419-245-1020

 9                      - - -

10                  ALAN ROSE,

11 being first duly sworn, as hereinafter certified,

12 testified and said as follows:

13                  CROSS EXAMINATION

14 BY MR. ELLIS:

15 Q   Mr. Rose, my name is Dan Ellis, and I'm an

16     attorney for Shawn Northrup.  This deposition is an

17     opportunity for me to ask you some questions about

18     the facts and your knowledge about what occurred

19     that day, okay?

20 A   Okay.

21 Q   Have you ever had a deposition taken before?

22 A   Yes.

23 Q   Under what circumstances?

24 A   I believe it was about 2004.

25 Q   What was the purpose of the deposition?
```

```
 1 A    I had a motorcycles accident.  A woman pulled out

 2      in front of me, I hit her, it was her fault, and

 3      there was a deposition concerning that.

 4 Q    Have you ever had any others?

 5 A    No.

 6 Q    You understand that everything you say will be

 7      recorded by the court reporter?

 8 A    Yes.

 9 Q    If you don't hear a question, if you don't

10      understand a question, will you let me know so I

11      can either repeat it or rephrase it?

12 A    Okay.

13 Q    Do you understand you've given an oath to tell the

14      truth?

15 A    Yes.

16 Q    And that you should answer the questions fully,

17      accurately, and truthfully just as if you're

18      sitting in front of a judge or jury?

19 A    Yes.

20 Q    If at any time you realize that one of your

21      earlier answers is incorrect, will you let me

22      know?

23 A    Yes.

24 Q    And I'll give you an opportunity to supplement and

25      correct it.  If you don't know or don't remember
```

```
 1        information necessary to answer the questions,

 2        just tell me.  Do you understand these

 3        instructions?

 4 A      Yes.

 5 Q      Are you on any medications or mood altering drugs

 6        that would prevent you from testifying fully,

 7        accurately, and truthfully today?

 8 A      No.

 9 Q      Do you have any illness that would prevent you

10        from testifying fully, accurately, and truthfully

11        today?

12 A      No.

13 Q      Can you tell me what you did to prepare for

14        today's deposition.

15 A      What I did to prepare?

16 Q      Yes.

17 A      Nothing.

18 Q      Have you discussed the subject matter of this

19        deposition with any party other than your

20        attorney?

21 A      No.

22                MR. MADIGAN:     Correct, that he

23                discussed it with me.

24 A      I wanted to know --

25 Q      Have you talked with Mr. Madigan then?
```

1  A    Yes, we have talked.

2  Q    Can you tell me where that conversation took

3       place.

4  A    It took place here.

5  Q    When did that take place?

6  A    Today.

7  Q    And can you tell me the substance of the

8       conversation.

9  A    He really was just asking me about what I had

10      remembered, and things like that.

11 Q    What did you tell him?

12 A    Well, I told him I didn't really remember too much

13      about what happened.

14 Q    Did you talk with anyone else besides John?

15 A    No.

16 Q    Have you reviewed any documents?

17 A    No.

18 Q    Did you listen to any audio tapes?

19 A    The 911 call was played for me.

20 Q    Who played that for you?

21 A    John.

22 Q    When did he play that for you?

23 A    Today.

24 Q    Did you also previously today talk to John about

25      your testimony?

```
 1 A    He called me on the phone to set up some kind of

 2      meeting, that he wanted me to come in for a

 3      deposition or that you wanted me to come in for a

 4      deposition.  It was a short conversation.

 5 Q    Did you also go through the facts in that

 6      conversation?

 7 A    Not really, no.

 8 Q    Can you give me your full name.

 9 A    Alan Rose.

10 Q    What is your permanent residence address?

11 A    City of Toledo, 438 Hayes.

12 Q    What's your date of birth?

13 A    4-10-1955.

14 Q    And your place of birth?

15 A    Toledo.

16 Q    And are you registered to vote?

17 A    Yes.

18 Q    What's your educational background?

19 A    Just have a GED.

20 Q    And are you presently employed?

21 A    Yes.

22 Q    Can you tell me where?

23 A    City of Toledo.

24 Q    What do you do for the City of Toledo?

25 A    I'm a water treatment operator out at the water
```

```
 1        plant.

 2 Q      What does that entail?

 3 A      That entails bringing the water in, putting

 4        chemicals in it, processing the water, and cleaning

 5        it.

 6 Q      Have you ever been convicted of a felony or a

 7        misdemeanor?

 8 A      No felonies, probably a misdemeanor.

 9 Q      Do you recall when that occurred?

10 A      I think I had one a couple years ago.  It happened

11        to be a dispute with me and she's now an ex-wife,

12        wife at the time.

13 Q      Was it domestic?

14 A      Yes.  It had something to do with an argument at

15        the home.

16               MR. MADIGAN:     I'm going object unless

17               it relates to a theft offense.

18 Q      Was it like disorderly conduct or something?

19 A      It was something like that.

20 Q      Have you also been convicted of aggravated

21        menacing?

22 A      I may have years and years ago, I may have.

23 Q      Would that have been in 2004?

24 A      It's possible.

25 Q      Have you ever had a civil protection order placed
```

1     against you?

2  A  Yes.

3  Q  Can you tell me when.

4  A  I'm going to say 2010 when me and my wife were

5     going through a divorce.

6  Q  Did that result out of the same incident?

7  A  Yes.

8  Q  Prior to that incident, did you ever apply for a

9     concealed carry permit?

10 A  Yes.

11 Q  Were you granted a concealed carry permit?

12 A  I've had a concealed carry permit for nine years

13    now.

14 Q  Do you have one presently?

15 A  Yes, sir.  It's in my wallet.

16 Q  Did you apply for your concealed carry permit

17    almost as soon as the law was enacted?

18 A  It wasn't too much after the law, yes.

19 Q  So you've renewed it?

20 A  Yes, it's been renewed.

21 Q  Have you ever been denied a concealed carry

22    permit?

23 A  No.  I will go ahead and add this.  When me and my

24    wife was having the problems, I couldn't stop her

25    from going down and saying whatever she wanted to,

1          and put that protection order against me.  The

2          sheriff did send me a letter to return the license,

3          I did return the license.  When the case was over

4          and there was nothing about it, you know, I was

5          told to go pick it back up.

6  Q      So they suspended it for the timeframe?

7  A      Just for the time period pending the outcome.

8  Q      Have you ever been in the military?

9  A      No.

10 Q      What is your understanding of your rights to carry

11         a firearm?

12 A      My understanding is if I have a concealed carry

13         permit, I'm allowed to carry a handgun, but I

14         have to keep it concealed.  And there are certain

15         places where I can't carry the handgun, just as in

16         here, Government Center, or somebody has a sign

17         posted.

18 Q      Are you aware of the rules and regulations that

19         apply to open carry?

20 A      No, I wasn't I should say.

21 Q      Are you aware today?

22 A      Yes.

23 Q      How did you become aware?

24 A      After this incident -- well, the police officer at

25         the end of this incident, the police officer

1    notified me that it is okay, I told him okay, and

2    then I also went in -- maybe not that day, but I

3    did when I got on the computer checked it out,

4    found out it is legal.

5 Q  And that was after the incident with

6    Mr. Northrup?

7 A  Up until that I didn't know it was legal.

8 Q  Have you ever been on probation?

9 A  I'm going to say years ago when I was younger.

10 Q  Now, did you make a 911 call to the police about

11    my client carrying a firearm?

12 A  Yes.

13 Q  Can you tell me where you were when you noticed he

14    was carrying a firearm.

15 A  I had seen him walking around prior to that day

16    carrying it out in the open a few times.  When I

17    did make the call, I was at a friends's house,

18    she lives on Rochelle.  She was telling me how

19    the young kids, the grand kids were asking her

20    about this gentleman carrying a gun around out in

21    the open, and saying, well, he's not a police

22    officer, Grandma, what's he carrying a gun around

23    for.  So that's kind of where this whole thing got

24    started.

25 Q  So prior to calling the police, you had seen my

```
 1       client walking around the neighborhood?

 2 A     Yes.

 3 Q     And he was openly carrying?

 4 A     Yes.

 5 Q     At any time did he threaten you?

 6 A     No.

 7 Q     At any time did he inappropriately handle his

 8       firearm?

 9 A     No.  I never seen him take it out of the

10       holster.

11 Q     Do you recall how many times you saw him

12       around the neighborhood?

13 A     I'm going to say a couple.

14 Q     Now, you live on Hayes, right?

15 A     Yes.

16 Q     He walks by Hayes frequently?

17 A     Yes.

18 Q     At least he did that summer?

19 A     Yes, he did.

20 Q     Now, were you riding a motorcycle when you first

21       saw him on the day you called the police?

22 A     I had my motorcycle when I was at my friend's

23       house who I told you, that I was talking about, I

24       had the bike, yes.

25 Q     You weren't driving the bike when you first
```

```
 1      encountered my client?

 2 A    No.  I was -- me and her were in the driveway.  I

 3      had rode the bike over there, parked it in the

 4      driveway, it was nice outside.

 5 Q    What driveway would that be?

 6 A    A friend of mine's.

 7 Q    What's the address?

 8 A    I'm going to only be guessing here, I think

 9      40 Rochelle, 20 Rochelle, I'm not sure what her

10      address is.

11 Q    Are you familiar with the intersection of Dalton

12      and Rochelle?

13 A    Yes.

14 Q    How far is it from there?

15 A    It's right there.

16 Q    Did you drive your motorcycle by my client, turn

17      around in the convenience store, and come back?

18 A    No.

19 Q    You did not get off your motorcycle and then

20      proceed to the side of the convenience store, and

21      yell to them?

22 A    No.  I was already at her house with my bike

23      parked.  I had been there for several minutes

24      talking to her when your client walked by.  I never

25      got back onto my bike until I went home.
```

1  Q    So your testimony would be that you were in the

2       driveway with your friend; is that correct?

3  A    Yes.

4  Q    What is your friend's name?

5  A    Debbie Wise.

6  Q    Can you spell her last name.

7  A    W-i-s-e.

8  Q    Do you know her phone number?

9  A    I'm not sure of her phone number.  Her and her

10      husband have now moved to Missouri because of his

11      job.  He worked for Ford, and he was laid off here

12      and now he's in Missouri.

13 Q    Do you know where in Missouri?

14 A    I think she told me Liberty.

15 Q    Do you know when they moved?

16 A    No.  Sometime last summer, end of summer, I'm not

17      sure.

18 Q    You understand -- did John tell you when he was

19      talking with my client, he said you passed him on

20      your motorcycle; did he tell you that?

21 A    I think there was something about me riding the

22      motorcycle.

23 Q    And that you came back around from the convenience

24      store and parked your motorcycle.  Did John tell

25      you that?

1 A    No.  John didn't ask me anything about what I was

2      riding.

3 Q    But you were riding your motorcycle that day,

4      correct?

5 A    I was riding my motorcycle that day.

6 Q    You have a Harley?

7 A    Yes.

8 Q    What kind of Harley?

9 A    Just a Harley Springer.

10 Q    So how close to the convenience store parking lot

11      was your friend's house?

12 A    There's the convenience store parking lot,

13      heading north there's one house, she's the second

14      house.

15 Q    Can you tell me as you saw my client, what you

16      did.

17 A    As I saw your client?

18 Q    Yes.

19 A    Well, my friend was talking to me when she seen

20      him coming around the corner, and I think he was

21      coming off of Dalton and turning on to Rochelle

22      walking.  She started telling me about the gun

23      and the kids, how it had bothered the kids, and

24      how in the past it had bothered some neighbor's

25      kids.

```
 1        So I walked out there because I was curious
 2   about carrying his gun in the open.  So I went out
 3   there just to ask him about what's with carrying
 4   the gun out in the open.  I mean, I have a permit,
 5   I always keep mine concealed.  I didn't have one on
 6   me that day, but I went out there to ask him about
 7   it.
 8 Q Did you yell to him and tell him you can't carry
 9   like that?
10 A I don't think I said that, no.
11 Q Well, that's what my client said you said and his
12   wife, so you would dispute that, correct?
13 A I think I would probably dispute that because I
14   don't know the facts about carrying a gun out in
15   the open.
16 Q That's not my question.  Did you say to him, you
17   can't carry it like that?
18 A I don't remember saying that.
19 Q Do you remember what you said to him then?
20 A This is going to be kind of hard to say what I
21   said to him because I don't have the advantage
22   of -- I didn't think that this was ever going to
23   come back and I would have to answer a question
24   about it.  I think I asked him -- now I'm not
25   saying I did -- I think I asked him about him
```

1     carrying the gun out in the open, what was that

2     about.  And I'm saying that because that was my

3     whole reason to go talk to him.

4 Q   And did his wife answer you?

5 A   I don't believe I heard her say anything.

6 Q   So you believe my client responded to you?

7 A   I don't remember if he said anything, but the

8     thing that I do remember about it, he was like

9     standoffish, like he wasn't going to discuss it

10    with me.

11 Q  So he didn't talk to you?

12 A  Because I can't remember what was said, I don't

13    know if he said any short thing to me, but I know

14    he was standoffish and didn't want to talk to me

15    about it.

16 Q  Do you know what his wife said to you?

17 A  I don't remember his wife saying anything.

18 Q  So there was no conversation, just walked by you;

19    is that what happened?

20 A  Yeah.  He just wanted to keep on going on his

21    way.

22 Q  So you didn't call him any names, didn't swear?

23 A  If anything like that was said, I don't remember.

24 Q  So you didn't curse at him?

25 A  If that happened, I don't remember.

Page 18

```
 1 Q    And you don't remember him saying you can carry

 2      open in Ohio?

 3 A    I certainly don't remember him saying that.

 4 Q    Do you remember anybody saying that?

 5 A    No.

 6 Q    So you basically didn't have a conversation?

 7 A    I'll tell you what.  I can't sit here and honestly

 8      tell you everything -- like I told John, I didn't

 9      think this was going to come back and be something

10      I was going to be asked about.  After that day, I

11      thought it was over with, but it was such a nothing

12      kind of conversation, that after the police officer

13      called me back and told me that it's legal for him

14      to do that, I forgot the whole incident.

15 Q    And do you remember arguing with the police

16      officer?

17 A    No.

18 Q    So when the police officer said you also disputed

19      you could carry open in Ohio, you don't remember

20      that; is that correct?

21 A    The police officer said what?

22 Q    That you argued with him about carrying openly in

23      Ohio; that would be incorrect also?

24 A    You're saying the police officer said that to me?

25 Q    Yes, on the telephone conference.
```

1 A   That I argued with him about that?

2 Q   Yes.

3 A   I would have to hear that conversation, but I

4     don't know if I argued with him or if I disagreed

5     with open carry?

6 Q   Well, did you tell him you disagreed with open

7     carry?

8 A   Again, without hearing any of the conversations, I

9     don't remember, but knowing me I would think that I

10    may have told him -- if I did say anything like

11    that, it would be more like I may have disagreed

12    with open carry.

13 Q  Why did you call 911 if you didn't have any kind

14    of a conversation or dispute with my client?

15 A  Because I didn't know it was lawful to carry your

16    gun on the side like that, and it seemed to be

17    bothering the kids in the neighborhood.  And I

18    thought, well, in order for me to find out about

19    this, I need to call and have the police -- I mean,

20    because your client made absolutely no effort to

21    want to talk to me and say, this is my right, this

22    is your right, this is our right.

23 Q  How would you react if somebody confronted you and

24    said you can't carry like that?

25 A  I would try to explain to them that according to

```
 1      the law, if I was doing that, yes, you can do it.

 2      I would try to inform them.

 3 Q    Let me just explain to you that both my client and

 4      his wife are going to testify that they tried to

 5      explain that to you, and your testimony is that

 6      that would be incorrect; is that right?

 7 A    Well, I can't help what your clients are going to

 8      say.  I mean, I don't even know if -- if they

 9      stopped, they stopped for a second and they kept on

10      going, and they just blew me off.

11 Q    Do remember my client asking you whether you were

12      a police officer?

13 A    He never asked me if I was a police officer.  He

14      knew damn well I wasn't a police officer.

15 Q    So your testimony is that his wife did not say to

16      you that it's okay to carry in Ohio; is that

17      correct?

18 A    I'm just saying I don't remember if his wife said

19      anything, but I don't remember her saying

20      anything.

21 Q    Just so you and I are clear, if she testifies that

22      she said that, you don't dispute it, you just don't

23      remember it; is that correct?

24 A    I don't remember it, so I don't think I could

25      really dispute it.
```

```
 1 Q    When you called 911, did you tell them you didn't

 2      want to send a crew out?

 3 A    I think when I was talking to 911, I told them

 4      about a guy carrying a gun out in the open.  As I

 5      understand it, the woman said maybe he could do

 6      that.  I'm like, if he can do that, then there's no

 7      use sending -- I wouldn't be interested in sending

 8      the police out, but then I believe that she didn't

 9      know.

10 Q    John played you the 911 tape; do you recall

11      that?

12 A    I believe she didn't know.  So since she didn't

13      know --

14 Q    Why don't I play you the 911 tape.

15 A    Go ahead and play it.

16 Q    Did he play it for you?

17 A    Yeah.

18 Q    Do you recall that she told you it was okay if he

19      had a concealed carry permit?  If you don't

20      remember that's okay, I'll play it for you.

21 A    Go ahead and play it for me.

22              (The following 911 recording played:)

23              DISPATCHER:      911.

24              CALLER:          Yeah, I have a guy

25              walking down the street here carrying a
```

Page 22

```
1                    gun out in the open.

2          DISPATCHER:      Where is this?

3          CALLER:          It's on Rochelle.  He's

4          walking a dog.

5          DISPATCHER:      Is it a rifle or a

6          handgun?

7          CALLER:          A handgun, and he's

8          telling me it's legal to carry out in the

9          open.

10         DISPATCHER       If you have a CCW.

11         CALLER:          You don't have to

12         conceal it?

13         DISPATCHER:      I'll get a crew out

14         though.  Is he white, black, or Hispanic?

15         CALLER:          I'm not going to call a

16         crew out if it's legal to carry a gun out

17         in the open.

18         DISPATCHER:      Because I'm not an

19         officer.

20         CALLER:          All right.  He's white.

21         DISPATCHER:      And you said he's

22         walking his dog?

23         CALLER:          Yeah, on Rochelle Drive.

24         DISPATCHER:      All right.  Got them

25         notified.
```

```
 1            CALLER:          Okay.  I'll be watching

 2            the guy.

 3            DISPATCHER:      Okay.  Bye-bye.

 4            (End of 911 recording.)

 5 Q   Was that you on the tape?

 6 A   Yes.

 7 Q   Would you agree that that truly and accurately

 8     depicts your call with the 911 operator?

 9 A   Yes.

10 Q   Does that refresh your recollection?

11 A   Yes.

12 Q   Now, did you wish to send a crew out?

13 A   Did I wish?  Yes, I believe I did because she

14     sounded like she wasn't sure because she's not a

15     police officer.

16 Q   So your interpretation was she's not a police

17     officer, so I'll send a crew out; is that right?

18 A   It sounded like to me she didn't really know the

19     law.

20 Q   You didn't either, right?

21 A   No.

22 Q   Now, at the time that you encountered my client,

23     who was with him?

24 A   I'm going to assume here that it was his wife and

25     child, a woman and a child.
```

1 Q    Do you remember whether there was one or two

2      children?

3 A    That's a good question because I never thought no

4      more about it after that day.  Two.

5 Q    Were they riding their bikes or were they

6      walking?

7 A    I'm having a hard time remembering if there was

8      exactly two.  I know there was one, I think it was

9      a little girl.  So I'm going to have to say I don't

10     know.

11 Q   Do you remember whether the little girl was riding

12     a bike or was she walking?

13 A   I'm just going to say I saw a child walking and I

14     don't remember anything after that.

15 Q   Did they have an animal with them?

16 A   A dog, I guess.

17 Q   So there were at least three people that you

18     recall; is that correct?

19 A   There was three or four.

20 Q   And at the time you saw them, what were they

21     doing?

22 A   Just walking.

23 Q   And did you engage them first or did they engage

24     you?

25 A   I walked out to talk to them to ask them about

```
 1      handgun wearing in the open.
 2 Q    So you went to engage them; is that correct?
 3 A    Yes.
 4 Q    At any time prior to you engaging them, had they
 5      done anything that was suspicious to you?
 6 A    No.
 7 Q    Did they commit any crime that you know of?
 8 A    No.
 9 Q    After they went by you, were they hostile toward
10      you?
11 A    I don't remember what the gentleman said to me.  I
12      don't remember if it was hostile or not.
13 Q    Were you hostile toward them?
14 A    I don't remember what I said to them other than
15      asking about the gun.
16 Q    Do you recall whether you yelled?
17 A    No, I don't remember.
18 Q    Do you recall whether you cursed?
19 A    If I did, I don't remember.
20 Q    Is cursing part of your normal vocabulary?
21 A    I try not to make it.
22 Q    Is it though?
23 A    It's not normal.
24 Q    At any time as they're walking by, did you feel
25      threatened?
```

```
 1 A    No.

 2 Q    So after they walked by, they just continued to

 3      walk; is that correct?

 4 A    Yes.

 5 Q    You live on Hayes; is that correct?

 6 A    Yes.

 7 Q    And on occasion did they walk by your house as

 8      well?

 9 A    Yes.

10              (Plaintiff's Exhibit 1 marked.)

11 Q    Mr. Rose, I'm going to hand you what's been

12      marked Rose Exhibit Number 1.  Take a minute to

13      look at that.  Have you had an opportunity to look

14      at it?

15 A    Yes.

16 Q    Is that the intersection of Rochelle and Dalton?

17 A    Yes, it appears to be.

18 Q    On the left-hand side is the convenience store and

19      the parking lot?

20 A    Yes.

21 Q    The second driveway is where you were; is that

22      correct?

23 A    Yes.

24 Q    It would be the one on the left that has a grey

25      roof and a little brown storage facility in the
```

```
 1      back?

 2 A    No.  I believe there's a house here that you can't

 3      see.  Her house is the one with the black roof

 4      that's before the house that you mentioned.

 5 Q    You think there might be one under the trees there

 6      that I just can't see?

 7 A    Yeah, I think there's a house there.

 8 Q    So you were in that driveway?

 9 A    Yes.

10 Q    When you first observed my clients, were they

11      coming down Dalton?

12 A    I don't think I seen them until after they turned

13      the corner, started coming up Rochelle.

14 Q    They were on the right side of the road; is that

15      correct?

16 A    Yes.

17 Q    It would be the east I think?

18 A    Yeah.

19 Q    So you were on the west side of the road; is that

20      correct?

21 A    Yes.

22 Q    And you never left the driveway, did you?

23 A    No.

24 Q    You never crossed the street?

25 A    No.
```

Page 28

1 Q   They were walking on one side of the road and you

2     were on the other?

3 A   No, I never left Deb's yard.

4 Q   So then you just kind of yelled to them across the

5     street; is that right?

6 A   Yes.  I walked down to the end of the driveway

7     and --

8 Q   And yelled to them?

9 A   Said something to them.

10 Q   Do you recall a yellow 1955 car going by just

11     before you did that?

12 A   A yellow 1955?

13 Q   Canary yellow.

14 A   I don't believe so, and I don't know that I've

15     ever seen a car like that in the neighborhood.

16 Q   A pickup truck I believe it was.

17 A   I don't remember that.

18 Q   Would you say that by the time they were past that

19     driveway, perhaps the next driveway, your encounter

20     with Mr. Northrup was completed?

21 A   Yes, because he was making no effort to explain to

22     me about the right to carry the gun.  So, I mean, I

23     don't think he even stopped walking while I was

24     talking to him.  He didn't want to talk to me about

25     it, and so I seen it was of no use, so I stopped

Page 29

```
 1        and walked back up to my friend Deb's.  We was
 2        standing up by her house, on the side of her
 3        house.
 4  Q     Is that when you called the police?
 5  A     I was really curious about carrying the gun in the
 6        open and I wanted to find out about it, and that's
 7        when I called the police, went in her house and
 8        called the police.
 9  Q     So you think you called the police to get
10        information about criminal activity?
11  A     I don't know if you're trying to put me in some
12        kind of a trick here or something, but I didn't
13        think the guy was doing anything criminal, but I
14        didn't know if it was legal to carry a gun out in
15        the open, so maybe that is a criminal act.
16  Q     But you believed it was not right at the time you
17        called them?
18  A     I didn't know, and I would like to have the police
19        inform me.
20  Q     You don't call 911 -- you understand 911 is an
21        emergency line, correct?
22  A     Yes.  Well, I don't know, I didn't take the time
23        to look up another police number.
24  Q     I understand.  As far as I can tell from your
25        testimony, there wasn't any crime going on and
```

1       there wasn't anything going on except him walking

2       down the road with his kids; is that right?

3 A     Yes.

4 Q     You tried to engage him and you're saying he

5       didn't engage you; is that correct?

6 A     That's absolutely correct.

7 Q     You don't recall whether his wife engaged you,

8       right?

9 A     I don't remember her, no.  I mean, I'm at the

10      disadvantage here.  These folks evidently can

11      remember this stuff because they have an agenda

12      here.  And as far as I was concerned, the whole

13      incident was nothing, it was over, and I didn't

14      think no more about it.

15 Q    In fact, you had the agenda; did you not?  They

16      didn't have any, they were walking down the road,

17      weren't they?

18 A    My agenda was just for someone to give me the

19      knowledge of whether it was right or wrong.

20 Q    How long have you been carrying a firearm?

21 A    I think I've had a permit for about nine years.  I

22      don't carry it that much, but I have the permit to

23      carry it.

24 Q    How long have you owned a firearm?

25 A    Longer than that, I don't know, 20 years.

```
 1 Q   Do you belong to any organizations like the NRA or
 2     anything?
 3 A   No.
 4 Q   Are you a hunter?
 5 A   No.
 6 Q   So you're more of a sports shooter?
 7 A   No.  I do go out and target shoot, but my whole
 8     purpose for when I got involved in getting a gun is
 9     just for self protection around the home.
10 Q   Do you believe that's important?
11 A   With what's going on in society, yes.
12 Q   So you think it's important that you should be
13     able to be armed to defend your home?
14 A   Yes.
15 Q   Do you carry concealed sometimes?
16 A   Sometimes.
17 Q   What makes you decide when you're going to carry
18     concealed?
19 A   That's a very good question.  I don't think I have
20     a reason whether I'm going to or not.
21 Q   You just carry it when you feel like it?
22 A   I don't consciously think that I have a reason
23     when I leave the house and I carry the gun.
24 Q   So sometimes you carry?
25 A   Yes.
```

```
 1 Q    And you took the steps so that you would be

 2      permitted to carry in Ohio, correct?

 3 A    Yes.

 4 Q    You took the class work, correct?

 5 A    Yes.

 6 Q    Do you go to any of the conceal carry websites and

 7      look at their information?

 8 A    No.

 9 Q    After this incident, you said you went and did

10      some research on the Internet; is that right?

11 A    I went on there to look up about open carry in

12      Ohio.

13 Q    What did you find out?

14 A    I found out that you can do it.

15 Q    Have you ever done it since then?

16 A    No.  I was just curious after the police told

17      me, went on there to look, to double check, found

18      out it was, and found -- that was the end of it

19      for me.

20 Q    Let me see if you and I can agree on this.  When

21      you called the 911 operator, you believed that you

22      could not carry openly in Ohio; is that right?

23 A    I'm going to tell you this again.  I didn't know

24      if you could or couldn't, and that's why I was

25      looking for someone to tell me if it was legal or
```

1     not.

2 Q   You weren't trying to get my client in trouble

3     because he ignored you?

4 A   No.

5 Q   After they left, you figured it was over?

6 A   I stayed at Deb's house and they continued on

7     walking, and I just stayed there.  I don't know how

8     much longer it was, I was still at Deb's house when

9     the police officer called me back, and then he

10    explained to me about it.  Maybe I did say that I

11    don't really agree with open carry, but that was

12    just my opinion, but, you know, if it's the law,

13    it's the law.

14 Q  Well, have you ever done any research on your

15    Constitutional rights to bear arms in Ohio?

16 A  Not really.

17 Q  You don't personally know my client?

18 A  No.

19 Q  You don't know his wife?

20 A  No.

21            MR. ELLIS:      I don't have any more

22            questions.  Thank you.  That's it.

23            MR. MADIGAN:     Alan, you have the right

24            to read this deposition over after it's

25            typed up, and maybe make any corrections

Page 34

1              or changes or whatever to it.  If you want

2              we can do that, or you can waive it and

3              say, no, I'll go with whatever is on

4              there.

5              THE WITNESS:      I'll waive it.

6              (Deposition concluded at 2:24 p.m.)

7              (Signature waived.)

8                      - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 C E R T I F I C A T E

2 STATE OF OHIO      )
                     ) SS.
3 COUNTY OF LUCAS    )

4              I, Vicki L. Plant, Court Reporter and

5 Notary Public for the State of Ohio, do hereby certify

6 that ALAN ROSE was by me first duly sworn; that the

7 testimony given was reduced to stenotype; that the

8 foregoing is a true and correct transcript of the

9 testimony so given; that this deposition was taken at

10 the time and place in the foregoing caption specified.

11             I do further certify that I am not a

12 relative, employee, or attorney of any of the parties

13 or counsel employed by the parties hereto or

14 financially interested in this action, nor am I or the

15 court reporting firm with which I am affiliated under a

16 contract as defined in Civil Rule 28(D).

17             IN WITNESS WHEREOF, I have hereunto set my

18 hand and affixed my notarial seal of office at Toledo,

19 Ohio, this 14th day of February, 2014.

20

21

22

23                         VICKI L. PLANT
                     Notary Public in and for the
24                         State of Ohio

25 My Commission expires August 17, 2016.